AT

## DUBUQUE, APRIL TERM, A. D. 1883.

IN THE THIRTY-SEVENTH YEAR OF THE STATE.

---

PRESENT:

HON. JAMES G. DAY, CHIEF JUSTICE.
" JAMES H. ROTHROCK,  ⎫
" JOSEPH M. BECK,       ⎬ JUDGES.
" AUSTIN ADAMS,         ⎪
" WILLIAM H. SEEVERS,  ⎭

---

## KOEHLER & LANGE v. HILL.

| 60 | 543 |
| 89 | 704 |
| 60 | 543 |
| 107 | 323 |

| 60 | 543 |
| 113 | 255 |
| 113 | 257 |
| 113 | 258 |

1. **Constitution of Iowa**: AMENDMENT TO PROPOSED BY GENERAL ASSEMBLY: EVIDENCE OF. Under article X, section 1, of the Constitution of Iowa, it is necessary that the several houses of the General Assembly which first proposes an amendment to the constitution, cause the same to be entered *at length* upon their respective journals, with the yeas and nays taken thereon. It is not necessary that the proposed amendment be enrolled, or signed by the presiding officers of the several houses, or by the governor; but where, as in this case, the proposed amendment was so enrolled and signed, and also entered at length, in *substantial* compliance with the constitution, upon the journal of the senate, that *journal* is the primary and best evidence of the proposed amendment, as agreed to by the senate—Code, § 3717—while the *roll* is, at

Koehler & Lange v. Hill.

the best, but secondary evidence thereof; and the parol testimony of members of the senate is not admissible to contradict the senate journal as to the language of the proposed amendment, as agreed to by the senate.

2. ———: ———: RECITAL OF IN JOINT RESOLUTION BY SUCCEEDING GENERAL ASSEMBLY: NOT CONCLUSIVE UPON THE COURTS. Where the Eighteenth General Assembly proposed an amendment to the constitution, a recital of such proposed amendment by the Nineteenth General Assembly, in a joint resolution agreeing to the same, is not conclusive upon the courts as to the form of such amendment as originally proposed, nor as to whether the Eighteenth General Assembly actually agreed to the same in the manner required by the constitution; and such recital does not preclude and estop the courts, in a proper case, from examining the journals of the Eighteenth General Assembly, to ascertain whether or not the amendment, as originally proposed, was in fact the same as that recited and agreed to by the Nineteenth General Assembly, and whether or not it was legally and constitutionally agreed to by the Eighteenth General Assembly.

3. ———: ———: FAILURE TO ENTER UPON JOURNAL: VARIANCE IN FORM AND SUBSTANCE. Where an amendment to the constitution proposed by the Eighteenth General Assembly, was not entered at length upon the journal of the house, as required by article X, section 1, of the Constitution; and where it appeared from the journal of the senate of the Eighteenth General Assembly, that the amendment agreed to by the senate was different, in language and substance, from that agreed to, and submitted to the vote of the electors, by the Nineteenth General Assembly; *held* that the amendment so submitted to the electors did not become a part of the constitution, notwithstanding it was approved by a large majority of the electors.

BECK, J., *dissenting*.

Upon a motion for re-hearing the foregoing propositions were reconsidered and affirmed, and the following additional points were determined.

4. **Constitution**: AMENDMENT TO: JURISDICTION OF THE COURTS AS TO REGULARITY OF. While it is not competent for courts to inquire into the validity of the constitution and form of government under which they themselves exist, and from which they derive their powers, yet, where the existing constitution prescribes a method for its own amendment, an amendment thereto, to be valid, must be adopted in strict conformity to that method; and it is the duty of the courts, in a proper case, when an amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed, and, if not, to declare the amendment invalid and of no effect.

5. ———: ———: EVIDENCE. A paper purporting to be the original joint resolution which passed the senate and house of the Eighteenth General

Assembly, and which had not been in legal custody, but was produced on the street three years after the action was had, by a person who would not permit his name to be disclosed, and whom the court is not permitted to know, is not entitled to judicial notice; and it is not competent thereby to contradict the journals of the Eighteenth General Assembly, and to show, notwithstanding those journals, that the constitutional amendment proposed in said joint resolution by the Eighteenth General Assembly passed both houses of that general assembly in the exact form and words agreed. to by the Nineteenth General Assembly.

BECK, J., *dissenting*.

## *Appeal from Scott District Court.*

### SATURDAY, APRIL 21.

ACTION to recover for beer sold and delivered by the plaintiffs to the defendant. Trial to the court, judgment for the plaintiffs, and the defendant appeals.

*Smith McPherson*, Attorney-general, *Peter A. Boyle, William E. Miller, J. A. Harvey, James F. Wilson, C. C. Nourse, John F. Duncombe* and *Liston McMillan*, for appellant.

*Bills & Block* and *Wright, Cummins & Wright*, for appellees.

SEEVERS, J.—At a special election held on the 27th day of June, 1882, the electors of the State, by a majority of about thirty thousand, ratified an amendment to the Constitution, which, it is claimed, had been previously agreed to by the Eighteenth and Nineteenth General Assemblies, prohibiting the manufacture and use of intoxicating liquors as a beverage, including ale, wine, and beer, as therein provided.

The question is fairly presented in the record in this case, whether or not the amendment aforesaid has been constitutionally agreed to and adopted, and this is the question discussed by counsel, and the only question we are called on to determine. The validity of the amendment, and whether the same now constitutes a part of the Constitution, de-

pend upon the question whether the Eighteenth General Assembly agreed to the amendment which was ratified and adopted by the· electors, and whether the amendment was agreed to .by the Eighteenth General Assembly in the form and manner required by the Constitution.

When the Constitution was adopted, it was wisely therein provided, or at least it must be· so presumed, that "any amendment or amendments to this Constitution may be proposed in either house of the General Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published as provided by law for three months previous to the time of making such choice; and if, in the General Assembly so next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such proposed amendment to the people, in such manner and at such time as the General Assembly shall provide; and if the people shall approve and ratify such amendment or amendments by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments shall become a part of the Constitution of this State." Art. 10, § 1.

This is the only way the Constitution can be amended or changed except by a convention called for that purpose.

In compliance with the foregoing provision, there was introduced into the House of Representatives of the Eighteenth General Assembly a joint resolution, the material portion of which, for the purpose of this case, is as follows:

"*Be it resolved by the General Assembly of the State of Iowa*, That the following amendment to the Constitution of the State of Iowa be, and the same is hereby, proposed, viz.:

"To add as section 26 to article 1 of said Constitution the following:

"SECTION 26. No person shall hereafter manufacture, sell, or keep with intent to sell, within this State, any alcoholic, distilled, brewed, fermented or vinous liquors, except for medicinal and mechanical purposes."

This resolution was agreed to by the House, sent to the Senate, and referred to the appropriate committee. The committee reported it back with the recommendation that it do pass. Various amendments were offered, and finally it was moved to adopt a substitute for the House resolution. The substitute was as follows:

"No person shall manufacture for sale, or sell, or keep for sale, as a beverage, or to be used for such purpose, any intoxicating liquors whatever."

The substitute was amended by adding after the word "whatever" the words "including ale, wine, and beer." It was further amended by striking out the words "for such purposes." Thereupon the substitute, as amended, was adopted. On motion, the rule was suspended, the joint resolution considered engrossed, read a third time, and agreed to by the Senate, as shown by the journal, and it was sent with the following message from the Senate to the House:

"*Mr. Speaker:* I am directed to inform your honorable body that the Senate has passed the House joint resolution proposing to amend the Constitution so as to prohibit the sale of intoxicating liquors within this State, with amendments, as noted in the resolution.

"A. T. McCARGAR, *Secretary.*"

The joint resolution which had been agreed to by the Senate was referred to the appropriate committee, and such committee afterward made the following report to the House:

"*Mr. Speaker:* Your committee on constitutional amendments, to whom was referred the substitute passed by the Senate for the joint resolution passed by the House, proposing to amend the Constitution of the State of Iowa, as follows:

"SECTION 26. No person shall hereafter manufacture, sell,

or keep with intent to sell, within this State, any alcoholic, distilled, brewed, fermented or vinous liquors, except for medical and mechanical purposes—beg leave to report that they have had the same under consideration, and a majority of said committee have instructed me to report the same back to the House with the recommendation that the House do concur in the passage of said substitute.

Thereupon the House concurred in the "Senate amendments."

The House journal shows that the committee on enrolled bills reported to the House that they had examined the joint resolution, and that the same was correctly enrolled. Thereupon, such enrolled resolution was signed by the Speaker of the House and President of the Senate, and approved by the Governor. The joint resolution thus signed and approved was as follows: "No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquor whatever, including ale, wine and beer." This proposed amendment to the Constitution was agreed to by the Nineteenth General Assembly, and ratified by the electors at a special election, held on the 27th day of June, 1882. Counsel for the plaintiff insist that the joint resolution, at the time it was agreed to by the Senate, contained the words "or to be used." Their contention is that it then reads as follows: "No person shall manufacture for sale, or sell, or keep for sale as a beverage, or to be used, any intoxicating liquor whatever, including ale, wine and beer." The resolution claimed to have been agreed to by the Senate is materially different in substance from the one ratified by the electors. Counsel for the appellant do not claim this is not so as shown by the journals, but their contention is that the enrolled resolution, signed by the Speaker of the House and President of the Senate, and approved by the Governor, is a verity, and is conclusive evidence that the resolution as enrolled was agreed to by both houses of the Eighteenth General Assembly, or, if this is not so, that the perponderance of the evidence is in favor of the proposition

that the resolution which was agreed to was correctly enrolled. The plaintiff contends that it is made clear and certain by an examination of the Senate journal that the words "or to be used" were in the resolution when it passed the Senate, and that the journal is the best evidence of such fact. This question, and all others in the case, have been elaborately and ably argued by counsel, both in print and orally at bar, and we proceed to the consideration of the question just stated.

I.   In Cooley's Constitutional Limitations, 4th Ed., 164, it is said: "Each House keeps a journal of its proceedings, which is a public record, and of which courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the Constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void." In the opinion of the eminent author, the journals of the respective houses, in the absence of a statute so making them, are evidence of what the houses respectively did, and, upon such evidence, a statute, if not constitutionally passed, should be declared void by the courts. It logically follows that a proposed amendment to the Constitution should be declared void, if the same has not been constitutionally agreed to. It is not claimed that it is not just as essential, in a constitutional sense, that a proposed amendment to the Constitution should be agreed to by two General Assemblies, as that it should be ratified by the electors. Not only so, but each house of each General Assembly must agree to the same amendment, and it must be adopted by the electors. It matters not if not only every elector, but every adult person in the State, should desire and vote for an amendment to the Constitution, it cannot be recognized as valid unless such vote was had in pursuance of, and in substantial accord with, the requirements of the Constitution. If, then, both houses of the Eighteenth General Assembly did not agree to the resolution which was adopted

and ratified by the electors at the special election held for that purpose, it is not a part of the Constitution, and cannot be so recognized.

There is much dispute between counsel as to whether Judge Cooley is sustained by the weight of authority. That there is an apparent want of harmony on the important question under consideration in the adjudged cases, must be conceded. In view of the peculiar provisions of our Constitution and statutes, we do not deem it important to determine, with any degree of accuracy, upon which side of this controversy there is a preponderance of authority, or which, in the absence of constitutional provisions or statutes, is the better rule. Nor do we deem it important to determine whether the term, "proceedings of the General Assembly," as used by Cooley, embraces the contents of a bill or statute, or not; that is, whether such contents may be evidenced or established by the journal.

A brief examination of some of the authorities may, however, be of advantage, when we come to consider the bearing of the provisions of the constitution and statutes of this State on the question under consideration. The leading and better reasoned of the cases which hold the enrolled bill is a verity, and that the journals cannot be considered in determining the question whether such bill was constitutionally passed by the General Assembly, or what the contents of the bill were, are—*The People v. Devlin* 33 N. Y., 269; *Sherman v. Story*, 30 Cal., 254; *Pagborn v. Young*, 32 N. J., 29; *Pacific R. R. Co. v. The Governor*, 23 Mo., 353; *Evans, Auditor of State, v. Brown*, 30 Ind., 514. These cases are based on substantially the same reasons which are stated in the New York case, as follows: The journals "are not made evidence by the Constitution; they are not made so by the statute; they were never made so at common law." In the New Jersey case, it is said: "They (the journals) are not required to be attested in any way whatever    *    *. There is required not a single guarantee to their accuracy or

truth; no one need vouch for them, and it is not enjoined that they should be either approved, copied or recorded." In the Missouri case, it is said: "But there is no provision of law declaring how the journals shall be authenticated, or what shall be their effect." In addition to the foregoing, counsel for the appellant have cited—*The State of Nevada v. Swift*, 10 Nev., 176; *Eld v. Gorham*, 20 Conn., 7; *Green v. Weller*, 32 Miss., 650; *Division of Howard County*, 15 Kan., 194; *Annapolis v. Howard*, 32 Md., 471; *Clare v. The State*, 5 Iowa, 509; and *Duncombe v. Prindle*, 12 Id., 1. All that was determined bearing on the question under consideration in the two last named cases was that, where there is a conflict between the printed act and the enrolled act filed in the office of the Secretary of State, the latter is the ultimate proof of the expression of the legislative will. Whether the journals were competent evidence, or their effect, was not considered in either case.

On the other hand, omitting reference to the earlier New York, Missouri and Indiana cases, there may be cited, as sustaining the rule laid down by Cooley, the following:— *Spangler v. Jacoby*, 14 Ill., 297; *The People v. Stame*, 35 Id., 121; *Miller v. Martin*, 70 Id., 695; *Burr v. Ross*, 19 Ark., 250; *The State v. Platt*, 2 So. Car., N. S., 150; *James v. Hutchinson*, 43 Ala., 721; *Moody v. State*, 48 Id., 115; *Smithie v. Garth*, 33 Ark., 17; *Board of Supervisors v. Henan*, 2 Minn., 330; *Southwark Bank v. Commonwealth*, 26 Pa. St., 446. The Opinion of the Justices, 35 N. H., 579. Also 52 N. H., 622; *The People v. Mahaney*, 13 Mich., 481; *Berry v. R. R. Co.*, 41 Ind., 446; *Osborn v. Staley*, 5 W. Va., 84.

As we have said, the appellant contends the enrolled joint resolution is a verity, and that we cannot look into the journals for the purpose of ascertaining whether or not it was ever agreed to by the respective bodies composing the Eighteenth General Assembly, and that the great weight of authority is in favor of this position. The citations made

indicate, to say the least, that this is a debatable question. We pass it, and turn to our constitution and statutes for the purpose of determining to what extent the adjudged cases are applicable in this State. The Constitution provides that each house shall keep a journal of its proceedings and publish the same—Art. 3, Section 9. It is believed a similar provision in substance is contained in the constitution of every State.

Every bill which shall have passed the General Assembly, before it becomes a law, shall be presented to the Governor. If he does not approve it, he shall return it to the house where it originated "which shall enter the same on their journal and proceed to consider it." Art. 3, Section 16. "No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered upon the journal." Art. 3, Section 17.

The foregoing provisions are substantially the same as the provisions of the constitution of Illinois, upon which the cases cited from that State, were based. This being so, those cases are clearly applicable to the case at bar, and therefore entitled, at least, to respectful consideration.

The statute provides: "The secretary of the Senate and clerk of the House of Representatives shall transcribe the journals of their respective houses in books furnished for that purpose by the Secretary of State, and, after having certified to the correctness of the same, shall deliver them to the Secretary of State for preservation in his office." Miller's Code, p. 27, sec. 4. It is further provided by statute: "The proceedings of the legislature of this or any other state of the Union, or the United States, or of any foreign government, are proved by the journals of those bodies respectively, or of either branch thereof, and either by copies officially certified by the clerk of the house in which the proceeding was had, or by a copy purporting to have been printed by their order." Code, § 3717.

Without doubt, the journals, under the foregoing statutes, are competent evidence to establish the proceedings of either or both houses of the General Assembly. The important, if not the only legitimate, business of the General Assembly is legislation; that is, the enactment of laws or statutes. The proceedings of the General Assembly, therefore, include the manner and form in which the laws are enacted. The journals, therefore, are competent evidence of such facts. If it becomes necessary, the design of the statute evidently is that the journals may be introduced and become competent evidence in the courts. The provision is, the proceedings are proved by the journals. For this purpose the journals are competent evidence in all courts and places, and for all purposes—for there is no exception.

We, therefore, have not only the right, but it is our duty, to regard the journals as competent evidence of the proceedings of the General Assembly. To what extent they can be regarded as evidence, or what can be established thereby, will be hereafter considered.

Statutes, before they become such, and when first introduced into either house of the General Assembly, are named "bills," and every bill which has passed both houses shall be signed by the Speaker of the House and President of the Senate, and, we will assume, approved by the Governor, before it becomes a law. Art. 3, sections 15, 16, of the Constitution.

The statute provides: "The original acts of the General Assembly shall be deposited with and kept by the Secretary of State." Code, § 31. No provision is made in the Constitution or statute for the enrollment of a bill, act, or joint resolution, which has passed the General Assembly. There is an implication in Art. 3, Section 15, of the Constitution, that the bills which are introduced should be signed by the presiding officers of each house. But the legislative practice has always been to enroll a bill or joint resolution, and it is such that are always presented to the presiding officers of each house, signed by them, and filed and preserved in the office

of the Secretary of State. This practice existed prior to the adoption of the present constitution, and no doubt was well known to the members of the constitutional convention. We, therefore, incline to think the enrolled bill is and should be regarded as the original act. But it is difficult to say enrollment is essential to the validity of a law or statute. If the enrollment was omitted, and the original bill, as introduced and passed by the General Assembly, was signed by the presiding officers of the two houses and approved by the Governor, we are not prepared to say it would not be a valid and constitutional law.

The question whether a bill which has been duly enrolled and properly signed by the presiding officers, and approved by the Governor, and deposited in the office of the Secretary of State, can be impeached or declared void because the journals fail to show it was passed by either house of the General Assembly, or when the journals show affirmatively it never was passed, is not before us. The first proposition can possibly be readily answered, but the latter cannot be as readily solved.

Inasmuch as a bill, before it becomes a law, must.be signed by the presiding officers of the two houses and by the Governor, as will be assumed, we may, for the purposes of this case, concede, when it has been enrolled and so signed, and deposited in the office of the Secretary of State, it is the ultimate and conclusive evidence of the contents of the bill which passed the General Assembly, and that it cannot be contradicted by the journals, because there is no constitutional provisions requiring that it shall be entered on the journals.

The question before us is as to the validity of a constitutional amendment, and we think there is a material distinction between the rules which must obtain in such case, and when a statute is assailed as not having been constitutionally enacted. The Constitution provides for its own amendment, and the manner in which this may be done is prescribed with particularity, and yet the provisions are simple and readily

understood. An amendment may be "proposed in either house of the General Assembly, and if the same shall be agreed to by a majority of the members elected to each of the two houses, the proposed amendment shall be entered on the journals, with the yeas and nays taken thereon."

Much has been said by counsel as to whether the provision as to entering the proposed amendment on the journals is mandatory or directory. We do not regard it as essential to determine this question, but we cannot forbear from quoting the following from Cooley on Constitutional Limitations: "In all that we have said upon this subject, we have assumed the constitutional provision to be mandatory   *   *   *. The fact is this:—that whatever constitutional provision can be looked upon as directory merely, is very likely to be treated by the legislature as if it is devoid even of moral obligation, and to be, therefore, habitually disregarded. To say that a provision is directory, seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so, must be conceded; that it is not so, we have abundant reason and good authority for saying. If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory, and if the legislature habitually disregard it, it seems to us that there is all the more urgent necessity that the courts should enforce it; and it also seems to us that there are few evils, which can be inflicted by a strict adherence to the law, so great as that which is done by the habitual disregard by any department of the government of a plain requirement of the instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed." Cooley's Constitutional Limitations, 2 Ed., 149.

We deem it sufficient to say that, if there is any provision of the Constitution which should be regarded as mandatory, it is where the Constitution provides for its own amendment otherwise than by means of a convention called for that purpose. The powers of a convention are, of course, unlimited.

The members thereof are the representatives of the people, called together for that purpose. The object of the provision cannot be doubted or misunderstood. It is to preserve in the manner indicated the identical amendment proposed, and in an authentic form, which, under the Constitution, is to come before the succeeding General Assembly. No better mode could have been adopted, when it is considered that, to be effective, the proposed amendment must be agreed to by the succeeding General Assembly. This thought is much strengthened by the consideration that the proposed amendment is only required to be entered on the journals of the first General Assembly which acts thereon. This distinction, to our minds, is significant, and enhances the importance of the constitutional injunction—that the proposed amendment shall be entered on the journals of both houses of the General Assembly which first agrees thereto. It is immaterial, however, whether the Constitution provides the best method for the preservation and authenticity of the proposed amendment or not, for the constitutional mode must prevail, even if it be conceded some other would have been better. It may be suggested that to enter or entering on the journal does not necessarily mean spreading the same at length thereon. This will be conceded, but that it may so mean must also, we think, be conceded. See Webster's Dictionary. Various instances where the words "to enter" or "entered" occur in statutes and Constitution may, no doubt, be cited, where they do not mean spread at length. But this is not of much significance—for the object to be attained must be considered in determining the meaning of the word entered, as used in the Constitution. The evident intent of the Constitution is that the proposed amendment should be entered at length on the journal, or, at least, so entered as to leave no reasonable doubt as to its provisions. This must be so, or the entering of the yeas and nays can be as readily dispensed with as entering the resolution, and yet this is the constitutional mode of ascertaining whether a majoriy of the members elected to

each house agreed to the amendment. Cooley's Constitutional Limitations, 2 Ed., 141.

When the object intended to be accomplished is considered, we think there is no doubt that it is the design and intent of the Constitution that a proposed amendment thereto should be so entered on the journals that it can be known, by an examination of the journals, what it is that has been agreed to by each house of the General Assembly which first acts thereon, to the end that the succeeding General Assembly may certainly know what its predecessor did. It seems to us that a simple entering on the journal of the title or object of a proposed amendment does not accomplish the intent of the Constitution, and the thought that this must be so is much strengthened when regard is had to all the provisions of the Constitution. That instrument provides that upon the final passage of a bill the yeas and nays must be taken, and the same entered upon the journal. This necessitates the entering on the journal of the title or substance of the bill to be voted upon. This being so, if no more than this was intended in relation to a constitutional amendment, the provision as to entering it on the journal is unnecessary and meaningless. There is no provision requiring a bill to be entered on the journal, but the Constitution does require that a proposed amendment thereto "shall be entered" on the journals "with the yeas and nays." This must mean that the amendment shall be spread at length thereon, and the yeas and nays set out in the journal in full or at length. No distinction between the two can possibly be drawn. Amendments were proposed to the Constitution in the Eleventh General Assmbly, some of which were agreed to, but *all* were spread at length on the journal. The amendments afterward ratified by the electors, striking out the word "white" where it occurred in the Constitution, were among the amendments proposed at that session. These amendments were spread at length upon the journals of both houses. Here we have a legislative construction of the Constitution which should not and cannot be ignored.

It will be observed that the Constitution does not provide in what manner the amendment shall be proposed. Whether it shall be done by a bill or joint resolution seems to have been left to the discretion of the General Assembly to determine. But, in whatever way proposed, when agreed to, it is provided that it shall be entered on the journal. Now suppose a member of either house had, while it was in session, orally proposed the amendment in question in the form it was agreed to by the electors, and it had been entered at length on the journal, and agreed to, and the amendment so entered had been correctly copied and properly transmitted to the other house, entered at length on its journal, and agreed to, and published as provided by the Constitution and law, and the subsequent general Assembly had agreed thereto as required by the Constitution, and the same had been submitted to the electors, as was done, could it be said it was not constitutionally adopted, because it was not enrolled, signed by the presiding officers of the two houses, and approved by the Governor? If it can be so said, why, or for what reason?

Suppose the Governor had vetoed the joint resolution and returned it, with his objections, to the house in which it originated, and upon being put upon its passage it had failed to receive a two-thirds majority of one or both houses, as provided in Art. 3., section 16 of the Constitution, would this have been fatal to the amendment? No one will so contend. It was not essential, therefore, the Governor should have approved the joint resolution. The Constitution does not so require. There is no provision of the Constitution, nor is there a statute which, by implication, requires that a joint resolution proposing to amend the Constitution shall be signed by the presiding officers of the two houses. Such signing, therefore, is not essential, and may be dispensed with. There is no provision of the Constitution or statute which requires it shall be enrolled. But there is a constitutional injunction, to say the least, that it shall be entered on the journals. In a constitutional sense, the journals constitute and are the primary and best evidence, and the enroll-

ing and signing, as above stated, at best, are only secondary evidence, which may, and can only be considered when the primary evidence has been lost or destroyed. The Senate substitute for the House resolution, when introduced, was entered at length upon the journal of the Senate. There was added to it the words, "including ale, wine and beer." These words are set out at length in the journal. The substitute, when introduced, contained the words "or to be used for such purpose." The words "for such purpose" were stricken out, as shown by the journal. Thereupon the substitute was agreed to, and the joint resolution, as thus amended, was agreed to by the Senate. The words "or to be used" were in the substitute when it was introduced. They were not, so far as the journal shows, stricken out by any action taken by the Senate. It necessarily follows that, so far as can be determined from any competent evidence, the words "or to be used" were in and formed a part of the substitute when it was passed, and of the joint resolution agreed to by the Senate.

The Constitution seems to contemplate that the proposed amendment shall be entered on the journals with the yeas and nays. Literally, we apprehend, the proposition should be entered on the journal, and immediately followed by the yeas and nays. But the substantial requirement is that the proposed amendment shall be entered on the journal, and we think this was done in the Senate journal of the Eighteenth General Assembly, and that a substantial compliance with even the forms enjoined by the Constitution clearly appears. We have, then, before us, in the Senate journal, the constitutional evidence of the exact form of the resolution which was agreed to by the Senate. We cannot ignore it or give effect to other evidence, and say that something else that was done shows that the Senate journal does not state truly what the Senate did. Where a statute prescribes that a particular fact or act shall be proven or established in a particular way, no other evidence can be regarded as sufficient. *Baldozier v. Haynes*, 57 Iowa, 683. The journal of the House of

the Eighteenth General Assembly fails to set out, or even show, the substance of the substitute or amendment of the House joint resolution which had been adopted by the Senate. Such journal only sets out the original resolution which had been introduced in the House, and shows simply that the House concurred in the Senate substitute, and, therefore, the House journal fails to show that it adopted the same resolution which was adopted by the Senate.

II. It was suggested on the oral argument, by one of the counsel for the appellant, that the words "or to be used" were struck out of the substitute by common consent before it was adopted by the Senate, and it was further suggested on such argument that we can readily so ascertain, if we should consult the persons present at the time, including the members of the Senate, and that we should not only do so, but that such is our duty. This argument practically concedes the necessity of getting rid of the words aforesaid in some manner. As has been said, the Senate journal, by the provisions of the Constitution, is made the primary evidence of the contents of the resolution, as it passed the Senate. This journal is in existence, and, as has been said, was kept as required by the Constitution. Now we are asked to ignore this constitutional evidence, and receive parol evidence, or ascertain for ourselves by inquiry of those who are supposed to know, as to the existence of a fact which is contradictory to the journals kept, certified to, and preserved by sworn officers, as provided by law. To our minds this is a startling proposition. It ignores fundamental rules which have always existed. Parol evidence never can be introduced or considered when there is written evidence of any fact which can be produced. If the journals had been lost or destroyed, it is possible that we could and should resort to the next best evidence attainable. If there was any written evidence in existence, resort, we presume, would first be had to that. If there was none such, it may be parol evidence should be regarded as competent. But it is useless to specu-

late. The constitutional evidence is before us, and by that we are bound.

In Kansas there is a statute requiring the Secretary of State to take charge of all enrolled laws, and in the *Division of Howard County*, 15 Kans., 194, it was said: "Now, as we have before intimated, the enrolled bills and the legislative journals being records provided for by the Constitution, imparting absolute verity, we cannot take judicial notice that they are untrue, nor can we even allow evidence to be introduced for the purpose of proving they are not true." In this case there was no conflict between the journals and enrolled law, and the court said, as both were records provided by the Constitution, both imparted absolute verity. So the journals in this State impart absolute verity, and, as no enrollment of a proposed constitutional amendment is required by the Constitution, it cannot impeach or contradict the journal.

III. It was suggested in argument that the journals of both houses of the General Assembly are written and kept by clerks, and that this duty is carelessly performed, and, therefore, they cannot be relied on as accurate. The rules adopted by each house require that the journals of the proceedings of the preceding day shall be read in the presence of the members thereof on the morning of the succeeding day. It is said such reading is frequently dispensed with. This is believed to be true, but this can be done only with the consent of the House. The journal of the Senate of the Eighteenth General Assembly, however, shows that it was read on the morning of the day after the proposed amendment was adopted by the Senate. Now if the words "or to be used" were stricken out by common consent, or otherwise, is it not exceedingly strange no member called attention to the fact that the journal failed to so show? Can or should it be presumed the members of the Senate failed to perform their duty? If the words aforesaid were stricken out by common consent, or by any action of the Senate, it is clear

the journal should show it. Under the circumstances, and in accord with the universal rule, if necessary, should not the presumption be indulged that every officer or other person does that which by law he is enjoined to do? It is true, the journals are written and kept by clerks, but they are sworn officers, who perform their duties under the direction of the respective houses of which they are officers. The records and proceedings of all courts are kept by clerks under the direction of the court, and they impart absolute verity, in the absence of fraud. Why, therefore, should not the import of the journals be the same? Especially should this be so held, when the Constitution has so clearly defined that amendments to the Constitution must be entered on the journals of, not one house only, but both. The Constitution contemplates that the journal is kept under the direction and in accord with the directions of the two houses, by whom the constitutional amendment must be agreed to before it can be valid. Who is so likely to know what was done, or the exact phraseology of a proposed amendment, as the body by whom it was agreed to, and how could the amendment be better evidenced or authenticated than by entering or spreading the same on the journal?

It is said that the enrolled joint resolution, which was signed by the presiding officers of the two houses, constitutes such evidence. But, as we have seen, such enrolling and signing is not required, but may be dispensed with at the pleasure of the two houses. It cannot be possible that such an enrolled bill or resolution can supersede or constitute more reliable evidence than the journals of the Senate of the Eighteenth General Assembly, which was kept in strict accord with the requirements of the Constitution. It is said the enrolled joint resolution constitutes better evidence of what the Senate did than the journal, because of the certainty which exists that it was enrolled precisely as it was agreed to. The joint resolution, as we have seen, was first agreed to by the House, sent to the Senate, and there a sub-

stitute was adopted, which was returned to the House and agreed to by it. It was not enrolled by the officers or clerks of the Senate under the supervision of a committee of that body. It was, no doubt, correctly enrolled as it passed the House. But whether it had passed the Senate in the same form, depends on the question whether the Secretary of the Senate reported to the House the same resolution which had passed the Senate. Here there is great liability to mistake. Besides this, the enrolling is the act of a clerk, under the supervision of a committee, composed of, we believe, two members of the House or Senate. This clerk and committee might make a mistate in enrolling the resolution. They are as liable to do so as the secretary of the Senate in keeping the journal under the direction and supervision of the whole body of senators. The argument, then, that the enrolled resolution is better evidence of what the Senate did than the journal, because more likely to be accurate, falls to the ground.

For fear we may be misunderstood, we will repeat that, when a bill or joint resolution is required to be signed by the presiding officers and the Governor, and it is so signed, it will be conceded that such bill or resolution constitutes the ultimate and conclusive evidence of the contents thereof.

IV. The Constitution provides that "the powers of the government of Iowa shall be divided into three separate departments—the legislative, the executive, and the judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed and permitted." When the Nineteenth General Assembly came to consider the question as to whether or not it would agree to the constitutional amendment proposed in the Eighteenth General Assembly, it did so in the following manner and form, omitting immaterial portions thereof:

"*Joint resolution agreeing to an amendment of the Con-*

*stitution of the State of Iowa, prohibiting the manufacture and sale of intoxicating liquors as a beverage within this State.*

"WHEREAS, The Eighteenth General Assembly of the State of Iowa did in due form, by a majority of the members elected to each of the two houses, agree to a proposed amendment to the Constitution of this State, to add as section 26, to article 1 of said Constitution, the following:

"SECTION 26. No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquors whatever, including ale, wine and beer."

It will be observed the words "or to be used" are not in this resolution, and that the Nineteenth General Assembly determined, in substance, such words were not in the resolution when it was agreed to by the Eighteenth General Assembly.

Now it is insisted by counsel that the courts and all persons are bound by the determination of a fact by the Nineteenth General Assembly, which occurred or did not occur in the Eighteenth General Assembly. The argument goes further, and it is insisted the courts are concluded and estopped from ascertaining the truth, and that the parties to this action and all persons are so concluded and estopped, no matter what the truth may be.

In support of this proposition *Shawhan v. Loffer*, 24 Iowa, 217; *Cooper v. Sunderland*, 3 Id., 114; *Boker v. Chapline*, 12 Id., 204; *Bonsall v. Isett*, 14 Id., 309; *Morrow v. Weed*, 4 Id., 77; *Ballinger v. Tarbell*, 16 Id., 491; *Pursley v. Hays*, 22 Id., 11; and *Lyon v. Vanatta*, 35 Id., 521, are cited. In these cases, or the most of them, there was a defective service of notice of the action or proceeding. While this was so, the court proceeded and granted the relief asked. It was held, in a collateral proceeding attacking the judgment of the court, that it was erroneous only, and not void. An erroneous judgment can only be corrected in a direct proceeding by appeal or other appropriate remedy provided

by law. If the court rendering the judgment is one of general jurisdiction the presumption is always indulged, where nothing appears to the contrary, that such court had jurisdiction. Every court of that character has, of necessity, the power to inquire and determine as to its own jurisdiction, and if it commits an error in this respect the judgment is not void, but erroneous merely. But if it affirmatively appears of record that such a court did not have jurisdiction over the subject-matter, or of the person against whom the judgment is rendered, such judgment would be absolutely void, and could not be enforced. *Boker v. Chapline* before cited.

Conceding, then, that the determination of the Nineteenth General Assembly as to what was done by the Eighteenth is similar to the determination of a court in relation to its own jurisdiction, we then have a case where jurisdiction has been asserted by the assumption of a fact which the record of the Eighteenth General Assembly affirmatively shows did not exist; that is, the journal of the Senate of the Eighteenth General Assembly shows that body did not pass the joint resolution the Nineteenth General Assembly determined it did. As this fact affirmatively appears of record, the determination of the Nineteenth General Assembly is not binding on anyone, and is absolutely void. It was held in *Duncombe v. Prindle,* 12 Iowa, 1, that the recital in an act of the General Assembly was not conclusive as to private parties affected thereby, and, in that case, the recited fact was found to be otherwise than it had been determined to be by the General Assembly. This, it seems to us, must be so, or a person might be deprived of his property and rights by the finding or recital of a fact by the General Assembly. For the argument is that such determination is conclusive, amounts to a verity, and cannot be impeached, however false it may be. To thus deprive a person of his property or of a substantial right, without trial by jury, or the opportunity to prove the truth, would be clearly unconstitutional, and an

usurpation by the legislative department of the government of the powers expressly conferred upon the judiciary. It is further insisted that, under the Constitution, the Nineteenth General Assembly had the jurisdiction and power to submit the amendment to the electors, provided it had been agreed to by the Eighteenth, and that, therefore, it was the province of the Nineteenth General Assembly to inquire what the Eighteenth did, and for this purpose, and to this extent, it was invested by the Constitution with judicial powers. In support of this proposition, counsel cite and rely on *Brittian v. Kinnard*, 1 Brad. & Bing., 432; *Betts v. Bagley*, 12 Pick., 572; *Marston v. Mott*, 12 Wheat., 19; *Vanderhayden v. Young*, 11 Johns., 150; *Birdsall v. Phillips*, 17 Wend., 464; *Ex Parte Watkins*, 3 Peters, 192; *The People v. City of Rochester*, 21 Barb., 656; and *Ryan v. Varga*, 37 Iowa, 78. The last case cited well illustrates the rule contended for, and the other cases cited are based upon the same rule, which is undisputed. The statute provided where a petition signed by one-third of the resident tax-payers of a township, "asking the question of aiding in the construction of any railroad to be submitted to the voters thereof, it shall be the duty of the trustees  *  *  *  *  *  *  to immediately give notice of a special election," for the purpose of determining such question. Before the trustees could order the election, they must determine the petition had been signed by the requisite number of tax-payers, and to this extent they were invested with judicial powers. Now, in *Ryan v. Varga* it was held, under this statute, where the trustees had given the requisite notice, and the election had been held, tax voted and duly levied, and it was sought to enjoin the collection on the ground that one-third of the tax-payers had not signed the petition, that the decision of this question by the trustees was conclusive. At the same time it was said such question could be re-examined and again "decided by the courts only upon an appeal, writ of error, *certiorari*, or other method provided for a direct review of the decision made

by the trustees." The proceeding in which this ruling was made was collateral in character, and not direct.

It cannot be questioned the decision of the trustees could have been reviewed on *certiorari*, and their decision reversed if the fact was the petition had not been signed by the requisite number of resident tax-payers. The plaintiff in the cited case, then, had a remedy which he failed to adopt. But it cannot be successfully maintained in the case at bar that either party to this action, or any other person, could, by *certiorari* or otherwise, have brought before the courts for review acts of the legislative department of the government.

It is clear, we think, the Nineteenth General Assembly could not have been enjoined by the courts, or in any manner prevented from passing the joint resolution, with the recital therein, just as it did. A law may be declared unconstitutional by the judiciary, but its passage by the General Assembly cannot be prevented. *The Des Moines Gas Co. v. The City of Des Moines*, 44 Iowa, 505.

There was no way known to the law, except the manner adopted in this case, by which the question as to the validity of the constitutional amendment could be tested in the courts. The logical result of the argument of counsel for the appellant is, that it is for the General Assembly to say whether an amendment to the Constitution has been constitutionally adopted, and that their determination is conclusive and binding upon all persons. Therefore, it follows, the Nineteenth General Assembly could have determined the Eighteenth General Assembly had agreed to an amendment which had never passed that body, and then agree thereto, and submit it to the people, and, if the same was ratified by the electors, that it would be valid. If this be so, the provision of the Constitution requiring it to be agreed to by two General Assemblies must be ignored, and certainly this will not be claimed.

Each General Assembly is independent and supreme as the law-making power, within the limits prescribed by the Con-

Koehler & Lange v. Hill.

stitution. The last General Assembly which convenes may undo all that its predecessors have done. But it cannot, so to speak, put words into the mouth of any of its predecessors.

V.   The Constitution provides, that "all political power is inherent in the people." Art. 1, § 2.   While this is so, the Constitution is a limitation on such power. The power of the people can only be exercised through the executive, legislative and judicial departments of the government, unless a change of the Constitution through a convention constitutes an exception to the general rule. The power which is inherent in the people must be expressed and exercised in a lawful manner. We are aware of the rule, which universally obtains, that a statute should not be declared unconstitutional unless it clearly appears to be so. It follows, this rule should be applied to amendments of the Constitution. Mindful of this rule, and feeling its full force, it is possibly to be regretted that we have felt forced to declare that the amendment in question, which was ratified by so large a majority of the electors, has not been constitutionally adopted. But we cannot ignore another rule, which also universally obtains, which is that it is not only the province, but the duty of the judiciary, to fearlessly declare a statute or amendment to the Constitution to be unconstitutional, when such is clearly the case. We would be derelict to duty if we did not do so. As the Constitution is a limitation on the power of the people, this proposed amendment is of that character. As we have held it is not a part of the Constitution, it is, perhaps, a subject of congratulation that the General Assembly can, by the enactment of a law, effectuate the object intended to be accomplished thereby.

The result is, the judgment of the District Court must be

AFFIRMED.

BECK, J., _dissenting._—I.   I cannot assent to the opinion of the majority of the court, announced by Mr. Justice SEEVERS.   I shall proceed to state, with the particularity and

care required by the importance of the case, the grounds of my dissent. In view of the fact that, in order to sustain the amendment, all objections thereto, presented by the record before us, must be discussed, it becomes necessary for me to consider facts established by the record, not stated or referred to in the majority opinion.

Counsel for the defendant insist that the resolution as enrolled is of the exact form and language in which it passed both the senate and house. They insist that this is shown by the better evidence, the enrollment of the resolution, while the counsel of the other side insist that the difference claimed by them is shown by the journal of the senate, which, they argue, is the stronger evidence. This is the very point of contention between the parties; and while this disputed question of fact is in the mind, it is an appropriate connection to state that, from the current public history of the state, it is known, and nowhere disputed, that the resolution, as it passed the senate and is enrolled, is the same, without the variance of a word. I am authorized by the rules of the law to take judicial notice of our public history, to recite it here, and to rest upon it. The resolution proposing the amendment, upon its passage in the senate, was copied by the representatives of the public press, and was sent by them at once to the newspapers published in the capital, and other cities of the state, as well as to the newspapers of the great cities in all quarters of the Union. It was copied by members of the General Assembly, and sent to their constituents. It was thus distributed in print, in writing, and by telegraph, all over the state and in every quarter of the Union. Pending the election for members of the Nineteenth General Assembly, and upon the amendment, the proposition was considered and discussed by all classes of people, and yet this alleged variance was never heard of until the case before us brought it to light. For more than two years, all the people of the state, trusting in the public history of the enrolled resolution attested with the greatest solemnity, had no information

of the alleged difference in the resolution as it passed the senate and as it is enrolled. They are now taught by this court that the public history is false, and that the enrollment in the most carefully preserved and most solemnly authenticated record to be found in the archives of the state, is false.

There are no questions in the case other than those involving the validity of the amendment to the constitution of the state, forbiding the manufacture and sale of intoxicating liquors. These questions, after certain amendments of the abstract are made, correcting errors therein, which were discovered by counsel at the oral argument, are presented with reasonable clearness and fairness.

II. The objections to the amendment of the constitution in question, urged in this case, are all, with one exception, based upon the alleged fact, that the requirements of the constitution prescribing the proceedings to be followed, in order to amend that instrument, have not been obeyed.

Attention is directed to Art. 10, section 1, of the constitution. It is set out in the majority opinion and need not be repeated here. It will be observed that, under this provision of the constitution, the instrument can be amended only upon the concurrent action of both houses of two successive General Assemblies. The provision also prescribes certain proceedings, and the manner of their perpetuation, which it will become necessary hereafter to consider. It is not necessary to recite, with particularity, the proceedings of the two houses of the Eighteenth General Assembly. It is sufficient to say that the journal of the senate does not show that certain words, viz: "or to be used," were stricken out of the proposition while it was under the consideration of the senate. Nor do the journals of either house show that the resolution was passed with these words in it. The resolution was enrolled; a committee on enrolled bills reported that the enrollment was correct; the resolution was duly signed by the president of the senate and the speaker of the house, and approved by the governor, and now remains in the

archives of the state, showing, as does the resolution itself, printed among the laws of the state, that the words "or to be used" are not found in it.

In addition to the requirements found in article X, section 1, of the constitution, and in the joint resolution itself, touching its publication, chapter 114, acts of the Sixteenth General Assembly provides, among other things, that when a proposition to amend the constitution is referred by one General Assembly to the next legislature, "the secretary of state shall cause the same to be published in two newspapers of general circulation in each congressional district for the time provided in section 1, article X of the constitution," which, it will be remembered, provides that such publication shall be "for three months" previous to the election of the members of the next General Assembly. The statute also directs that proofs of publication shall be certified by the Secretary of State to the next General Assembly to which the proposition for amendment was referred. There is no dispute that the publications, directed by these constitutional and legislative requirements, were all made in conformity therewith, except in one instance, in which it is claimed the publication was not for the time prescribed. In that instance, the publication made in the *Weekly Oskaloosa Herald*, the proof filed in the office of the secretary of state, shows that the notice "was published for three months (twelve weeks) successively * * *, commencing with the date of June 16, and ending September 1, A. D. 1881."

Both houses of the Nineteenth General Assembly agreed to the proposed amendment by adopting the following joint resolution:

"WHEREAS, The Eighteenth General Assembly of the State of Iowa did, in due form, by a majority of the two houses, agree to a proposed amendment to the constitution of this state, to add as section 26 to article I of said constitution the following:

" SECTION 26. No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquors whatever, including ale, wine and beer. The General Assembly shall by law prescribe regulations for the enforcement of the prohibition herein contained, and shall thereby provide suitable penalties for the violation of the provisions hereof."

"And the said proposed amendment was entered on the journals of said houses, and was referred to the legislature to be chosen at the next general election, and the same having been published as required by law, therefore,

"*Be it resolved by the General Assembly of the State of Iowa,* That the following amendment to the Constitution of the State of Iowa be and the same is hereby agreed to: Add as section 26 to Article I of said constitution the following:

" SECTION 26. No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquors whatever, including ale, wine and beer. The General Assembly shall by law prescribe regulations for the enforcement of the prohibition herein contained, and shall thereby provide suitable penalties for the violation of the provisions hereof."

No question is made involving the sufficiency and regularity of the action of the Nineteenth General Assembly, and it is not claimed that there is any departure from the requirements of the constitution and statute in that action.

III. Counsel for the plaintiff insist that the amendment in question has never become operative, but is void. The grounds of their position, stated in their own language, is as follows:

"*First.* That the proposed amendment was never *published, as provided by law,* for *three months* prior to the time of choosing the legislature to which it was referred.

"*Second.* That said amendment was never *entered upon the journals of the two houses* with the yeas and nays taken thereon.

"*Third.* That the amendment voted upon by the people

and agreed to by the Nineteenth General Assembly *never passed*—was never agreed to by the Eighteenth, or the legislature first taking action thereon."

It is proper, for a clear understanding of the objections of counsel, to state here concisely, the facts, as disclosed by the records and evidence before us, upon which these several propositions of counsel are based.

1. The proposition to amend the constitution was published in the *Weekly Oskaloosa Herald*, in twelve weekly issues of the paper, beginning the 16th of June, and the last publication being in the issue of September 1.

2. The proposition was not entered upon the journals of the two houses of the Eighteenth General Assembly *in extenso*, after the several amendments were adopted by the respective houses. The original resolution and the several amendments were all entered at length, when each was offered in the respective houses, but after the adoption of the amendments, the resolution was not transcribed in its proper form as it appeared after the amendments. The resolution is more than once entered in the journal of each house by its title, and by brief statements of its purpose and effect.

3. The first sentence of the substitute for, or amendment of, the house resolution, proposed by Senator Hemenway, as offered by him, is in this language:

"No person shall manufacture for sale, or sell, or keep for sale as a beverage, or to be used for such purpose, any intoxicating liquor whatever." On motion of Senator Kimball the words "including ale, wine and beer" were added to this sentence. The journal further shows that, on motion of Senator Woolson, the words "for such purpose" were stricken from Senator Hemenway's substitute, and thereupon, without further amendment, the substitute was adopted, and, on the same day, the joint resolution, as amended, was adopted. The first sentence of Senator Hemenway's substitute above quoted, after the amendments as shown by the journal of the senate, would read as follows: "No person shall manufacture for

sale, or sell, or keep for sale, as a beverage, *or to be used,* any intoxicating liquor whatever, including ale, wine and beer." Attention to the journal of the house discloses the facts that the joint resolution, and the amendments adopted by the Senate, were sent to the house and concurred in by that body, and formally adopted, after having been considered and reported upon by the proper committee. The joint resolution was then enrolled, the proper committee reporting that the enrollment was correct. The resolution as enrolled does not contain the words "or to be used," but sets out the proposed amendment in the exact form and language in which it was concurred in by the Nineteenth General Assembly, and submitted to the vote of the electors of the state.

IV. The objections to the validity of the amendment urged by plaintiff's counsel involve three issues of fact presented by the following questions:

1. Was the notice published for the time prescribed by the constitution—three months—in the *Weekly Oskaloosa Herald?*

2. Was the joint resolution entered upon the journals of the Eighteenth General Assembly?

3. Did both houses of the Eighteenth General Assembly pass and agree to the resolution in the language and form in which it was agreed to and adopted by the Nineteenth General Assembly.

V. There was much discussion, in both the oral and printed arguments of counsel representing both sides of the case, upon the question whether the provisions of the constitution requiring publication of the proposition to amend that instrument, and directing that it be entered upon the journals of the respective houses of the General Assembly, and that the same proposition be voted upon by successive General Assemblies, are directory, and obedience thereto may be rendered at the discretion of the General Assembly; or whether they are mandatory, and disregard thereof will avoid the action of the two General Assemblies in submitting the prop-

osition to the people, and will annul the vote of the people adopting it. I find it unnecessary to consider these questions, and, for the purposes of this case, concede that the provisions of the constitution referred to are mandatory, and cannot be disregarded by the legislature or any other department of the government.

VI. It is now my duty to enquire by which department of the government the issues of facts above pointed out are to be determined. The constitution and laws nowhere prescribe a tribunal to try these issues. There must be a compliance with the constitution in these respects, to give the General Assembly, last acting upon the proposition, jurisdiction. The constitution withholds power from that General Assembly to adopt and submit the proposition to the people, unless it be determined that its requirements referred to had been obeyed. No other department of the government, and no officer of the state, can determine the facts for the General Assembly. They must be determined, for they rest at the very foundation of the jurisdiction of the General Assembly. The constitution undoubtedly contemplates that these questions of fact shall be determined, and that such determination shall be by the General Assembly itself. The humblest officer of the state is authorized to determine the extent of his powers and jurisdiction, when called upon to exercise his authority. The effect of his determination is another question. I think it cannot be denied that the Nineteenth General Assembly was authorized to determine the questions of fact involved in the proceedings pertaining to the adoption of the proposition by the Eighteenth General Assembly, and to the publication thereof.

Attention to the joint resolution of the Nineteenth General Assembly, submitting the proposition to the vote of the people, reveals the determination of that General Assembly, to the effect that the prior General Assembly, the Eighteenth, did, "in due form," agree to the identical proposition submitted to the people and adopted by their vote; that it was en-

tered upon the journals of each house of the Eighteenth General Assembly, and was published as required by law. Here we find the very jurisdictional facts determined by the department of the government required to act upon them. Under this determination, the Nineteenth General Assembly assumed to act upon the proposition. The determination of these facts, as we have seen, was entrusted to it by the constitution, for their determination was necessary, and no other branch of the government, and no public officer, was authorized to make the determination. The Nineteenth General Assembly, as we have seen, under the rule applied to all courts and officers, was authorized to determine these facts, as its jurisdiction rested upon them.

VII. I will next proceed to inquire as to the effect of this determination of the Nineteenth General Assembly. It is a familiar rule that the adjudications of courts, as to facts whereon their jurisdiction is based, is conclusive, while they stand unreversed, and cannot be questioned in collateral proceedings. Thus, when a court has found as a fact, the service of process or notice, upon which its jurisdiction depends, its adjudication to that effect is conclusive in collateral proceedings. This is the settled rule of this state, and does not demand for its support the citation of authorities.

The legislature may, in certain cases, discharge judicial functions. This is done by each house in determining contested elections, and in inflicting punishments for contempts and breaches of privilege, and in other cases. Its decision in such cases, and the records thereof, have the same effect and solemnity as the judgments of the courts. Cushing's Law and Practice of Legislative Assemblies, p. 173, sections 425, 426. The warrant of the speaker of the House of Commons, it is held in England, is entitled to the same respect, and should be construed in the same manner, as a warrant issued by any of the courts of Westminister. In *Gosset v. Howard*, 10, Q. B., 459 (59 E. C. L. R., 358), decided in the Exchequer Chamber, Park, B., delivering the judgment reversing the

decision of the Queen's Bench, quotes approvingly the following language of Mr. Justice Powys in *Regina v. Paty*, 2 Ld. Raymond, 1108. "The House of Commons is a great court, and all things done by them are intended to have been *rite acta.*"

As I have pointed out, the Nineteenth General Assembly was charged with the duty and authority to determine the facts whereon its jurisdiction rested. Their determination required the exercise of the power of judicature. The rules applicable to the decisions and records of courts are therefore applicable to the determination of the Nineteenth General Assembly, upon the facts pertaining to its jurisdiction. Its decision is a verity that cannot be questioned or impeached. This position is not only in accord with principle and authority, but is supported by sound public policy. One department of the government is not superior to another, nor is it charged with the supervision of other departments. Each has plenary authority and power within its own sphere. The General Assembly is alone charged with the duty and power of determining whether an enactment ought to be passed, and, if the exercise of power to pass it depends upon facts which the legislature is authorized to determine, its determination must be conclusive. Were it otherwise, legislation would rest in uncertainty. But the public interest and public policy demand certainty in all legislative enactments. The mischief, which would result from a rule allowlowing the courts, or the executive department of the government, to determine facts whereon the jurisdiction of the General Assembly is based are obvious, and need not be here enumerated.

It will not, I think, be doubted, that the rule I have stated is applicable to the adjudications of courts. The cases in this court are uniform in so holding. Of the many wherein this question is decided, only the following need be here cited: *Shawhan v. Loffer*, 24 Iowa, 217; *Cooper v. Sunderland*, 3 Id., 114; *Shea v. Quintin*, 30 Id., 59. The rule has been

applied by this court to the proceedings of city and township officers charged with the duty of levying taxes.   See *Ryan v. Varga*, 37 Iowa, 78; *West v. Whitaker*, Id., 598; *Macklot v. City of Davenport*, 17 Id., 379.   And it has been applied to the action of county supervisors in proceedings to re-locate county seats.   *Baker v. Supervisors of Louisa Co.*, 40 Iowa, 226; *Bennett v. Hetherington*, 41 Id., 142.

The following cases among many decisions of other courts sustain my conclusion upon the point of the case now under consideration.   *The U. S. v. Arredondo*, 6 Pet., 691; *Commissioners of Knox County v. Aspinwall*, 21 How., 539; *Evansville, etc., R. R. Co., v. City of Evansville*, 15 Ind. 395; *Betts v. Bagley*, 12 Pick., 572; *Martin v. Mott*, 12 Wheat., 19; *Brittain v. Kinnaird*, 1 Brod. & Bing., 432; (5 E. C. L. R., 127–137); *Vanderhydin v. Young*, 11 Johns., 150; *Birdsall v. Phillips*, 17 Wend., 464.

If the determination of inferior courts, of executive, township, county and city officers, upon questions pertaining to their jurisdiction, while unreversed, is conclusive in collateral proceedings, surely the rule should be applied to the adjudication of a legislative assembly.   Upon this point, in my judgment, there can be no doubt.   It was held by this court in *Shawhan v. Loffer*, 24 Iowa, 217, (228–9,) that when the question of service of notice, whereon a court's jurisdiction rested, was before such court, and the return or proof of service prescribed by law appeared to be wholly insufficient, and the court entertained jurisdiction, we will presume that the evidence was before the court in some other form than by the return or proof showing legal service.   The same presumption will be exercised in this case.   We must presume that it was made to appear to the Nineteenth General Assembly that all the requirements of the constitution upon which jurisdiction to adopt the proposition rested, had been performed.   When it is remembered that the Nineteenth General Assembly had access to the original resolution, which showed erasures striking out the words "or to be used," and that one-half of the

senators in that General Assembly were members of the Eighteenth General Assembly, all having great familiarity with the action and the proceedings of that body, and being conversant with the legislative history of the resolution, and that it was a subject attracting the attention of all classes of the people of the state, it will be readily seen that proof of the regularity of the proceedings pertaining to the amendment was accessible on every hand.

VIII. But, in my opinion, the conclusion may be reached, supporting the validity of the amendment upon other grounds than the one I have just stated, which are wholly satisfactory, and are fully in accord with principle and the authorities. I will now proceed to their consideration, noticing the objections urged by plaintiffs' counsel, in the order of their statement as quoted above.

The first objection, in counsel's own words, is this: "The proposed amendment was never published as provided by law, for three months prior to the time of choosing the legislature to which it was referred." Art. X, section 1, of the constitution, provides that the proposed amendment "shall be published, as provided by law, for three months previous to the next general election at which members of the General Assembly shall be chosen. The statute provides that the publication shall be for the time prescribed in the constitution. The election at which members of the General Assembly, to which the proposition to amend the constitution was referred, were chosen on the second Tuesday, the 11th day, of October, 1881. Code, § 573; Constitution, Art. III, Sec. 3. The proof shows that the publication in the *Weekly Oskaloosa Herald*, "three months (twelve weeks) successively * * * *, commencing with the date of June 16, and ending September 1, A. D. 1881." Neither the constitution nor the statute prescribes the number of publications which shall be made. They simply provide that the proposition shall be published for three months before the election. It appears that the newspaper was issued weekly, and that the proposition was pub-

lished in no more than twelve issues. The purpose of the constitution is to prescribe that three months notice of the proposition shall be published. The first publication was more than three months before the election. It was then published in contemplation of the constitution. It cannot be insisted, in the absence of any direction to repeat the publication, that the requirement of the constitution was not obeyed. The words, "shall be published three months," do not relate to the act of printing the notice, but to the notification given to the people. The notice is published by printing it in the newspaper, whether once or oftener. The first issue of the newspaper is a publication, and, in the case before us, this was more than three months prior to the election. It is held in *Leffler v. Armstrong*, 4 Iowa, 482, that the notice of a sale under a deed of trust, which required thirty days' notice to be given, was sufficient, though less than thirty days intervened between the first and last issues of the newspaper containing the notice. No objection was made in the case upon the ground that the notice had not been printed often enough. It was claimed that the time prescribed in the deed of trust, thirty days, did not intervene between the first and last days of publication. The same objection is urged in the case before us. Chief Justice WRIGHT uses the following language in announcing the decision of the court: "And if public notice was what the parties designed, and if such notice is given by the contemplated circulation and reading of the paper, and not merely by taking the impression from the type in the printing office—why is there not as much as thirty days' notice, if that length of time intervenes between the first publication and the day of sale, as where it intervenes between the first and last publication? To our minds, there can be but one correct answer to this last question, and the error of any other view arises from this fact, that the notice is treated as being given or imparted on the day of and by the printing of the paper only, and not upon the days when it is being circulated and read, and by such circulation and reading; and

we conclude, therefore, that the notice in this case, having been published successively in the newspaper, and thirty days having elapsed between the first publication and the day of sale, such notice was sufficient, and the title of the purchaser is not invalidated for any supposed irregularity in this respect." The learned chief justice in the opinion, criticises the decision in *Armstrong v. Scott*, 3 G. Greene, 433, and shows that whatever is found therein contrary to the conclusion he reaches, is *dictum*. *Andrews v. Ohio & M. R. R. Co.*, 14 Ind., 169, and *Muskingum Valley Turnpike Co. v. Ward*, 13 Ohio, 120, support my position upon this point of the case. They hold that a requirement of sixty days' notice in the newspaper is obeyed by one publication made sixty days before the day fixed ed in the requirement.

Our statutes requiring the publication of notice in newspapers for a specified time, where more than one insertion is required, uniformly prescribe the number of insertions, or in direct language indicate the precise number of the issues of the paper which shall contain the notices. Indeed, I think there is scarcely an exception to this common practice to be found. See Code, § § 1062, 1122, 1470, 2341, 2619, 3080. The inference may be fairly drawn that, in the absence of language indicating the number of publications of a notice, one made at the time prescribed is a compliance with the requirement of the statute.

IX. Plaintiff's second objection to the amendment is based upon the claim that it was not *entered* upon the journals of the two houses of the Eighteenth General Assembly. It is insisted that the constitution requires the proposed amendment to be copied, transcribed, set out in full, upon the journals. This was not done, but it was entered by its title, or a statement of its purpose and effect, more than once in the journal of each House. The language of the constitution relied upon to support plaintiffs' position is this: "Such proposed amendment shall be *entered* upon their journals."

The definition of the word "to enter," as given by Web-

ster, which is applicable to it in the connection it occupies in the clause of the constitution under consideration, is this: "To inscribe; to enroll; to record; as to enter a name, a date, or a statement of fact; to enter a debt in a ledger, a manifest of a ship, or of merchandise in a custom house, and the like." Worcester's definition is: "To set down in writing; to register." It will be observed that none of these definitions necessarily conveys the idea of copying or transcribing an instrument of writing. There can be no claim to the contrary except, possibly, as to the word "to record," used in Webster's definition. But one of his definitions of the word "to record" is "to make a note of." I think I may safely say that the word "to enter", in its common use, has not a meaning synonymous with "to copy," or "to transcribe." Without qualifying words, the idea conveyed by its use in relation to papers or accountants, is the writing down of their substance, character or description, for purposes expressed or understood.

The word is doubtless used in the constitution with reference to the practice prevailing in legislative assemblies in keeping their journals. Bills and other matters acted upon are not commonly transcribed, copied upon the journals, but are entered by their titles or by a statement of their contents, or otherwise. It is said, "the assembly itself may direct a particular proceeding to be entered or not to be entered on the journals, or to be entered thereon in a particular manner, or with explanatory remarks stating the grounds of it. In general, it is the custom, in the legislative assemblies of the United States, to make the entries in a more concise and summary form. Cushing's Law and Practice of Legislative Assemblies, p. 169, section 418. The same writer declares that the constitutional requirement that a journal be kept, "though imperative as to the keeping of a daily record of the proceedings, leaves the form and manner of keeping it wholly to the assemblies themselves, who may, notwithstanding, direct what entries shall be made therein." Id. p. 171, section 422. This author may be quoted with confidence, in view

of the fact that the rules of parliamentary practice announced by him are recognized by legislative enactment of this state. See Code, § 27.

The word "to enter" is much used in the legislation of this state. We are required by the rules for the exposition of constitutional and statutory provisions to consider and adopt the meaning of words as shown by their use in the statutes and constitution of the state.

The collation of forty-four instances of the use of the word "to enter," in the Code, and constitution of the state, conclusively shows that, without qualifying words, it does not have a meaning synonymous with "to copy," or "to transcribe," but implies the making of a record or a writing showing facts, memoranda, statements, or the character, title or contents of written instruments. When used to indicate the making of a record, as of a judgment, it does not convey the idea of copying or transcribing a paper, but rather of writing in the proper book, in due form, the decision or order announced by a court or judge.

The instances of the use of the word above referred to are found in the following sections of the Code:—56, 57, 66, P. 8, 76, 197, 198, 199, 201, 308, 314, 320, 321, 845, 1925, 1926, 1943, 1944, 1945, 2858, 2861, 2864, 2865, 3029, 3031, 3426, 3515, 3568, 4367, 4471, 4685, 4697, 4698, and in constitution Art. 3, sections 10 and 16.

In Code, § 308, the words "to record" and "to enter" are both found; the first indicating the writing out at length of orders, proceedings, etc., and the second requiring certain matters appearing in a written instrument to be written in a book.

When the word "to enter" is used to direct documents or procedings to be copied *in extenso*, qualifying words accompany it, as, in Code, § 314, a proposition voted upon by the people, and the result, are required "to be entered *at large*" and in a book. So in section 4471, a verdict is required to be entered "in full," and in the same section a certain

*fact* is required to be entered upon the record. So section 320 directs that "full entries" shall be made of certain resolutions and decisions of the board of supervisors.

I reach the very satisfactory conclusion, based upon the uniform practice of legislative assemblies, and the meaning of the words of the constitutional requirement under consideration, as commonly understood and as taught by their use in the laws of the state, that Art. X, section 1, of the constitution does not require a proposition for amendment to be copied, transcribed, entered in full, upon the journals of the respective houses of the General Assembly adopting the measure, and that its directions were followed by the General Assembly in the proceedings under consideration.

X. I come now to the consideration of the third objection of plaintiffs to the amendment, viz.: "The amendment voted upon by the people and agreed to by the Nineteenth General Assembly never passed—was never agreed to by the Eighteenth, or the legislature first taking action thereon." This objection is founded upon the claim that the proposition for the amendment, as it passed the senate, and possibly the house, of the Eighteenth General Assembly, contained the words "or to be used," which are not found in the joint resolution agreed to by the Nineteenth General Assembly, and voted upon by the people. The facts upon which the plaintiffs' claim is based, are plainly set out in my statement of facts.

It has before been stated that the enrolled joint resolution of the Eighteenth General Assembly, which was signed by the speaker of the house, the president of the senate and the governor, does not contain the words, "or to be used," and the proposition in the identical words of this enrollment was agreed to by the Nineteenth General Assembly, and adopted by a vote of the people. Under the practice of the General Assembly of this state, all acts and joint resolutions are enrolled and signed by the presiding officer of each house, and by the governor. They are then deposited with the Secretary, and become the original and authoritative acts of the

General Assembly. This enrollment is the record of final action of the legislative department of the government in making the laws, and of the governor in approving them. It holds the relation to all prior proceedings, in the course of legislation, of the judgment of a court to the pleadings and other proceedings of an action. It is the authoritative and conclusive expression of legislative will, and is a verity. Whatever may be found in the prior proceedings, inconsistent therewith, cannot invalidate the enrolled act. It will be presumed that they were changed by the exercise of the legislative will, and such change is evidenced by the enrollment. This doctrine has been more than once recognized by this court. See *Duncombe v. Prindle,* 12 Iowa, 1; *Clare v. The State,* 5 Id., 509. It is declared in the first named case that behind the enrolled act "it is impossible for any court to go for the purpose of ascertaining what the law is."

This doctrine is not peculiar to this court. It has been recognized by the courts of many other states, and, in my opinion, is supported by the preponderance of the authorities. See *Mayor of Annapolis v. Harwood,* 32 Md., 471; *Fouke v. Fleming,* 13 Md., 392; *Berry v. Railway Co.,* 41 Md., 446; *Sherman v. Story,* 30 Cal., 253; *State v. Swift,* 10 Nev., 176; *Louisiana Lottery v. Richoux,* 23 La. Ann., 743; *People v. Devlin,* 33 N. Y., 269; *Eld v. Gorham,* 20 Conn., 8; *Evans v. Browne,* 30 Ind., 514; *Pangborn v. Young,* 32 N. J., 29; *Brodonax v. Groom,* 64 N. C., 244; *Pacific R. Co. v. The Governor,* 23 Mo., 353; *Division of Howard County,* 15 Kas., 194; *Commissioners of Leavenworth Co. v. Higginbotham,* 17 Kas., 62; *Green v. Weller,* 32 Miss., 650; *Swan v. Buck,* 40 Miss., 268; *Southwark Bank v. Commonwealth,* 26 Pa. St., 446; *Bank of Pennsylvania v. Commonwealth,* 19 Pa. St., 144.

*Sherman v. Story, State v. Swift,* and *Pangborn v. Young, supra,* present able and exhaustive discussions of the doctrine, and extensive reference to the adjudged cases wherein it is considered. It is supported by reason and

sound legal principle, and has been recognized by this court; it must be regarded as a settled rule in this state.

XI. I have before stated that, under the legislative practice of the state, joint resolutions are enrolled in the manner of the enrollment of statutes. It is said in Cushing's Law and Practice of legislative assemblies, p. 930, section 2403, that "this form of legislation is recognized in most of our constitutions, in which, and in the rules and orders of our legislative bodies, it is put upon the same footing and made subject to the same regulations with bills properly so called. In Congress a joint resolution, which is the name given in that body to this kind of legislation, is there regarded as a bill."

While there is nothing in the constitution or statute directing the enrollment of bills and joint resolutions, in view of the prevailing legislative practice and rules which existed before the adoption of the constitution, it must be regarded as done under authority of law, and the enrolled bill must be regarded as the ultimate and authoritative expression of the legislative will.

XII. Under article 3, section 26, of the constitution, laws do not take effect until the fourth day of July next after their passage, unless it is provided that they take effect upon publication. No such provision is found in the joint resolution proposing the amendment. Counsel for plaintiff insist that the resolution had not gone into effect when the vote of the people was taken on the 27th day of June following its adoption, for the reason that it had not been published.

Attention to article 10, section 1, of the constitution, prescribing the manner of amending the constitution, will disclose the fact that this objection is not well founded. The office of the joint resolution in question is to enable two successive General Assemblies to reach a concurrence upon the proposition to amend the constitution, and the form thereof. Its adoption is, in fact, such a concurrence. Here its office ends. It is then within the power of the last General Assembly, and becomes its duty, to submit the proposition to a

vote of the people in the manner and at such time as shall be prescribed. This the clause of the constitution above referred to, plainly provides shall be done by the last General Assembly, and, of course, it may be done immediately upon the adoption of the joint resolution. It plainly appears that under the constitution the joint resolution takes effect at once. The provisions in regard to publication of laws are not applicable to it. Upon this point I will consume no more time. A reading of the clause of the constitution, without argument or comment, sufficiently supports my position.

XIII. The provisions in regard to publication are applicable to the statute providing for the time and manner of the election upon the proposition. This statute, chapter 192, acts Nineteenth General Assembly, was published as required by the constitution.

XIV. Counsel for plaintiff insist that, as the manufacture and sale of beer was lawful when plaintiff acquired and erected his brewery, it is not within the power of the state, by its constitution or statutes, to prohibit the manufacture of beer by plaintiff, for the reason that it would reduce the value of his brewery, thereby impairing vested rights of property, secured by the constitution of the United States.

Statutes prohibiting the manufacture and sale of intoxicating liquor have been upheld by repeated decisions of courts of this and other states. These decisions are too familiarly known to be here cited. They have also been sustained by the Supreme Court of the United States. Among other cases decided by that court, see *License Cases*, 5 How., 504 (513); *Bartemyer v. Iowa*, 18 Wal., 129; *Beer Co. v. Mass.*, 97 U. S., 25. If it be competent for a state to prohibit by statute the manufacture and sale of intoxicating liquors, it can do so by its constitution.

This point was not argued by counsel for plaintiff to a great extent, and is but barely stated in their printed brief,

and no authorities are cited in its support.   It demands no further attention.

XV.   We are asked in this case to declare a·legislative act, having·the force and effect of law, to be void for want of conformity with constitutional provisions, and to set aside an amendment to the constitution on the ground that it was not adopted in pursuance of the provisions of that instrument.   It cannot be doubted that the same rules should guide us in reaching a judgment that we are required to follow when passing upon the constitutionality of a statute.

It is a settled rule that courts will never declare a legislative act unconstitutional when a doubt upon the subject exists in the judicial mind.   All doubts will be solved in support of the act, and unless the violation of the constitution be clear and palpable, it will be sustained.   The rule is announced in the strongest language, only varied to gain force of expression.   CHIEF JUSTICE MARSHALL declares that "the question whether a law be void for its repugnance to the constitution, is at all times a question of much delicacy, which ought seldom, if ever, be decided in the affirmative, in a doubtful case."   "The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with·each other." *Fletcher v. Peck,* 6 Cranch, 87, 128.

Justice WASHINGTON states the rule in the following language:   "The presumption, indeed, must always be in favor of the validity of laws, unless the contrary is clearly demonstrated."   *Cooper v. Telfair,* 4 Dal., 14.   "It is but a decent respect due to the wisdom, the integrity, and the patriotism of a legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond a reasonable doubt."   *Ogden v. Saunders,* 12 Wheat., 213, 270.

Chief Justice SHAW, adhering to the rule that courts should never declare a legislative act unconstitutional unless

its invalidity is shown beyond a reasonable doubt, announces the rule that "if a legislative act may or may not be void, according to circumstances, courts are bound by the plainest principles of exposition, as well as just deference to the legislature, to presume the existence of those circumstances which will support it, and give it validity." *Wellington et al. Petitioners*, 16 Pick., 87, 97.

Judge BLACKFORD declares that, when the validity of a law is brought in question, it is the duty of courts "to decide in favor of the validity of the statute, unless its unconstitutionality is so obvious as to admit of no doubt." *State v. Cooper*, 5 Blackf., 258.

The rule has been often recognized by this court in language equally broad and strong. In *Santo v. The State*, 2 Iowa, 208; it is declared that a law will not be held unconstitutional, "unless the case be clear, decisive, and unavoidable."

In *Morrison v. Springer*, 15 Iowa, 304, 347, this court quotes with approbation the following language of the Supreme court of Pennsylvania in *Sharpless et al. v. The Mayor of Philadelphia*, 21 Pa. St., 147 (164): "We can declare an act void only when it violates the constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds." It is not necessary to cite others of the many cases found in the reports of this and other states, and in the decisions of the courts of the United States, recognizing and enforcing the rule stated, always expressed in the strongest and most direct language.

I am justified in asserting with confidence that no court can be justified in holding that the legislative acts and proceedings assailed in this case are, without the gravest doubts, in conflict with the constitution. Indeed, such a claim would hardly be expected from counsel in the case. I am quite sure the most that can be said by the members of the profession who do not fully concur in the positions I have above announced, is, that they are doubtful. In that view it is the

duty of the court to sustain the legislative acts and proceedings brought in question in this case.

For myself I am free to say that I entertain no doubt upon a single one of the propositions I have announced. I am most thoroughly satisfied that the acts and proceedings of the General Assembly, brought in question in this case, are all in harmony with the constitution.

XVI. I will now proceed to notice the conclusions and arguments expressed in the opinion of the majority of the court, announced by Mr. Justice SEEVERS. His first point is intended to establish the proposition that the journals of the houses are conclusive evidence and show:

1. That the joint resolution was not agreed to by both houses of the Eighteenth General Assembly in the language and form of the resolution adopted by the Nineteenth. The fact is conceded that the enrolled resolution passed by each of these General Assemblies is the same. But the opinion of the majority insists that the journals show differently.

2. That the resolution was not entered upon the journals of the houses of the Eighteenth General Assembly, and that this is conclusively shown by the journals. These positions are based upon a doctrine, which is claimed by the majority of the court to be expressed in the quotation they make from Cooley's Constitutional Limitations (4 Ed.), 169. This quotation constitutes the text of the first point of the opinion, and the foundation and the keystone of the arch whereon the structure built by the argument of the opinion is based. In my judgment, my brothers have failed to weigh and measure the words of the quotation whereon they rest their conclusions announced in this point of their opinion.

Attention to the language of the quotation clearly shows that the learned author refers to and speaks of the method and manner pursued in adopting a statute, and not to its language, form, contents, or substance. His language does not express the thought that courts are to go to the journals to ascertain the language, form, and substance of the statute.

He does mean to say that the journals are evidence of the method pursued, the proceedings had, in adopting the statute. To make my position so plain that it cannot be disputed, I will reproduce the words of the author, quoted in the majority opinion, so far as they bear upon this point, viz.: "If it should appear from the journals that any act did not receive the required majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence and adjudge the statute void." To the end that the meaning of the author may be made plainer, I will repeat the quotation in what no one can deny is a correct paraphrase of the text under consideration, as follows: "If it should appear from their journals that any act did not receive the requisite majority," [a matter pertaining to the method and manner of proceedings] "or that in respect to it the legislature did not follow any requirement of the constitution," [referring to the method of proceedings, not to the language, form, or substance of the statute] "or that in any other respect the act was not constitutionally adopted," [referring again to proceedings of the legislature, not to the contents, language, or form of the statute] "the courts may act upon this evidence and adjudge the statute void."

Now my brothers use this quotation to sustain their position that we must take the journals as conclusive evidence that the words and substance of the joint resolution adopted by both houses of the Eighteenth General Assembly, is different from the one adopted by the Nineteenth General Assembly. It must be kept in mind that just now I am not considering proceedings or methods of the legislature in adopting the resolution, but whether the resolution passed by both houses of the Eighteenth General Assembly, in form, language and substance, is the same as the resolution passed by the Nineteenth General Asssmbly. The question upon this point relates to the identity of the words of the resolution

passed by the two legislatures. Judge Cooley's language, quoted by the majority, relates to the proceedings of the legislature and not to the language or form of its enactment. I am justified in expressing surprise that the meaning and effect of the quotation has not been observed by the majority of this court. And right here is the fatal error in the foregoing opinion, which has misled my brothers. The distinction I make between the contradiction by evidence of the words, form, and contents of a legislative act, and showing that it was not in fact adopted, is pointed out in *Mayor of Annapolis v. Harwood*, 32 Md., 471.

In support of the doctrine announced by Judge Cooley, as interpreted by the majority of the court, they cite a number of cases, which may be classified as follows:

1. Those which hold the legislative journals may be used to show that a statute did not receive a majority vote, or the yeas and nays were not taken and recorded, or some other constitutional provision as to the method and form of legislative proceedings were not followed. To this class belong the Illinois cases. *Smithee v. Garth*, 33 Ark., 17; *Board of Supervisors v. Heenan*, 2 Minn., 330; *Osburn v. Staley*, 5 W. Va., 85.

2. Those which hold that it may be shown that an act was not in fact passed by, or was defeated in, one or both of the houses. *Burr v. Ross*, 19 Ark., 250; *Jones v. Hutchinson*, 43 Ala., 721; *Opinions of the Judges*, 35 N. H., 579; *Opinions of the Judges*, 52 N. H., 622.

3. Those which hold that the form, language and contents of the statute as enrolled may be shown to be different from the bill which passed the legislature. *Moody v. The State*, 48 Ala., 115; *The State v. Platt*, 2 S. C. (N. S.), 150.

It may be admitted that *Jones v. Hutchinson*, 43 Ala., 721, contains reasoning, and probably facts, which bring it within the class last named.

*Miller v. Goodwin*, 70 Ill., 659, has no bearing upon the question in hand. It simply holds that *certified* copies of

the journals may be admitted in evidence. But *Ryan v. Lynch*, 68 Ill., 160, not cited by the majority of the court, belongs to the first class. It follows the prior Illinois cases. None of them are elaborately considered, and the court in *The People v. Starne*, 35 Ill., 121, while following the prior decision of the same court, express doubts as to its soundness.

I will now proceed to notice some of the cases cited by the majority which I have not included in any one of the classes for the reason that they support my views of the case.

*Southwark Bank v. Commonwealth*, 26 Pa. St., 446, holds that the journals were properly admitted to show that a bill had not been passed by either house which had been signed by the Governor through mistake. The court says: "It is true that the journals are not evidence of the meaning of a statute, because this must be ascertained from the language of the act itself, and the facts connected with the subject upon which it operates," and cites *Bank of Pennsylvania v. Commonwealth*, 19 Pa. St., 144, wherein it is said that the court in construing an act will not look to what occurred upon its passage through the legislature, or into the journals, declaring that such evidence "was not only of no value, but delusive and dangerous." I may fairly cite these cases in support of my position.

*The People v. Mahaney*, 13 Mich., 481, is hardly in point, but probably belongs to the first of the above classes. It does not hold that the form and contents of a statute may be ascertained by going to the journals, but from them it may be ascertained if the law was constitutionally passed.

In *Berry v. Railway Co.*, 41 Md., 446, a clerk fraudulently or negligently changed a date in a bill. The journal was considered to establish this alteration. The court used this language in deciding the case: ."Nor do we decide in this case that the journals of the two houses, *though required by the constitution to be kept as records of their proceedings,* would be evidence *per se* upon which the validity of a statute having the required authentication could be successfully ques-

tioned as to the *manner* of its enacting.   But, as we think, the
journals, in connection with other competent evidence upon
the subject, may be examined as a means of information, as
aid in arriving at a correct construction as to what was the
action of the legislature upon any particular bill."   It is de-
clared that such evidence must be of a satisfactory character.
In the case before us there is no evidence except the journals.
It will be observed that the decisions of two states, Alabama
and South Carolina, support the view of the majority of the
courts.   My position has the support of the decisions of the
courts of twelve states.

Now I insist that the doctrine of Judge Cooley, and of the
cases cited in its support, is no warrant for holding that we
may look to the journals in order to determine the words, form,
contents, and substance of the statute, and that the statute it-
self, the enrolled act, is not conclusive as to its language,
form and substance.   I will admit the doctrine does apply to
what may be called proceedings ending in the enactment of
the statute, that is, the method and manner of its enactment.
Hence, it may legitimately be cited to support the position of
the foregoing opinion in regard to entering the resolution
upon the journals.   I am very clear that the dotrine in the
broad terms in which it is expressed is erroneous, but I do
not care to assail it here, for the reason that I think I have
shown conclusively that in fact, and in contemplation of the
constitution, the resolution was entered on the journals of
each house of the Eighteenth General Assembly.

XVII.   This is an appropriate connection in which to con-
sider the character of legislative journals, as evidence.   I
will briefly state the manner of keeping the journals of the
legislative assemblies of this state.   The proper journal clerk
enters on loose sheets of paper the proceedings, as they occur,
in his own language and according to his own ability and
judgment.   The journal of the preceding day, under the
rules, ought to be read each morning, but the reading is often
dispensed with, and, when read, it is amid the confusion of the

morning hour.   The constitution, Art. 3, section 9, provides that a journal shall be kept and published by each house, but the manner of keeping is not provided for in the constitution; this is left to the statute and legislative practice. The statute provides that the clerical officers of the respective houses shall transcribe the journals in books, and certify to their correctness.   They are then delivered to the Secretary of State, who superintends the printing thereof.   Acts Sixteenth General Assembly, Chap. 159, sections 4, 5; McClain's Statutes, p. 29.   It is not the practice, and never has been, to copy bills or resolutions in the journals.   They are entered there by their titles, or by a brief description, and often by their numbers.   As I have shown, the requirement of the constitution, that the proposition or resolution for its amendment shall be entered upon the journal, means that it shall be entered according to the legislative practice, and as contemplated by the word "to enter," which does not mean "to transcribe" or "to copy," but the statement of the title, substance, or description of the resolution.

Now the majority of the court hold that a legislative enactment, duly enrolled—the enrollment reported correct by the committees of the two houses, signed by the president of the senate, and speaker of the house, and approved by the governor, who attests his approval by his official signature, and finally filed in the archives of the state, may be shown not to have passed one or both houses of the General Assembly in the form and language in which it appears in the archives of the state, by these journals, which are, at best, but copies made from original journals kept by mere clerks; and, in the case before us, the omission of the journal to show that the words "or to be used" were stricken out, is taken as conclusive evidence.   It will be remarked that the journal does not show that the words were not stricken out—it simply omits to show that they were, while the enrolled act, authenticated with all the care and solemnity that ingenuity could devise—by the report of an enrollment committee, being

members of the respective houses, by the attestation of the signatures of the presiding officers of the two houses, and finally by the official signature of the chief executive officer of the state, shows that no such words were in the resolution as it passed the General Assembly.

The law has no rule of evidence like unto this. I challenge the production of a case where a solemn instrument, public or private, has been annulled or set aside upon evidence of the character of these journals. The rule contended for makes the weaker and more imperfect evidence of greater effect than the stronger and more solemn. It fairly reverses the rule in regard to the weight of documentary evidence. I have seen no decision of a court sustaining the rule contended for by the majority of this court. If one could be produced, which I think impossible, I am free to say, I would not follow it.

XVIII. But it is said that the constitution and the law make the journals evidence. Certainly they are evidence for just what they are worth. But the constitution and laws also make the enrolled statutes evidence. They do not declare that the journals shall be evidence superior in credibility and effect to the enrolled statutes. They are both evidence, and the courts are to determine upon their weight. My brothers accept as conclusive the weaker evidence. I insist that the stronger, the more carefully prepared and solemnly authenticated, should prevail.

The opinion of the majority distinguishes this case from those I cite in support of the position that the enrolled statute is the best and conclusive evidence of what the law is, upon the ground that the constitution and statutes of the states wherein the decisions were made are different from our constitution and laws, and do not make the journals evidence. It may be here remarked that they are evidence for what they are worth without statutes. This is a common law rule, prevailing in all the states. But my investigation satisfies me that the constitution and laws of the states, the

courts of which hold that enrolled statutes cannot be impeached by the legislative journals, are not unlike our own, in requiring legislative journals to be kept, and in providing that they shall be received as evidence by the courts.

It is admitted, in the opinion of the majority of the court, that a provision similar to that of our constitution, requiring legislative journals to be kept and published, is found in the constitution of all the states. I find such a provision in all the constitutions I have examined. It was introduced in the constitutions of the states at an early day; in North Carolina in 1776; in Connecticut in 1818; in Missouri in 1821. There is nothing in our constitution or statutes prescribing the effect and weight of the journals as evidence. As I have said, the journals are admissible in evidence at common law. The journals are, therefore, evidence in states where there are no statutes similar to our own. The cases I cite cannot, therefore, be distinguished from the one before us, as the opinion of the majority attempts to do.

XIX. The majority of the court quote from the opinion of the court in *The People v. Devlin*, 33 N. Y., 269, to sustain their position that the legislative journals have more weight in this state, under our own peculiar statutes and constitution, than they have in New York. An examination of the constitution of New York will reveal nothing in it differing from our own. As the journals are competent evidence at common law, I need not inquire as to the statutory provisions on the subject, to learn that they are not made conclusive evidence by statute in this or any other state.

The quotation of the whole paragraph in the opinion in *The People v. Devlin*, from which the majority quote a part of a sentence, presents the true view of the law, for which I contend. Mr. Justice POTTER, in announcing the decision of the court, uses this language: " I am of the opinion that the legislative journals were not legitimate evidence to impeach the statute produced. They are not made evidence by the constitution; they are not made so by the statute;

they were never made so by the common law. They are, doubtless, evidence from the necessity of the case, on the grounds of public convenience, and from the public character of the facts they contain, to prove the proceedings of the body whose records they are, because the constitution requries them to be kept. Whenever any act or proceeding of such body becomes necessary to be shown as evidence, such journals may be received, but to impeach the force and effect of a solemn statute duly certified, no authority can be found within the limits of my research to admit them to be legitimate evidence, but much authority can be found to the contrary."

The opinion of the majority holds that the journals of the houses of the General Assembly, become evidence by virtue of the statutes of this state. This position is clearly incorrect. At common law the journals are competent evidence, and are proved by copies. See 1 Greenleaf's Ev., section 582; 2 Phillips' Ev. (Cowan & Hill's & Edwards' notes), p. 444; Starkie's Ev., 282. Of course, when admitted in evidence, they are proof of the facts recorded therein, and it may be that, as to some proceedings, they are conclusive evidence. But neither do the statutes of this state, nor the common law, make them conclusive evidence of the form, language, or contents of legislative enactments. There is really no difference in their effect and weight as evidence, under the common law and under our statutes. I think I have shown beyond contradiction that the journals cannot be used as evidence to show that an enrolled act of the legislature, a statute, was passed in a different form and expressed in language different from that found in the enrollment. It follows that we must hold that the proposition for amendment, as it passed the Eighteenth General Assembly, did not contain the words "or to be used."

XX. If the position of the majority opinion, that the legislative journals are conclusive evidence of the form, language, and substance of statutes, and other expressions of the legislative will, be correct, then must these journals become

the familiar hand-books of every judge, lawyer and officer of
the state, to be consulted and studied, before a case can be
decided under a statute, or an opinion given as to its effect
and purpose. The journals, under this view, are the original
source and the fountain of statute law. The books containing
the statutes themselves are only conveniently arranged publi-
cations, presenting secondary evidence of what the law is,
which may or may not be correct. The profession will surely
be astonished to find that they are now directed to legislative
journals to ascertain the true form, language, and contents
of statutes. The most perplexing labor will follow this as-
tonishment. I express the opinion that an examination of
the journals will reveal the fact to be that they often fail to
show enactments in the form and language in which they ap-
pear in the statute books. The opinion is based upon the
manner of keeping these journals, and the haste of their
preparation.

XXI. I do not care to notice the arguments of the major-
ity of the court in support of their position, that the consti-
tution requires the proposition for amendment shall be copied
upon the journal, further than to say, that those which are
based upon the supposed necessity, in the case of an oral
proposition of that kind being moved by a member of the
General Assembly, seem to me to be answered by the mere
statement that, under the rules and practice of legislative
bodies, matters of this kind, indeed all kinds of motions, ex-
cept those pertaining to the routine business of the body, are
always reduced to writing.

XXII. It is argued that, as the proceedings of the Gen-
eral Assembly cannot be reviewed upon *certiorari*, or in any
other manner, therefore in collateral proceedings between
private parties, wherein private rights are alone involved, the
courts may declare enactments of the legislature void upon
evidence found in the journal, which, as I have shown, is at
best but a copy, and certified to be such only by a mere clerk.
The fact that the law provides no proceedings in the courts

to review the action of the General Assembly, to my mind is conclusive that the law does not intend they shall be reviewed. The action of all officers of the state, executive, judicial, county, township, etc., etc., may be reviewed in some manner by direct proceedings; the action of the General Assembly cannot be in any manner. It is to my mind an inadmissible conclusion that, for this reason, the courts, in a collateral proceeding between private citizens, may review and hold for naught the proceedings of the General Assembly. The conclusion to my mind is irresistible that the constitution and the law do not intend that acts of the General Assembly shall be reviewed by the courts in any action or proceeding.

XXIII. Distinction is made between the joint resolution and a statute, on the ground that statutes must be signed by the presiding officers of the two houses and approved by the governor, and that the joint resolution is required to be entered upon the journals. I have shown that, under the legislative practice prevailing when the constitution was adopted, joint resolutions were regarded as acts, and passed as statutes, authenticated by the same officers, and enrolled in the same manner. The constitution does not direct whether the proposition for amendment shall be by statute or joint resolution. It surely may be made by either. I have also pointed out that the resolution for amendment was entered in the journals, according to the meaning of the word, and according to the legislative practice, and as contemplated by the constitution. It cannot be doubted that these considerations remove all grounds of distinction between statutes and the joint resolution proposing the constitutional amendment.

XXIV. Great weight is attached in the majority opinion to the fact that the journals of the senate, for the day the resolution was adopted, was read and approved by the senate. If this is a controlling fact, then the rule must be that the journals of legislative bodies must be regarded as conclusive when read, and not conclusive when not read. Surely the force of these journals as evidence is controlled by a general

rule, and are not affected by considerations of the character suggested.

XXV. The arguments of the majority opinion in support of the position that the constitution requires the proposition for its amendment to be copied upon the journals of the house, based upon the thought that this direction is necessary in order to preserve and make known the proposition, is answered by the consideration that the references to the resolution in the journals sufficiently identify it, and refer to the enrollment. The action of the legislature, and the form and contents of the resolution, are shown and perpetuated in the enrollment.

It is a rule of law that all papers or documents referred to in a writing or instrument of any character, if sufficiently identified, are to be read with and become a part of the document. In this case I am warranted in saying that the enrollment of the resolution is sufficiently referred to by entries upon the journal to identify it. The rule of law just cited requires the enrollment to be read with the journal, and to be regarded as a part of the journal when so read. The enrollment thus becomes a part of the journal. We should so regard it.

I may say here what ought to have been said in another place, that the question as to which shall prevail, the legislative journals or the enrolled statute, is one of evidence. In *Pangborn et al. v. Young*, 32 N. J., 29, it is said that a question of this character "belongs entirely to that branch of legal science which embraces and illustrates the laws of evidence." In the absence of statutory requirements, the courts will always give the greater weight to documents which are the more carefully prepared and the more solemnly authenticated, and it is the invariable rule that the record or document showing the final act and determination of tribunals or officers shall prevail over records of prior and preliminary proceedings. An illustration will make plain the application of the principle.

The journal entries and other records of a court fail to show the appearance of a party or service of process, or they may show affirmatively that service was irregular and insufficient, yet the court takes cognizance of the case and renders judgment. The judgment is the stronger evidence, and conclusively estops the denial of service of process: for it is the record of the final determination of the case, and the courts will presume the existence of every fact necessary to support it. The enrolled statute, being the final expression of the legislative will, overcomes all journal entries which contradict it. I express this argument and conclusion with confidence, believing that they are fully in accord with legal principles.

XXVI. It will be observed that my discussion somewhat lacks in orderly connection, and that some points and thoughts would more appropriately appear in another place. But this, I find, is impossible to avoid, on account of the fact that some arguments found in the opinion of the majority were added thereto after I had, as I supposed, completed my dissent. This was entirely proper, and of it I make no complaint, but think, in justice to myself, I may state it as an explanation of the form of my discussion.

XXVII. It will be observed that the opinion of the majority of the court admits that, upon the controlling—the decisive question of this case, namely, the conclusive character of the enrolled act of the General Assembly as evidence, there is a conflict of the adjudged cases in the Supreme Courts of the states of the Union. To support the opinion of the majority, in my judgment, the decisions from only two states can be cited. It will be observed that I cite the decisions of the supreme courts of twelve states holding the contrary doctrine. With this division of the authorities, the most zealous advocate of the views advanced in the majority opinion must be compelled to admit that the question is doubtful upon the authorities. I am constrained to think no one in the exercise of judicial impartiality can insist that the doc-

trine contended for by my brothers is not doubtful upon principle, and I am glad to observe that my brothers do not insist that the question is free from doubt. Other doctrines upon which their conclusions are based are admitted, in the majority opinion, to be of doubtful soundness. In view of the unquestioned doubts in the case, I am perplexed in efforts to account for the disregard, in this case, by the majority of the court, of the familiar rule recognized by all courts, which I have above stated, namely, that no act of the legislature will be held invalid by the courts, unless it be found to violate the constitution, clearly, palpably, plainly; and in such manner as to leave no doubt or hesitation in the judicial mind. It seems to me the existence of the gravest doubts cannot be denied, and, upon this ground alone, the amendment to the Constitution ought to be declared by this court valid and of force. See *Osburn v. Staley*, 5 W. Va., 85.

The mischievous consequences which will follow the recognition by this court of the doctrines upon which their opinion is based, I will not stop to consider. They will crowd upon the mind of all intelligent members of the profession. Believing these doctrines are in conflict with principle and authority, and with sound public policy, I dissent to the conclusions of the majority of the court, and express the opinion, based upon the most thorough conviction, that the judgment of the District Court ought to be reversed.

## On Re-hearing.

Day, Ch. J.—A petition for re-hearing was presented in this cause, and the whole case has been re-argued by eminent counsel with much ability and research. In view of the great interest which has attached to this question, and of its public importance, we deem it not only proper, but necessary, to examine with considerable fullness the leading points relied upon as necessitating a conclusion different from the one reached in the foregoing opinion.

I. It is asserted in the petition for re-hearing that "the judicial department of the state has no jurisdiction over political questions, and cannot review the action of the Nineteenth General Assembly, and of the people, in the matter of the adoption or amendment of the constitution of the state." This position practically amounts to this: that the provisions of the constitution for its own amendment are simply directory, and may be disregarded with impunity; for it is idle to say that these requirements of the constitution must be observed, if the departments charged with their observance are the sole judges as to whether or not they have been complied with. This proposition was advanced for the first time upon the petition for re-hearing, and, if correct, it is of course an end of the controversy. Upon this branch of the case counsel cite *Luther v. Borden*, 7 How., 1. As this case has principally been relied upon by the advocates of the theory now under consideration, and has been given great prominence in the discussions which have taken place, we desire to present its facts with a degree of fullness which, under ordinary circumstances, would perhaps be considered unnecessary, to the end that the degree of its applicability to the present case may be fully understood.

In 1841, the state of Rhode Island was acting under the form of government established by the charter of Charles II, in 1663. In this form of government no mode of proceeding was pointed out by which amendments could be made. It authorized the legislature to prescribe the qualification of voters, and in the exercise of this power the right of suffrage was confined to freeholders. In 1841, meetings were held and associations were formed by those who were in favor of a more extended right of suffrage, which finally resulted in the election of a convention to form a new constitution, to be submitted to the people for their adoption or rejection. The persons chosen came together and framed a constitution by which the rights of suffrage was extended to every male citizen of twenty-one years of age who had resided in the

state for one year.  Upon a return of the votes, the convention declared that the constitution was adopted and ratified by a majority of the people of the state, and was the paramount law and constitution of Rhode Island.  The charter government did not admit the validity of the proceedings, nor acquiesce in them.  On the contrary, in January, 1842, when this new constitution was communicated to the governor and by him laid before the legislature, it passed resolutions declaring all acts done for the purpose of imposing that constitution upon the state, to be an assumption of the powers of government, in violation of the rights of the existing government and of the people at large, and that it would maintain its authority and defend the legal and constitutional rights of the people.  Thomas W. Dorr, who had been elected governor under the new constitution, prepared to assert the authority of that government by force, and many citizens assembled in arms to support him.  The charter government thereupon passed an act declaring the state under martial law, and at the same time proceeded to call out the militia to repel the threatened attack, and to subdue those who were engaged in it.  The plaintiff, Luther, was engaged in supporting the new government, and, in order to arrest him, his house was broken and entered by the defendants, who were enrolled in the military force of the old government, and in arms to support its authority.  The government under the new constitution had but a short and ignoble existence.  In May, 1842, Dorr made an unsuccessful attempt, at the head of a military force, to get possession of the state arsenal at Providence, which was repulsed.  In June following, an assemblage of some hundreds of armed men, under his command at Chipatchet, dispersed, upon the approach of the troops of the old government, and no further effort was made to establish the new government.  In January, 1842, the charter government took measures to call a convention to revise the existing form of government, and a new constitution was formed, which was ratified by the peo-

ple, and went into operation in May, 1843, at which time
the old government formally surrendered all its powers.
Under this government Dorr was tried for treason, and in
June, 1844, was sentenced to imprisonment for life.   In Oc-
tober, 1842, Luther brought an action in the Circuit Court
of the United States, against Borden and others, to recover
damages for the breaking and entering of his house in June,
1842.   The defendants justified, alleging that there was an
insurrection to overthrow the government, that martial law
was declared, that plaintiff was aiding and abetting the in-
surrection, that defendants were enrolled in the militia force
of the state and were ordered to arrest the plaintiff.   The
plaintiff relied upon the fact that the Dorr government, to
which he adhered, was the legal government of the state, and,
as the new constitution had never been recognized by any
department of the old government, he offered to prove at
the trial, by the production of the original ballots, and the
original registers of the persons voting, and by the testimony
of the persons voting, and by the constitution itself, and by
the census of, the United States for the year 1840, that the
Dorr constitution was ratified by a large majority of the
male people of the state, of the age of twenty-one and up-
wards, and also by a majority of those who were entitled to
vote for general officers under the then existing laws of the
state.   The Circuit Court rejected the evidence, and in-
structed the jury that the charter government, and laws under
which the defendants acted, were, at the time the trespass
was alleged to have been committed, in full force and effect,
and constituted a justification of the acts of the defendants.
The correctness of this ruling involved the only question
which was taken to the Supreme Court of the United States
for review.   The Supreme Court held that the evidence was
properly rejected.   Of the correctness of that decision no
one can entertain the shadow of a doubt.   But the differ-
ences between that case and this are so many and so evident,
as to deprive it of all force as an authority in the present

controversy.   In that case an entire change in the form of government was undertaken; in this, simply an amendment, in no manner affecting the judicial authority of those acting under the existing government, is sought to be incorporated into the existing constitution.   In that case the charter provided no means for its amendment; in this, the mode of an amendment is specifically provided.   In that case the authority of the court was invoked for the admission of oral evidence to overthrow the existing government and establish a new one in its place; in this, that authority is invoked simply to preserve the existing constitution intact.

It is evident, from an examination of the entire case of *Luther v. Borden*, that the question which the court was considering pertained to the power of the federal courts to determine between rival constitutions in the states.  The power is not denied to the state courts, unless one of the constitutions involved in the controversy be the one under which the court is organized.   This is fully apparent from the whole opinion.   Referring to the trial of Thomas W. Dorr for treason, in the Supreme Court of Rhode Island, the court say: " It is worthy of remark, however, when we are referring to the authority of state decisions, that the trial of Thomas W. Dorr took place after the constitution of 1843 went into operation.   The judges who decided that case, held their authority under that constitution; and it is admitted on all hands that it was adopted by the people of the state, and is the lawful and established government.   It is the decision, therefore, of a state court, whose judicial authority to decide upon the constitution and laws of Rhode Island is not questioned by either party to this controversy, although the government under which it acted was framed and adopted under the sanction and laws of the charter government.   The point, then, raised here has already been decided by the courts of Rhode Island.   The question relates altogether to the constitution and laws of that state; and the well settled rule in this court is, that the courts of the United States adopt and

follow the decisions of the state courts in questions which concern merely the constitution and laws of the state. Upon what ground could the Circuit Court of the United States, which tried this case, have departed from this rule, and disregarded and overruled the decisions of the courts of Rhode Island." It seems from the foregoing quotation, which is really the fact, that the courts of Rhode Island had determined the question involved in *Luther v. Borden*, and that the courts of the United States were bound by and followed that adjudication.

The language of the court which, it is claimed, asserts the doctrine that the question of a change of constitutions is a political one, with which courts have nothing to do, was clearly employed with reference to the peculiar facts of the case. This is apparent from the following language of the opinion, which is found upon pages 39, 40. "Indeed, we do not see how the question could be tried and judicially decided in the state court. Judicial power presupposes an established government, capable of enacting laws and enforcing their execution, and of appointing judges to expound and administer them. The acceptance of the judicial office is a recognition of the authority of the government from which it is derived, and if the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it, and if a state court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try. If it decides at all as a court, it necessarily affirms the existence and the authority of the government under which it is exercising judicial power." That this reasoning is eminently sound no one can doubt. A court which, under the circumstances named, should enter upon an inquiry as to the existence of the constitution under which it was acting, would be

like a man trying to prove his personal existence, and would be obliged to assume the very point in dispute, before taking the first step in the argument. It is apparent that the reasoning employed in that case can have no application whatever to an amendment to a constitution, which does not affect the form of government, or the judicial powers of existing courts. The case of *Luther v. Borden* gives no countenance whatever to the doctrine that the sovereignty of the people extends rightfully to the overturning of constitutions and the adoption of new ones, without regard to the forms of existing provisions. It is true that right, under our form of government, exists, but it is a revolutionary and not a constitutional right. When that right is invoked, a question arises which is above the constitution, and above the courts, and which contending factions can alone determine by appeal to the *dernier resort*. In such a case as that, might makes right. That there are questions of such a character as to admit of no adjustment but through an appeal to arms, we freely admit. This arises out of the imperfections of human government. A government which could provide for the peaceful adjustment of all questions would be more than human. But surely no sagacious statesman or wise jurist will seek, by a narrow construction of judicial power, to extend the questions which are beyond the domain of the courts, and capable of solution only by an appeal to arms. Happily for the permanency and security of our institutions, the present case, as we believe, involves no such question.

It has been said that changes in the constitution may be introduced in disregard of its provisions; that, if the majority of the people desire a change, the majority must be respected, no matter how the change may be affected, and that the change, if revolution, is peaceful revolution. But the revolution is peaceful only upon the assumption that the party opposed surrenders its opposition and voluntarily acquiesces. If it objects to the change, then a question arises which can be de-

termined only in one of two methods, by the arbitrament of the courts, or by the arbitrament of the sword.

Disguise the question as we will, theorize about it as we may, this is the fact with which we are at last brought face to face, and wisdom dictates that its dreadful possibilities should be apprehened and appreciated. We fear that the advocates of this new doctrine, in a zeal to accomplish an end which a majority of the people desire, have looked at but one phase of the question, and have not fully considered the terrible consequences which would almost certainly follow a recognition of the doctrine for which they contend. It may be that the incorporation of this amendment in the constitution, even if the constitution has to be broken to accomplish it, would not, of itself, produce any serious results. But if it should be done by sanctioning the doctrine contended for, a precedent would be set which would plague the state for all future time. A Banquo's ghost would arise at our incantation which would not down at our bidding. The contest between the rival governments in the state of Rhode Island raised a question which was above the power of the existing courts; and it is a matter of history that it was not determined until the adherents of the Dorr Constitution fled at the point of the bayonet. We have read history to little purpose, if we refuse to learn from its examples or profit by its teachings. The public dangers which threatened the republic from the rival claims for the presidency, so graphically and so beautifully described by appellant's attorney, were averted only through a commission created by Congress, entrusted with judicial powers, which judicially determined the questions involved, and to whose decisions the people yielded voluntary obedience. That judicial decision averted the horrors of a civil war. The political department of the government, to which so much reference has been made in this case, stood appalled and impotent in the face of the great danger, and yet we are asked to abdicate our functions, to deny our jurisdiction, and to leave the question of an amendment to the

constitution, unless voluntarily acquiesced in, to be determined by a resort to arms.  We ought to ponder long before we adopt a doctrine so fraught with danger to republican institutions.  All the danger lies in the line of the argument of appellant's attorneys.  The courts can never overturn our institutions or subvert our liberties.  They command neither the purse nor the sword of the state.  But a people which is educated to disrespect the decisions and disregard the adjudications of the courts, is prepared for anarchy, with all its attendant evils and dreadful consequences.  We may, perhaps, be excused, if in the interest of social order and public security, and the permanency of republican institutions, we enter a most earnest protest against the heresies which have been advanced in this case.

The appellant further cites and relies upon *Williams v. Suffolk Insurance Company*, 13 Pet., 414.  The only point determined in this is, that where the President, in a message to Congress, and in correspondence carried on with the government of Buenos Ayres, denied the jurisdiction of that country over the Falkland Islands, the courts must take the facts to be so.

The determining of the territorial jurisdiction of a foreign country, from the very nature of the subject, cannot reside in the courts of this country, but must be entrusted to the treaty making power, which rests in the President by and with the advice and consent of the senate.  When, therefore, the President, in his official communications, has denied the jurisdiction of a foreign country over specified territory, it may well be conceded that it would not be within the jurisdiction of the courts to determine the fact to be otherwise.  We are, however, unable to see that this case has any bearing upon the question now under consideration.

The case of *United States v. Baker et al.*, 5 Blatchford, 12, is also cited and relied upon by appellant.  This is a *nisi prius* case.  The defendants were indicted for piracy, and were tried in 1861.  They were acting as privateers under a commission

from Jefferson Davis, President of the Confederate States, which they claimed was, at least, a government *de facto*, and entitled to the rights and privileges that belong to a sovereign and independent nation. NELSON, J., upon this branch of the case, charged the jury as follows: "The court do not deem it pertinent or material to enter into this wide field of inquiry. This branch of the defense involves considerations that do not belong to the courts of the country. It involves the determination of great public and political questions, which belong to the departments of our government that have charge of our foreign relations—the legislative and executive departments. When those questions are decided by those departments, the courts follow the decisions, and, until those departments have recognized the existence of the new government, the courts of the nation cannot. Until this recognition of the new government, the courts are obliged to regard the ancient state of things as remaining unchanged." This case falls under the same principle as the preceding case.

The case of *White v. Hart*, 13 Wallace, 646, which is the only remaining case cited by the appellant upon this branch of the case, originated as follows: In January, 1866, the plaintiff instituted a suit in the Supreme Court of Chattooga county, Georgia, upon a promissory note. The defendant pleaded in abatement that the consideration of the note was a slave, and that, by the present constitution of the state of Georgia, the court is prohibited to take and exercise jurisdiction or render judgment thereon. To this plea the plaintiff demurred. The court overruled the demurrer, and gave judgment for the defendants, thus enforcing the constitutional provision. The plaintiff excepted, and removed the case to the Supreme Court of the state, where the judgment was affirmed, and the plaintiff thereupon prosecuted a writ of error in the Supreme Court of the United States. The constitution of Georgia of 1868 contains the following clause:

"Provided, that no court or officer shall have, nor shall the General Assembly give, jurisdiction to try, or give judgment

on, or enforce any debt, the consideration of which was a slave or the hire thereof." The plaintiff insisted that this provision was in conflict with the constitution of the United States, in that it impaired the obligation of contracts. The defendant sought to maintain the judgment in his favor, upon the ground, amongst others, that the constitution of Georgia was adopted under the dictation and coercion of Congress, and is the act of Congress rather than of the state, and that, though a state cannot pass a law impairing the validity of contracts, Congress can, and that for this reason the inhibition in the constitution of the United States has no effect in this case. In passing upon this question the court says: "Congress authorized the state to frame a new constitution, and she elected to proceed within the scope of the authority conferred. The result was submitted to Congress as a voluntary and valid offering, and was so received, and so recognized in the subsequent action of that body. The state is estopped to assail it upon such an assumption. Upon the same ground she might deny the validity of her ratification of the constitutional amendments. The action of Congress upon the subject cannot be inquired into. The case is clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."

This case is a very peculiar one, from the fact that the defendant did not claim that the constitution was not in force on account of its being adopted under coercion, but he claimed the benefit of its provisions *because* it was adopted under coercion. We most heartily approve the decision of the court in this case. The court might even have gone further, if the question had been in the case, and decided that, if a question had been raised in the courts of Georgia as to the validity of the constitution, on the ground that its adoption had been coerced by Congress, the courts of that state could not entertain jurisdiction of the question. But even such a decision as that would not have been at all in conflict with our right to entertain jurisdiction in this case. These are all the au-

thorities relied upon by appellant upon this branch of the case. We think it is apparent that they do not, even by implication, sustain the doctrine contended for, that the judicial department of the state cannot review the action of the General Assembly in the matter of the amendment of the constitution of the state. Counsel have drawn an appalling picture of the wreck in which our political institutions would be involved, if the courts should conclude to decide that the constitution of 1857, under which they are organized, had not been properly adopted. The courts of this state possess no such power, and they could not assume such a jurisdiction. The reason why a court could not enter upon the determination as to the validity of a constitution under which it is itself organized, is forcibly set forth in the case of *Luther v. Borden, supra,* upon which appellant relies. The distinction between such a case and one involving merely an amendment, not in any manner pertaining to the judicial authority, must at once be apparent to the legal mind. The authorities recognize the distinction. We are at a loss to know why appellant's counsel ignore and disregard it.

Appellant's counsel cite and rely upon section 2, article 1, of the constitution of the state. This section is a portion of the bill of rights, and is as follows: "All political power is inherent in the people. Government is instituted for the protection, security and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require." Abstractly considered, there can be no doubt of the correctness of the propositions embraced in this section. These principles are older than constitutions, and older than governments. The people did not derive the rights referred to from the constitution, and, in their nature, they are such that the people cannot surrender them. The people would have retained them if they had not been specifically recognized in the constitution. But let us consider how these rights are to be exercised in an organized government. The people of this state have adopted a constitution which

specifically designates the modes for its own amendment. ✓ But this section declares the people have the right at all times to alter or reform the government, whenever the public good may require it. If the people unanimously agree respecting an alteration in the government, there could be no trouble, for there would be no one to object. Suppose, however, a part of the people conclude that the public good requires an alteration or reformation in the government, and they set about the adoption of a new constitution, in a manner not authorized in the old one. Suppose, also, as would most likely prove to be the case, that a part of the people are content with the existing government, and will not consent to the change, and that the governor, who, under the constitution, is the "commander in chief of the militia, the army and navy of the state," determines to maintain the existing government by force. It is evident that the *people* who think the public good requires a change, can establish these changes only by superior force. If they are powerful enough to succeed, well. They will have altered or reformed the government. But if they are not powerful enough to succeed, their attempt to overthrow the government is treason, and they are liable to punishment as traitors. They have the right to alter their government, in a manner not recognized in the constitution, only when they can maintain that right by superior force. It follows, then, after all, that the much boasted right claimed under this action, is simply the right to alter the government in the manner prescribed in the existing constitution, or the right of revolution, which is a right to be exercised, not under the constitution, but in disregard and independently of it.

For a very valuable case upon this subject, see *Wells v. Bain*, 75 Pa. St., 39. In commenting upon a reservation in the bill of rights, the same as that contained in our own constitution, the court says: "The words 'in such manner as they may think proper,' in the declaration of rights, embrace but three known recognized modes·by which the whole people, the state, can give their consent to an alteration of an exist-

ing lawful form of government, viz: 1. The mode provided in the existing constitution. 2. A law, as the instrumental process of raising the body for revision, and conveying to it the powers of the people. 3. A revolution." In the progress of the opinion the court employ the following language, which is most applicable to the question now under consideration: "In considering this question of delegated power, some are apt to forget that the people are already under a constitution, and an existing frame of government instituted by themselves, which stand as barriers to the exercise of the original powers of the people, unless in an authorized form." It is well that the powers of the people and their relations to organized society should be understood. No heresy has ever been taught in this country so fraught with evil, as the doctrine that the people have a constitutional right to disregard the constitution, and that they can set themselves above the instrumentalities appointed by the constitution for the administration of law. It tends directly to the encouragement of revolution and anarchy. It is incumbent upon all who influence and mould public opinion to repudiate and discountenance so dangerous a doctrine, before it bears fruits destructive of republican institutions. It will be well if the people come to understand the difference between natural and constitutional freedom, before license becomes destructive of liberty.

The authority opposed to the view advanced by appellant's counsel is most satisfactory and conclusive, and, so far as we have been able to discover, is without conflict. Not only must a constitution be amended in the manner prescribed in the existing constitution, but it is competent for the courts, when the amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed.

That eminent jurist and law writer, Justice COOLEY, in his work upon Constitutional Limitations, page 598, says: "al-

though by their constitutions the people have delegated the exercise of sovereign powers to the several departments, they have not thereby divested themselves of the sovereignty. The government which they create they retain in their own hands a power to control, so far as they have thought needful, and the three departments are responsible to and subject to be ordered, directed, changed, or abolished by them. But this control and direction must be exercised in the legitimate mode previously agreed upon. The voice of the people can only be of legal force when expressed in the times and under the conditions which they themselves have prescribed and pointed out by the constitution; and if any attempt should be made by any portion of the people, however large, to interfere with the regular working of the agencies of government, at any other time, or in any other mode, than as allowed by existing law, either constitutional or statutory, it would be revolutionary in character, and must be resisted and repressed by the officers who for the time being represent legitimate government." The author cites *Gibson v. Mason*, 5 Nevada, 291, in which Chief Justice LEWIS employs the following language: "The maxim which lies at the foundation of our government is that all political power originates with the people. But since the organization of government, it cannot be claimed that either the legislative, executive, or judicial powers, either wholly or in part, can be exercised by them. By the institution of government the people surrender the exercise of all these sovereign functions of government to agents chosen by themselves, who, at least theoretically, represent the supreme will of their constituents."

On page 30, Judge COOLEY further says: "In the original states, and all others subsequently admitted to the Union, the power to amend or revise their constitutions resides in the great body of the people as an organized body politic, who, being vested with ultimate sovereignty, and the source of all state authority, have power to control and alter the law which they have made at their will. But the people in

the legal sense must be understood to be those who, by the existing constitution, are clothed with political rights, and who, while that instrument remains, will be the sole organs through which the will of the body politic can be expressed. But the will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the constitution whose revision or amendment is sought, or by an act of the legislative department of the state, which alone would be authorized to speak for the people upon this subject, and to point out a mode for the expression of their will, in the absence of any provision for amendment or revision contained in the constitution itself." The learned author cites in support of this doctrine of the text, *Opinions of the Judges*, 6 Cush., 573; *Collier v. Frierson*, 24 Ala., 100; *State v. McBride*, 4 Mo., 303. In *Opinions of the Judges*, 6 Cush., 573, the facts are as follows: In 1833 the House of Representatives of Massachusetts submitted to the Supreme Court of that state, the following questions:

*First.* Whether if the legislature should submit to the people to vote upon the expediency of having a convention of delegates of the people for the purpose of revising or altering the constitution of the commonwealth in any specified parts of the same, and a majority of the people voting thereon should decide in favor thereof, could such convention, holden in pursuance thereof, act upon, and propose to the people, amendments in other parts of the constitution not so specified ?

*Second.* Can any specific and particular amendments to the constitution be made in any other manner than that prescribed in the ninth article of the amendments adopted in 1820? The justices of the Supreme Court responded to these questions substantially as follows: "*First.* Considering that the constitution has vested no authority in the legislature, in its ordinary action, to provide by law for submitting to the people the expediency of calling a convention of delegates, for

the purpose of revising or altering the constitution of the commonwealth, it is difficult to give an opinion upon the question, what would be the power of such a convention, if called. If, however, the people should, by the terms of their vote, decide to call a convention of delegates to consider the expediency of altering the constitution in some particular part thereof, we are of opinion that such delegates would derive their whole authority and commission from such votes, and, upon the general principles governing the delegation of power and authority, they would have no right, under such vote, to act upon and propose amendments in other parts of the constitution not so specified."

*Second.* "That under and pursuant to the existing constitution, there is no authority given, by any reasonable construction or necessary implication, by which any specific and particular amendment or amendments of the constitution can be made in any other manner than that prescribed in the ninth article of the amendments, adopted in 1820. Considering that previous to 1820 no mode was provided by the constitution for its own amendment, that no other power for that purpose than in the mode alluded to is anywhere given in the constitution, by implication or otherwise, and that the mode thereby provided appears manifestly to have been carefully considered, and the power of altering the constitution thereby conferred to have been cautiously restrained and guarded, we think a strong implication arises against the existence of any other power, under the constitution, for the same purposes."

This opinion was signed by all the justices of the Supreme Court of Massachusetts, consisting of Chief Justice SHAW, and justices PUTNAM, WILDE, and MORTON, judicial luminaries as illustrious as ever adorned the bench of this or any other country.

In *Collier v. Frierson*, 24 Ala., 108, it appears that the legislature had proposed eight different amendments to be submitted to the people at the same time. The people had approved them, and all the requisite proceedings to make

them a part of the constitution had been had, except that in the subsequent legislature the resolution for their ratification had by mistake omitted to recite one of them. On the question whether this one had been adopted, the court say: "The constitution can be amended in but two ways; either by the people who originally framed it, or in the mode prescribed in the instrument itself. If the last mode is pursued, the amendments must be proposed by two-thirds of each house of the General Assembly; they must be published in print at least three months before the next general election for representatives; it must appear from the returns made to the secretary of state that a majority of those voting for representatives have voted in favor of the proposed amendments, and they must be ratified by two-thirds of each house of the next General Assembly after such election, voting by yeas and nays, the proposed amendments having been read at each session three times on three several days in each house. We entertain no doubt that to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done, certain requisites are to be observed, before a change can be effected. But to what purpose are those acts required or those requisitions enjoined, if the legislature, or any department of the government, can dispense with them? To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against any amendment which is not shown to have been made in accordance with the rules prescribed by the fundamental law." In this case counsel distinctly made the point that, "when the legislature has declared an act done, which it alone has the

power to do, it does not become the judiciary to gainsay it." The court repudiated this doctrine and asserted its jurisdiction in the following terse and unambiguous language: "Every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

The case of *State v. McBride*, 4 Mo., 303, involved a question as to the proper adoption of an amendment to the constitution of the state of Missouri. The counsel on behalf of the state, contended almost in the language of appellant's counsel in this case, "that this amendment having been passed and promulgated by the Eighth General Assembly, as a part of the constitution, this court is bound to receive and give it the effect of a constitutional provision; it being an act done by the General Assembly, not in their capacity of ordinary legislation, but the exercise of sovereign authority in a conventional capacity." The language of the court in passing upon this position of counsel is so applicable to, and so entirely decisive of, the question now under consideration, that we quote in full. The court says: "The constitution of this state requires that each officer, whether civil or military, shall, before entering on the duties of his office, take an oath or affirmation to support the constitution of the United States and of this state, and to demean himself faithfully in office. In pursuance of the duty imposed by this oath, it has become quite a common business of the courts to examine the acts of the legislative body, to see whether any of them infringe the constitution, and to declare that such acts, or parts of acts, as are repugnant to the constitution, are not the law of the land, and are, therefore, of no force. No educated man at this day denies this right to the courts. On the contrary, it is considered a base abandonment of duty for a judge to hesitate, when it becomes his duty to examine the acts of the more powerful branches of the government. If, then, the constitution be the supreme law of the land, it becomes

the duty of the judge to look into and understand well this first law of the land. The General Assembly, acting itself under a power granted by the convention, can only change the constitution in the manner presented to it. Is, then, this court, each member of which is sworn to support the constitution, that first law of the land, to be told that they are not to inquire what that constitution is? We are told that this is a matter which the people have confided to two successive General Assemblies, and that their declaration of what is done is to be to us evidence that the thing is done, they being sworn, as well as ourselves, to support the constitution. Yet we look into the acts of each General Assembly, and if we find any of its acts violating the constitution, we declare such acts null and void. The General Assembly, or two General Assemblies in succession, are but public servants, and it is disrespectful to them to say that their acts will not bear inspection. If, then, they will bear inspection, and if, as we believe, they have left behind them evidence of what they have done, why need we, whose duty it is to observe the constitution as the supreme law of the land, hesitate respectfully to approach and examine those proofs, and see if indeed the constitution of 1820 has been changed, or if by neglecting to pursue the course pointed out by the 12th section of the constitution, they have failed to give to their acts the validity of constitutional acts. To tell us that the people have reserved to themselves the sole right of looking into the matter, is to tell us that we are sworn to support a constitution which we are not permitted to know." Those two cases contain the calm adjudications of respectable courts, in times when there was no popular excitement, and upon constitutional amendments not arousing popular interest. They are, therefore, entitled to the highest consideration, as they were entirely uninfluenced by popular clamor.

It is not at all material that in *State v. McBride, supra*, the court finally concluded that the amendment under con sideration had been properly adopted. The court had to de-

termine its power to decide, before it could decide in favor of the amendment. As was well said by one of appellant's attorneys upon the argument: "the power to decide, involves the power to decide either way." In *The State v. Swift*, 69 Ind., 505, the jurisdiction of the court was exercised, and an amendment to the constitution of the state of Indiana was held not to have been properly adopted. In the opinion the court say: "The people of a state may form an original constitution, or abrogate an old one and form a new one, at any time, without any political restriction except the constitution of the United States; but if they undertake to add an amendment, by the authority of legislation, to a constitution already in existence, they can do it only by the method pointed out by the constitution to which the amendment is to be added. The power to amend a constitution by legislative action does not confer the power to break it, any more than it confers the power to legislate on any other subject contrary to its prohibitions."

In *Westinghausen v. The People*, 44 Mich., 265, the Supreme Court of Michigan entertained jurisdiction of a question as to the adoption of an amendment to the constitution of that state. The *Prohibitory Amendment Cases*, 24 Kans., 700, in so far as they assume jurisdiction over the question involved, are in harmony with all the cases upon the subject. In *State v. Timme*, 11 N. W. Rep., 785, the Supreme Court of Wisconsin assumed jurisdiction of a question involving the validity of an amendment to the constitution of that state. The same thing was done in *Trustees University of North Carolina v. McIver*, 72 N. C., 76.

It is true that in the last five cases the question of jurisdiction was not raised by counsel. But the courts could not have entered upon an examination of the cases without first determining in favor of their jurisdiction. If they entertained doubts respecting their jurisdiction, it was the duty of the courts to raise the question themselves. We have then seven states, Alabama, Missouri, Kansas, Michigan,

North Carolina, Wisconsin and Indiana, in which the jurisdiction of the courts over the adoption of an amendment to a constitution has been recognized and asserted. In no decision, either state or federal, has this jurisdiction been denied. We may securely rest our jurisdiction upon the authority of these cases. He would be a bold jurist, indeed, who would ride rough-shod over such an unbroken current of judicial authority, so fortified in principle, sustained by reason, and so necessary to the peaceful administration of the government.

II. It is next insisted that the Nineteenth General Assembly had jurisdiction of the subject embraced in the joint resolution of the Eighteenth General Assembly, proposing the amendment to the constitution drawn in controversy in this case, including the regularity of its passage, and its judgment thereon is conclusive and cannot be reviewed. This point was insisted upon in the original argument. It is now renewed, and is reinforced by a citation of some additional authorities. This argument in effect admits that there were defects and omissions in the submission of the question, but contends that, notwithstanding such omissions and defects, the action of the Nineteenth General Assembly estops all investigations, and that its recital, no matter how false, cuts off all inquiry as to its truth. As this point is relied upon with much confidence, we propose, even at the risk of tediousness, to state as briefly as we can the points decided in all of the cases relied upon in the re-argument.

In *Gaines v. Thompson*, 7 Wall., 347, it was held that the act of the Secretary of the Interior, and Commissioner of the Land Office, in canceling an entry for land, is not a ministerial duty, but is a matter resting in the judgment and discretion of these officers, as representing the executive department, and that the United States courts will not interfere by injunction or *mandamus* to restrain it. At the same time it was conceded that there were numerous cases in which the Supreme Court of the United States had sustained the courts

of justice, after the title had passed from the United States, and the matter had ceased to be under the control of the executive department, in decreeing the equitable title to belong to the person against whom the department had decided. The case of *Litchfield v. Register and Receiver*, 9 Wall., 575, simply re-affirms the doctrine of *Gaines v. Thompson*, and applies it to the register and receiver. The cases of *Johnson v. Towsly*, 13 Wall., 72, and *Secretary v. McGarrahan*, 9 Wall., 298, are to the same effect as the two preceding cases. The case of *French v. Fyan*, 93 U. S., 169, simply decides that a patent of lands, as swamp lands, cannot be impeached in an action at law, by showing that the land which it conveys was not in fact swamp and overflowed land. In *Town of Coloma v. Evans*, 92 U. S., 484, the following point was determined, as correctly stated in the syllabus: "Where, by legislative enactment, authority has been given to a municipality or to its officers to subscribe for the stock of a railroad company, and to issue municipal bonds in payment, but only on some precedent condition, such as a popular vote favoring the subscription, and where it may be gathered from the enactment that the officers of the municipality were invested with power to decide whether that condition has been complied with, their recital that it has been, made in the bonds issued by them, and held by a *bona fide* purchaser, is conclusive of the fact, and binding upon the municipality, for the recital is itself a decision of the fact by the appointed tribunal.

The case of *Virginia v. West Virginia*, 11 Wallace 39, involves the validity of the proceedings by which the counties of Jefferson and Berkley and others became a part of the state of West Virginia. The case is a long one. The point decided, bearing upon this case, is as follows: "The statutes of the Virginia legislature having authorized the Governor of that state to certify the result of the voting on that proposition (to transfer said counties) to the state of West Virginia, if in his opinion the vote was favorable, and he having

certified the fact that it was so, under the seal of the state to the Governor of West Virginia, and the latter state having accepted and exercised jurisdiction over these counties for several years, the state of Virginia is bound by her acts in the premises." In the opinion in the case the fact was emphasized that the legislature had vested the Governor with large control as to the time of taking the vote, and made his *opinion* of the result the condition of final action, and rested, of its own accord, the whole question on his judgment, and in his hands.

In *Miners' Bank of Dubuque v. The United States,* Morris (Iowa) 482, where a bank charter contained a provision "That if said corporation shall fail to go into operation, or shall abuse or misuse their privileges under their charter, it shall be in the power of the legislative assembly of this territory at any time to annul, vacate and make void this charter," it was held that the legislature reserved to themselves the right of repeal upon certain contingencies, and of determining when the contingencies had happened. In the same case, 1 G. Greene, 533, the question again came before the court and was determined the same way.

In *Carpenter v. Montgomery,* 7 Blackf., 415, under a constitution providing that statutes are not to be in force until published in print, unless in cases of emergency, it was held that "of the existence of the emergency the legislature must necessarily be the judges; and when they deem it to exist, they have the right to declare a statute in force from and after its passage."

In *Barret v. Brooks,* 21 Iowa, 148, where an act of Congress granted swamp lands to the state, and required that the proceeds of the sale of the lands should be applied to the purpose of reclaiming the same "as far as necessary," it was held that the General Assembly had the right, under the act of Congress, to determine whether or not it was necessary to drain the lands, and how far it was necessary to appropriate the proceeds of the sales of the land to that purpose. The

same doctrine was recognized in *American Emigrant Company v. Adams Co.*, 100 U. S., 68.

In *Martin v. Mott,* 12 Wheaton, 19, it was held that the authority to decide whether the exigencies contemplated in the constitution of the United States, and the act of Congress of 1795, in which the President has authority to call forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions, have arisen, is exclusively vested in the President, and his decision is conclusive upon all other persons. This decision was grounded upon the nature of the power, and the necessity of prompt and unhesitating obedience to commands of a military nature. It is evident that upon no other construction could the President perform his duty of suppressing insurrections and repelling invasions, for he could never keep together an army if every soldier could call in question his power to call him into the service. In *Varderhuyden v. Young,* 11 Johnson, 150, the same question came before the Supreme Court of the state of New York, and was decided the same way.

In *Commissioners of Knox County v. Aspinwall,* 21 Howard, 539, it was held that where the statute of a state provides that the board of commissioners of a county should have power to subscribe for railroad stock, and issue bonds therefor, in case a majority of the voters of the county should so determine after a certain notice should be given of the time and place of election, and the board subscribed for the stock and issued the bonds, purporting to act in compliance with the statute, it is too late to call in question collaterally the existence or regularity of the notices, in a suit by the innocent holders of the coupons attached to the bonds. In *Ryan v. Varga,* 37 Iowa, 78, it was held that, after township trustees have passed upon the sufficiency of a petition presented to them, calling for an election to decide the question of levying a tax in aid of the construction of a railroad, and the election has been ordered, and the tax voted and levied, the determination of the township trustees cannot be assailed col-

laterally, but like any other judicial determination, remains conclusive until reversed or set aside by writ of error, *certiorari*, or other direct proceeding provided by law. These are all the cases cited in the arguments on rehearing upon this branch of the case. It is evident that most of them bear but very remotely upon the question under consideration. In our opinion, the question involved in the case at bar does not fall within the principle involved in any of these cases, and is not determined by them.

It is true, the Nineteenth General Assembly was authorized to submit to the people for their adoption, only a proposition which had already been proposed and agreed to by the Eighteenth General Assembly. The fact that the Eighteenth General Assembly had agreed to the same proposition that the Nineteenth General Assembly was about to submit, was a condition precedent to the right of the Nineteenth General Assembly to take any action in the premises. If the Nineteenth General Assembly acted within the scope of its constitutional authority, it necessarily had to be of opinion that the Eighteenth General Assembly had agreed to the same resolution which it was about to submit to the people. This opinion would amount to a conclusion, primarily, that the Eighteenth General Assembly had so acted, and this conclusion, until reviewed and examined in some legal manner, would be absolute. Further, if the law has provided no means for the examination of this determination, it would be absolute and binding upon all parties, as the appellant claims. The appellant assumes that no mode of examination has been provided by the law, and that, therefore, the determination of the Nineteenth General Assembly is conclusive. Upon the contrary, we maintain that a mode of examination has been provided, and that, therefore, the action of the Nineteenth General Assembly is not conclusive. The Nineteenth General Assembly recited in substance that the Eighteenth General Assembly adopted and duly entered upon its journals the same resolution which the Nineteenth General Assembly

was about to submit to the people. The argument of appellant impliedly concedes that this recital might, upon examination, be found to be untrue, and hence it is insisted that the recital is conclusive, and that we cannot inquire into the truth. If this recital is untrue, for what reason are the courts estopped from declaring it untrue?

The district courts of this state, are courts of general jurisdiction. There is no presumption that anything is beyond their jurisdiction. We have already established in the first division of this opinion, that the jurisdiction of the courts extends to the setting aside of a constitutional amendment, if it has not been adopted in the manner provided in the existing constitution. Indeed the argument of the appellant upon this branch of the case impliedly admits this general jurisdiction of the courts, for the appellant, upon this branch of the case, in effect relies upon an estoppel. But there would be neither necessity nor propriety in relying upon the finding of the Nineteenth General Assembly, as an estoppel, if the jurisdiction of the court did not extend to the subject of the adoption of an amendment at all. The jurisdiction of the court, to inquire whether an amendment has been properly adopted, being then established, and in effect conceded by the argument, what warrant is there for cutting it short just as it enters upon an examination as to the truth of this recital. The appellant says this recital is conclusive, and, therefore, the courts cannot inquire into it. But a recital of this kind is conclusive only when no mode of examination is provided. The appellant says no mode of examination has been provided, and upon the appellant is the burden of proof to establish that fact. The district courts being courts of general jurisdiction, it is incumbent upon the appellant, who denies that this jurisdiction extends to inquiry into the truth of this recital, to establish that fact. The presumption is that the jurisdiction extends to all questions, until the contrary is shown. The party who relies upon an exception must establish its existence. The appellant must give a bet-

ter reason for the absence of this jurisdiction than that the recital is conclusive, for,when that reason is assigned,the question recurs, why is the recital conclusive. There is no provision of constitution or statute making it conclusive. There is nothing in the policy of our institutions or in the nature of the subject making it conclusive. Then why should it be considered conclusive? Why should the Nineteenth General Assembly by the recital of a fact, which, at least for the purposes of the argument on this branch of the case, must be conceded to be untrue, estop the courts from declaring it false? As we understand the argument of the appellant's counsel, they claim that the recital is conclusive because the jurisdiction of the court does not extend to the making of any inquiry into it. But whether the jurisdiction of the court extends to the making of inquiry into the recital, is the very question in dispute. The argument, therefore, as it seems to us, begs the whole question, except in so far as it is based upon the authorities above referred to, which, in our opinion, are not pertinent to the question. Further, it is claimed that the finding of the Nineteenth General Assembly that the Eighteenth General Assembly had adopted the same proposition that the Nineteenth General Assembly was about to submit to the people, was the determination of a matter within its jurisdiction, and that it cannot be collaterally impeached. It is insisted that the same rules are applicable to the action of the Nineteenth General Assembly as to a court acting within its jurisdiction. We propose to examine the grounds of this position. We will, for the sake of the argument, concede that the same rule applies to the Nineteenth General Assembly as to a court. The Nineteenth General Assembly, then, had no jurisdiction to submit to the people, any proposition which had not previously been adopted by the Eighteenth General Assembly. The fact that the proposition had been adopted by the Eighteenth General Assembly was necessary, in order that any jurisdiction over it could be possessed by the Nineteenth General Assembly. The Nine-

teenth General Assemby could not acquire jurisdiction by a false recital that the fact existed. The existence of the fact itself was necessary, before jurisdiction could attach. The case of the *People v. Cassels*, 5 Hill, 168, is, upon this branch of the case, directly in point. This case was *certiorari* to the judge of Chenango county courts, to review his action in discharging upon habeas corpus the defendant, Cassels, from a commitment by a magistrate for contempt. In the branch of the case pertinent to this inquiry, the court say: " The prisoner had an undoubted right to show that the committing magistrate acted without authority; and this is so, notwithstanding the commitment recites the existence of the necessary facts to give jurisdiction. No court or officer can acquire jurisdiction by the mere assertion of it, or by falsely alleging the existence of facts on which jurisdiction depends." See also *Griffiths v. Frazier*, 8 Cranch, 9.

But there is another view of this case which is to our minds conclusive. The constitution required the Eighteenth General Assembly to keep a journal of its proceedings, and to enter thereon the proposed amendment. An entry was made upon the journal of the senate of the Eighteenth General Assembly, which shows that the proposed amendment, when it passed the senate of the Eighteenth General Assembly, contained the words "or to be used." The Nineteenth General Assembly recited that the Eighteenth General Assembly proposed and agreed to, and duly entered upon its journals, a proposition which did not contain the words "or to be used." In other words, the Nineteenth General Assembly recited as a fact essential to its jurisdiction, a matter which the journal of the Eighteenth General Assembly, which is the constitutional and statutory record of its proceedings, shows to be untrue. It is a familiar doctrine that, where the record of a court shows affirmatively the non-existence of the facts upon which a court bases its jurisdiction, the recital that the facts exist is a nullity, no jurisdiction attaches, the proceedings are void, and may be collaterally impeached. The authority upon

this point is abundant. In *Kitsmiller v. Kitchen*, 24 Iowa, 163, a decree was collaterally drawn in question, which was rendered upon a notice which failed to inform the defendant as to the place where, and time when, he must appear and defend the action. The court say: "We are clear that the service of such a notice did not confer jurisdiction upon the court over the person of the party served. The judgment was, therefore, void, and could not be relied upon as *res adjudicata*, since it did not affect the rights of the parties."

In *Cait v. Haven*, 30 Conn., 197, the following language is employed: "We do not, understand that, upon the authorities at home or abroad, there is any contrariety of opinion that a domestic judgment, rendered by a court of general jurisdiction, where no want of jurisdiction is apparent on the record, cannot be collaterally attacked. If it be a foreign judgment, or the judgment of a court of limited jurisdiction, or the want of jurisdiction is apparent on the record, it can be collaterally attacked, for then the jurisdiction is not presumed, or the presumption is repelled by the record itself, and the judgment is an absolute nullity if the want of jurisdiction in fact exists." To the same effect, see, also, *Hahn v. Kelley*, 34 Cal., 391; *Penobscot Railroad Co. v. Weeks*, 52 Maine, 456; *Parish v. Parish*, 32 Ga., 653; *Mercier v. Chace*, 9 Allen, 242.

The journal of the Eighteenth General Assembly constitutes the record of that body, and it shows that the fact, the existence of which was essential to the jurisdiction of the Nineteenth General Assembly to submit the proposition upon which the people voted, did not exist. It follows from the doctrine of the foregoing authorities, that the finding by the Nineteenth General Assembly that such facts did exist is a nullity, and that it may be impeached collaterally.

There is a further reason why the finding of the Nineteenth General Assembly should not have the force for which the appellant contends. The constitution makes three steps necessary for the adoption of an amendment, viz: the proposal of an amendment in one General Assembly, and its

entry upon the journals; the agreement thereto by the next General Assembly, and its submission to the people; and the approval and ratification thereof by the people. These steps are distinct, independent and essential. No one of them can be dispensed with. It is necessary that the proposition shall be concurred in by two successive General Assemblies. If, however, one General Assembly can cut off all inquiry into the action of its predecessor, by a mere recital of what it has done, it follows that an amendment may be incorporated into the constitution, which has never received the sanction of more than one General Assembly. Such a construction might lead to a clear violation of the constitution. We cannot give it our sanction. In our opinion, the action of the Nineteenth General Assembly is not conclusive as to what the Eighteenth General Assembly proposed.

III.  The resolution adopted by the senate of the Eighteenth General Assembly, as shown by its journal, reads as follows: "No person shall manufacture for sale, or sell, or keep for sale, as a beverage, *or to be used*, any intoxicating liquor whatever, including ale, wine and beer." The resolution as enrolled in the Eighteenth General Assembly, adopted by the Nineteenth General Assembly, and ratified by the people, reads as follows: "No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquor whatever, including ale, wine and beer." The difference between these two resolutions is that the four words "or to be used" are in the resolution as entered upon the journal, but are not in the resolution as enrolled. It has always been conceded in the arguments in this case that the difference between the two resolutions is a substantial and material one. It is claimed, however, that the entry upon the journal is a mistake, and that the enrolled resolution expresses the legislative intent. If we should concede that the difference between the journal entry and the enrolled resolution resulted from mistake, we would still have to inquire which expresses the legislative will. The appellant says the enrolled resolution, clearly. At

the same time, appellant's attorneys have not at all times been consistent with themselves as to the manner in which the four words, *"or to be used,"* were made to disappear from the resolution. Upon the original oral argument, it was stated that after the amendment, striking out the words "for such purpose," had been adopted, the senate, by common consent and without any motion, agreed to drop out the words, *"or to be used,"* and that the clerk failed to make any record of that action. Subsequently it has been stated that the amendment proposed in the senate was to strike out the words, *"or to be used for such purpose,"* and that the clerks, by mistake, recorded only the latter portion of it, *"for such purpose."* These conflicting statements, however honestly made, show the danger and the impracticability of going outside of the record, and accepting parol proof of what was done in the senate of the Eighteenth General Assembly. It has further been insisted that the journal contains internal evidence of a mistake: that it cannot be conceived that any senator would move to strike out the words *"for such purpose,"* and leave the words *"or to be used."* We propose to give some consideration to this position. It is a matter pertaining to the public history of the amendment that those favoring it were divided into two classes, those who wished to prohibit the manufacture and sale of intoxicating liquors for all purposes, and those who simply wished to prohibit the manufacture and sale of intoxicating liquors to be used as a beverage. It will be remembered that it was claimed that the resolution, as enrolled and as submitted by the Nineteenth General Assembly, was ambiguous, and that it was uncertain whether it would be construed to prohibit absolutely the manufacture of intoxicating liquors for all purposes, or simply to prohibit the manufacture of intoxicating liquors for sale as a beverage. It will not be forgotten that an effort was made to procure from the Nineteenth General Assembly an interpretation of the resolution, and that a resolution expressing the understanding of the Nineteenth General Assembly did actually pass the senate

of that assembly. It is further a matter of public history that the press of the state, and the public speakers who advocated the amendment, differed as to its meaning, and that an effort was made in the State Bar Association, before the election, to have that association place a construction upon it. In fact, the advocates of the amendment were very greatly embarrassed in their presentation of it, because it was couched in language susceptible of two essentially different meanings, and requiring judicial construction before its meaning could be settled. Now, if the senator who moved the last amendment to the resolution belonged to that class which thought the prohibition should be absolute, it is evident that he could not have adopted a course more likely to have accomplished his purposes, than to move to strike out the words *"for such purpose,"* for, whatever may be the ambiguity in the resolution as ratified by the people, there is no ambiguity in it as it appeared after the words *"for such purpose"* were stricken out, and with the words *"or to be used,"* remaining. In that form, no one questions that it requires the absolute prohibition of manufacture for any purpose, even including mechanical and medicinal purposes. There would have been no necessity for judicial construction to ascertain its meaning. There is no warrant anywhere in the record, for saying that the resolution as shown upon the journal does not express the intent of the senate.

It is claimed, however, that the enrolled resolution contains the conclusive evidence of the action of the senate of the Eighteenth General Assembly, and that it overrides and is paramount to the journal entry. But little which is new has been advanced upon this branch of the case, and we deem it necessary to say but little in addition to what is contained in the former opinion.

Section 1, article 10, of the constitution provides: "Any amendment or amendments to this constitution, may be proposed in either house of the General Assembly; and if the same shall be agreed to by a majority of the members elected

to each of the two houses, such proposed amendment shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election."

Section 3717 of the Code, provides: "The proceedings of the legislature of this, or any other state of the union, or the United States, or of any foreign government, are proved by the journals of those bodies respectively, or of either branch thereof." Notwithstanding this constitutional provision requiring the entry of the proposed amendment upon the journals, and the statutory provision that the proceedings of the legislature are proved by the journals, the appellant insists that the enrolled resolution is better evidence of the action of the legislature than the evidence required and provided by both the constitution and the statute. There is no provision either in the constitution or the statute requiring the enrollment of a bill or of a resolution. Section 9, article 3, of the constitution, authorizes each house to determine its rules of proceedings. Pursuant to this authority, the Eighteenth General Assembly adopted the following joint rules;

"4. When a bill shall have passed both houses, it shall be duly enrolled by the enrolling clerk of the house in which it originated, and the fact of its origin shall be certified by the indorsement of the secretary or clerk thereof.

"8. All orders, resolutions, memorials, or other votes, which are to be presented to the governor for his approval, shall be enrolled, examined, signed, and presented in the same manner as bills."

It will be observed that these rules require the enrollment of *bills*, and of such *resolutions* as are to be presented to the governor for his approval. It is conceded that the governor cannot veto a resolution proposing an amendment to the constitution, and it must also be conceded that, because he cannot veto it, it is not necessary that it should be presented to him for approval. It follows, we think, that there is not even a rule of the General Assembly requiring the enrollment

of a resolution proposing a constitutional amendment. We have, then, this question: shall the journal entry which the constitution requires, and by which the statute declares the legislative proceedings shall be proved, be overridden by the enrolled resolution which is not required by constitution, statute, or rule of the General Assembly? Upon this question, it seems to us, there is not room for two opinions. Appellant contends, however, that joint rule eight, refers not to such resolutions as the *law* requires to be presented to the Governor for his approval, but to such resolutions as it has been the *custom* of the legislature to present for approval; and that the uniform custom of the legislature has been to present for approval resolutions proposing amendments to the constitution. If this should be conceded to be the custom of the legislature and the meaning of the rule, it would still, we think, be apparent that the legislature could not, by mere custom, override the provisions of the constitution and of the statute, and substitute different evidence of a fact from that which the constitution and the statute require. The authority conferred upon the legislature to determine its rules of proceedings, authorizes it to adopt rules of proceeding only in subordination to, and in harmony with, other provisions of the constitution. If the journal entry had contained the resolution in the form that it was adopted by the Nineteenth General Assembly and ratified by the people, and the enrolled resolution had contained the words "*or to be used*," would any one have had the audacity to claim that the enrolled resolution must override the journal entry, and that the amendment must fail? But if the journal entry would constitute the better evidence in the case supposed, it must constitute the better evidence in the case at bar. The rules of law are not elastic. They cannot be bent or stretched to meet the exigencies of a particular case.

The authorities cited by appellant as to the conclusiveness of an enrolled act, with regard to its contents, all apply to the case of a bill which is not required to be entered on the

journal. No authority has at any time been cited during the progress of this case, which holds that, as to a paper required to be entered upon the journal, the enrollment can override the journal entry. As to a bill, we concede the correctness of the authorities cited. Under the custom of legislation, the enrolled bill is presented to the speaker of the house and the president of the senate, for their signatures, and is approved by the governor. It is in all respects treated as the original act. No entry of it is required to be made upon the journal, and hence the journal could not contain any evidence of its contents. But with regard to a proposition for an amendment to the constitution, whether it be in the form of a resolution or of a bill, the provisions of the constitution are different. That is required to be entered upon the journal, and if this requirement is observed, the journal does contain evidence of its contents. It is evident that the authorities which apply to the case of an ordinary bill have no application whatever to the resolution in question.

IV. The constitution, article 10, section 1, provides that, if the proposed amendment shall be agreed to by a majority of the members elected to each of the two houses, "such proposed amendment shall be entered on their journals, with the yeas and nays taken thereon." It is claimed that this provision does not require that the proposed amendment shall be made to appear at length upon the journals, but that it is a compliance with this requirement of the constitution if the proposed amendment is entered by title, or other descriptive words. In addition to what we have advanced in the former opinion, we submit that this construction utterly nullifies and ignores the constitutional requirement. The constitution does not require that the second General Assembly, which agrees to the proposition, and submits it to the people, shall enter it upon its journals. But of necessity it must be entered upon its journals by title or descriptive words, for in no other manner could any record be kept of the action of the second General Assembly. It

follows that, under the construction contended for by appellants, the second General Assembly, which is *not* required to make any entry upon its journals, must make precisely the same entry as the first General Assembly, which *is* required to make an entry upon its journals. It is evident that this construction utterly ignores the provision requiring an entry upon the journal, and in effect eliminates it from the constitution. We are not authorized to deal thus with constitutional requirements. Article 3, section 16, of the Constitution, provides that if the Governor does not approve a bill, "he shall return it with his objections to the house in which it originated, which shall enter the same upon their journal and proceed to reconsider it." Under this provision, the uniform custom of the legislature has been to spread the Governor's veto upon the journal at length. It has never been claimed that this provision could be complied with by simply entering the title of the veto. The only other provision in the constitution with regard to entries of papers upon the journals is found in article 3, section 10, which authorizes any member of the General Assembly "to dissent from or protest against any act or resolution which he may think injurious to the public or an individual, and have the reasons for his dissent entered on the journals." Who would contend that this provision does not authorize a member to have the reasons for his dissent spread at length upon the journal, and that he could be put off by having his protest entered by title or descriptive words ? To our minds, this claim of the appellant is utterly untenable.

V. The appellant insists that the enrolled joint resolution of the Nineteenth General Assembly, in the custody of the Secretary of State, is conclusive of the action of the Eighteenth General Assembly. Upon this branch of the case the appellant cites and relies upon section 61 of the code, which is as follows:

"The secretary of state shall keep his office at the seat of government, and perform all duties which may be required

of him by law; he shall have charge of and keep all the acts and resolutions of the territorial legislature and the General Assembly of the state, the enrolled copy of the constitutions of the state, and all bonds, books, records, maps, registers, and papers which now are or may hereafter be deposited to be kept in his office." As the Nineteenth General Assembly was not required to enter upon its journals the proposition by it agreed to and submitted to the people, it might preserve the evidence of its action by an enrollment of the resolution by it agreed to. This enrolled resolution may, under this section, be kept in the office of the secretary of state, as the action of the Nineteenth General Assembly, and, after the adoption thereof by the people, it may be kept as the evidence of the amendment agreed to. But the Eighteenth General Assembly was required to preserve evidence of a different kind of its action. There is no trouble as to what the Nineteenth General Assembly agreed to and submitted. All the difficulty is in regard to what the Eighteenth General Assembly proposed. The enrolled resolution of the Nineteenth General Assembly may be the very best evidence of the action of that body. But, for the reasons already assigned in this opinion, it cannot be regarded as any evidence of the action of the Eighteenth General Assembly.

VI. It is said that there is a presumption in favor of the regularity of all official action, and that, therefore, it must be presumed that the words "or to be used" were stricken from the proposition for the amendment, by the action, in some manner, of the senate of the Eighteenth General Assembly. This argument assumes that it was irregular for the Eighteenth General Assembly to agree to the proposed amendment, with the words "or to be used" in it. This assumption is purely voluntary. It was just as regular for the Eighteenth General Assembly to agree to the proposed amendment, with or without the words "or to be used." No inference, therefore, can be drawn, as to what the Eighteenth General Assembly did, from the fact that it is presumed to have acted

regularly. It is said that the words "or to be used" may have been stricken out by general consent, and that, therefore, we must presume they were so stricken out. Even if we should concede that they *might* have been stricken out by general consent, we would not be authorized to presume that they were so stricken out. It is said that, where action is had by general consent, the journal does not show, and needs not show, the action. This is true in some cases, and untrue in others. If a bill is under consideration, which is not required to be entered on the journal, and an amendment is made by general consent, the amendment may be entered on the bill, and needs not appear on the journal. But if a matter is under consideration which has been entered upon the journal, then all changes, whether by general consent or otherwise, must appear upon the journal, otherwise the journal would not contain a correct record of the proceedings, and there would be no way in which the action could be proved, for the journal could not be contradicted by parol. It follows that we cannot legally presume that the words "or to be used" were stricken out by general consent.

VII. In the oral argument upon rehearing, it was stated by counsel that the original resolution which passed the senate and house of the Eighteenth General Assembly, was in the possession of the secretary of state, showing that the amendment proposed by the Eighteenth General Assembly passed both houses in the exact form and words agreed to by the Nineteenth General Assembly. Counsel produced what purported to be a copy of this paper, and asserted that there is no doubt about the authentic character of the document, and that it is the original record, and is better evidence of what the General Assembly did relative to said amendment, than the transcribed journal in the custody of the secretary of state. It was insisted that we must take judicial notice of this paper. This was the first time in the history of this case that any reference was made to the existence of such record. Upon inquiry of the Attorney-general, he stated in

open court that the paper referred to was handed to him on the street, about three weeks prior to the argument on re-hearing, by a person whose name he was not authorized to disclose. The Attorney-general further stated that he had procured and caused to be attached to said paper the affida-vits of J. S. Farron, enrolling clerk of the Eighteenth Gen-eral Assembly, and of W. V. Lucas, clerk of the house, and A. T. McCargar, secretary of the senate of the Eight-eenth General Assembly. Upon the argument it was ex-pressly conceded by counsel that the affidavits could not be considered for any purpose, and counsel expressly and re-peatedly disclaimed all intention of making use of them for any purpose whatever. We went to the office of the secre-tary of state, for the purpose of obtaining information res-pecting the paper, as requested by appellant's counsel. The secretary informed us that the paper was presented to him by the Attorney-general, about two weeks before the argu-ment on re-hearing, with the request that he file it as a paper belonging to his office. That he refused to do this, but con-sented to retain custody of it as an individual. That the paper had never before been in his custody, did not belong to the archives of his office, and that he would not certify to it as a paper in his official custody.

The constitution, article III, section 9, provides that each house shall keep a journal of its proceedings and publish the same. The statute, code, section 3717, provides that the proceedings of the legislature "are proved by the journals of those bodies respectively, or of either branch thereof, and either by copies officially certified by the clerk of the house in which proceeding was had, or by a copy purporting to have been printed by their order." Section 4, chapter 159, of the acts of the Sixteenth General Assembly, provides that: "The secretary of the senate and clerk of the house of rep-resentatives shall transcribe the journals of their respective houses, in books furnished for that purpose by the secretary of state, and, after having certified to the correctness of the

same, shall deliver them to the secretary of state for preservation in his office." Section 5, of this same chapter, provides for the printing and indexing of the journals. These are the provisions of law by which the journals are preserved and authenticated. It is not claimed by counsel that there is any difference between the journal, as contained in the books certified by the secretary and clerk of the respective houses, and delivered to the secretary of state, and the journals as published under the provisions heretofore referred to. In fact, no such difference exists. The practice has been to print the journals, not from a transcribed copy, but from the original journals, kept in the respective houses. When, therefore, the printed copies and the transcribed journals agree, as they do in this case, an almost conclusive presumption is afforded that both are correct. The printed journals, or the certified books in the custody of the secretary of state, made and authenticated as provided by law, are the ultimate and conclusive proof of the proceedings of a General Assembly. It would be a startling doctrine, indeed, if it should be held that the journals of the General Assembly could be contradicted by a paper produced upon the street, three years after the action was had, *by a person who will not permit his name to be disclosed,* and whom the court is not permitted to know. We might well tremble for the permanency of our constitution, if such a proceeding could be sanctioned. It is a matter of the greatest regret that a paper should have been brought into this case, so clearly not legally entitled to consideration, and which could have no other effect than to further inflame and excite an already excited and inflamed public mind.

VIII. We have now determined all of the points involved in the petition for rehearing, and answered its positions as fully as we deem essential. If all of the obstacles in the way of sustaining the amendment, which have already been considered, could be overcome, there are still others in the way which would most likely prove insurmountable. We have already seen that the constitution requires that a pro-

posed amendment to the constitution shall, when agreed to, be entered upon the journal of each house with the yeas and nays. The Eighteenth General Assembly disregarded this constitutional requirement. The resolution is not entered upon the journal of the senate in the form that it was adopted by the Nineteenth General Assembly, and the senate substitute is not entered upon the journal of the house at all. Indeed, it is impossible to determine from the house journal that the senate substitute ever passed the house. It seems fairly inferable from the house journal, pages 502 and 3, that the house re-adopted the original Harvey resolution, denominating it the senate amendment.

The constitution, then, having required this entry upon the journal, is the General Assembly at liberty to disregard its provisions? Is this constitutional provision mandatory, or simply directory? A mandatory provision is one which must be observed. A directory provision is one which leaves it "optional with the department or officer to which it is addressed to obey it or not, as he shall see fit." Courts sometimes exercise the power of declaring statutory provisions directory. Even in the case of a statute, the exercise of this power is a delicate one, and must be indulged very sparingly. But in the case of a constitutional provision, the exercise of this power is of much more doubtful propriety. Judge COOLEY, in his excellent work upon Constitutional Limitations, page 78, as a result of his examination of the authorities upon the subject, holds the following language, which commends itself to us for its evident soundness: "But the courts tread upon very dangerous ground, when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to es-

tablish those fundamental maxims, and fix those unvarying rules, by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument, which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised, as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end; especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication." We adopt the foregoing quotation as giving expression to our own views. Placing the most liberal construction upon the provision of the constitution under consideration of which it is susceptible, we think it requires at least that the entries upon the journals shall show the terms of the amendment submitted. This is not shown upon the journal either of the senate or house of the Eighteenth General Assembly.

We have approached and discussed this grave question with a full appreciation of the responsibilities which it involves, and we have given to its consideration the earnest attention which its importance demands. We have sought to maintain the supremacy of the constitution at whatever hazard.

It is for the protection of minorities that constitutions are framed. Sometimes constitutions must be interposed for the protection of majorities even against themselves. Constitutions are adopted in times of public repose, when sober reason holds her citadel, and are designed to check the surging passions in times of popular excitement. But if courts could be coerced by popular majorities into a disregard of their provisions, constitutions would become mere "ropes of sand," and there would be an end of social security and of constitutional freedom. The cause of temperance can sustain no injury from the loss of this amendment, which would be at all comparable to the injury to republican institutions which a violation of the constitution would inflict. That large and respectable class of moral reformers which so justly demands the observance and the enforcement of law, cannot afford to take its first reformatory step by a violation of the constitution. How can it consistently demand of others obedience to a constitution which it violates itself? The people can, in a short time, re-enact the amendment. In the matter of a great moral reform, the loss of a few years is nothing. The constitution is the palladium of republican freedom. The young men coming forward upon the stage of political action must be educated to venerate it; those already upon the stage must be taught to obey it. Whatever interest may be advanced or may suffer, whoever or whatever may be "voted up or voted down," no sacrilegious hand must be laid upon the constitution.

Abidingly and firmly convinced of the correctness of our former conclusion, recognizing no superior higher than the constitution, acknowledging no fealty greater than loyalty to its principles, and fearing no consequences except those which would flow from a dereliction in duty, we adhere to and re-affirm the doctrines already announced.

The petition for rehearing is

OVERRULED.

Mr. Justice SEEVERS, although unable to be present at this

time by reason of sickness, has consulted with us upon all the points involved in the case, and is fully in accord with us upon all the positions of the foregoing opinion.

BECK, J., *dissenting:*—I. I adhere to the conclusions announced in my first dissenting opinion, after a careful and thorough review of all the arguments and authorities presented in the case. My re-examination of the doctrines involved, in the clear and powerful light shed upon it by the re-argument, has strengthened my conviction that the judgment of the District Court ought to be reversed. I will proceed now to present additional arguments and authorities which, in my judgment, adding convincing effect to those I have before adduced, establish with the force of demonstration the correctness of my conclusion. The order of my present discussion will vary somewhat from that pursued in my first opinion, for the reason that the additional arguments and facts I propose to consider may, in this manner, be presented more nearly in accord with correct logical arrangement.

II. That the views I now propose to present may be entirely plain, it becomes necessary to state briefly the facts upon which the majority of the court base their conclusion, that the amendment of the constitution has not become a part of that instrument, and may, therefore, be disregarded by this court. The facts referred to are these: 1. The joint resolution of the Eighteenth General Assembly proposing the amendment to the constitution, as it appears in its enrolled form in the archives of the state, is in the precise language and form of the proposition adopted by the Nineteenth General Assembly, and adopted by the vote of the people. 2. But the journal of the senate of the Eighteenth General Assembly, it is claimed by the majority of the court, shows that the joint resolution passed by that body contained the words "or to be used." It is not claimed, neither does the journal show, that these words were not stricken out with other words from the substitute offered by Senator Hemen-

way.  3.  It will be remembered that the joint resolution originated in the house, and the senate did not concur therein, but adopted a substitute.  It is not denied that the house finally adopted the substitute in the precise language and form in which it appears in the enrollment, nor is any change of the words of the resolution shown to have been made in the house after it was sent from the senate.  4. The joint resolution was not entered at length, copied in full, upon the journals of the two houses.  But it does appear to have been entered upon the journals by its title, description, or by statements of its object and purpose.  5. It was published in one newspaper designated by the Secretary of State, under Chap. 114, Acts 1876 (Miller's Code, p. 1198), in twelve weekly issues thereof, the first of which was more than three months prior to the election for members of the General Assembly.

For the reasons that, as it is claimed by plaintiffs, the journal of the senate shows the joint resolution passed that body containing the words "or to be used;" that it was not copied in full on the journals of the respective houses; and that it was not published in one newspaper for the full time required by the constitution, plaintiffs claim that the amendment is not a part of the constitution of the state.

III.   Before proceeding to the further consideration of the objections urged by plaintiffs to the constitutional amendment in question, I will proceed to state certain political principles pertaining to the form of government of our state— a representative democracy—which are nowhere denied and by all admitted, and are axiomatic in character.

1.   Sovereignty, i. e., supreme political power, inheres in the people.

"2.   All political power is inherent in the people.  Government is instituted for the protection, security and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it.   Const., Art. 1, Sec. 2.

"3.   The enumeration of rights (in the constitution) shall not be construed to impair or deny others retained by the people.   Const., Art. 1, Sec. 25."

4.   The constitution of the state is not a limitation upon or a surrender of the absolute power of the people.   This is a corollary to the preceding propositions.

It is sometimes said that the people limit their own power by the constitution.   The expression, in its proper sense, is not accurate.   The people, by the constitution which they ordain, may prescribe the manner of the exercise of these powers, as the manner of amending the constitution, or of ordaining a new one.   Such provisions are obligatory upon the representatives of the people who administer the government created by the constitution.   These representatives, and the government administered by them, must pursue the course pointed out by the constitution for its amendment or the creation of a new constitution, when it is sought to be changed through the instrumentality of the existing government.   But this limitation does not extend to the power of the people; it is rather a limitation upon the power of their representatives.   The constitution is a limitation upon the power of the government organized under it, and not a limitation of the power of the people.   But if in terms the people should limit their powers, the limitation would terminate at the will of the people.   Possessing sovereignty, the restrictions they impose upon their own power they may annul at pleasure.   See Jameson on the Constitutional Convention, section 351; Cooley's Constitutional Law, 598.

5.   The Constitution of the State of Iowa is an instrument formed by the people through their representatives, and adopted and ratified by them, ordaining and establishing a free and independent government and restricting its powers.   See Constitution, preamble, Art. 12, Sec. 13.

IV.   I will now proceed to recite certain facts taught by the political history of the state, which cannot be denied.

The present constitution was framed by a convention, the

members of which were chosen in pursuance of, and in accord with, the provisions of the old constitution. See Acts 1855, chapter 78. The convention, after having agreed upon the constitution, caused it to be *enrolled*, and to be deposited in the office of the Secretary of State. It was adopted by the people at an election held pursuant to Art. 12, Sec. 13, and the proclamation of the governor required by the same provision was issued, declaring that it had been adopted by the vote of the people. Under this provision it took effect and became the constitution of the state after the publication of the proclamation. Thereupon the government existing under the old constitution ceased to exist; the government of the state from thence forward was the government established by the new constitution. While, according to the provisions of the new constitution, the offices, for a time at least, were filled by persons elected under the old constitution, and no great and radical change was made, the new government being of the same form and possessing, practically, the same power as the old one, yet it cannot be doubted that the new constitution created a new government which took the place of and superseded the old one.

I have thus shown briefly the process of forming the constitution, its promulgation, and its effect to supersede the existing government and create a new one. The instrument, as all written laws have been, since written laws were first promulgated among men, was consigned to the custody of the government, and kept by the proper officer in the archives of the state. The instrument there found and kept is the authoritative and only constitution of the state. Copies for convenience are multiplied in print, and are declared to be *prima facie* correct. But all disputes as to the contents of the instrument are settled by appealing to the original constitution found in the office of the secretary of the state. My statement of facts and conclusions thus far I have never heard doubted.

Now, suppose a question is raised involving the validity of

the constitution; that is, a claim is made that it was not lawfully adopted by the people. How is this controversy to be settled? It will be remembered that the constitution is the work of the people, that, upon the approval of the instrument by the vote of the people, certified by the proclamation of the governor, it becomes the supreme law of the land. The instrument itself prescribes that it shall take effect after it is ratified by the people, upon the promulgation of the proclamation of the governor. This proclamation, probably alone, but surely together with the evidence of the vote of the people adopting the constitution, is the evidence, and only evidence, necessary to establish the fact that it is of force, and is the expression of the sovereign will of the people. There is no officer or tribunal that can go back of the proclamation of the governor and the vote of the people, as shown by the records in the archives of the state. And, indeed, we shall presently see that the constitution cannot now be so far called in question by a demand of evidence of the vote and proclamation.

To repeat what I have said, the constitution took effect upon the publication of the proclamation. It was, from thence on, *the* constitution—the supreme law of the land. Springing from this instrument, the state government arises. The government in all its departments rests upon and exists by virtue of the constitution. Every department of the government, every officer of the state, derives authority from the constitution, and from no other source. Now, it is very plain that, as the government cannot exist without the constitution, it cannot possess the power to overthrow that instrument, and declare it to be of no effect. If there is no constitution, if it is void, there is no government. If there is no constitution, there are no officers, legislative, executive or judicial, and the acts of all departments of the government, looking to the overthrow of the constitution, would be as nothing. No proposition can be plainer.

The constitution exists as a whole, and was adopted as a whole. Causes of invalidity which affect one part affect the

whole. I am now speaking of the original constitution without amendments. Therefore, if one part be invalid, the whole is void. It follows that neither the judicial, nor any other department of the government, can claim that the portions of the instrument creating such department, and upon which it rests, is valid, while another part is void. It is, therefore, impossible for any one department of the government to maintain its own existence, and declare any provision of the constitution void. *Luther v. Borden*, 7 How., 1. A contrary view would make the constitution of the state a *felo de se*—would recognize the supreme law of the state as containing within itself the elements of its own destruction. But our government is planted upon no such uncertain foundation. Permanency, an existence to be ended only by the sovereign authority, the people, which called it into existence, belongs to it. The attribute of supremacy is possessed by the constitution, and is derived from the sovereign people; it is the supreme law of the land. The thought that the sovereignty of the constitution is rightfully subject to overthrow by the government designed to execute its authority, cannot be entertained. If so subject, the constitution is not supreme.

The people make the constitution; the constitution establishes the government. The government in none of its departments is charged with the duty, or possesses the power, of ordaining and establishing the constitution. The legislative and executive departments of the government are appointed as instruments by the people, to be used in amending the constitution, but in the formation of the original instrument these departments had nothing to do, for when it was framed, adopted, and promulgated, they did not exist. It cannot be possible that the constitution confers authority upon the government, or any of its departments, which may be exercised to effect its own overthrow. There is nothing like this within the dominion of morals, politics, or jurisprudence.

The constitution is the life of the government. As we have seen that life began upon the promulgation by the gov-

Koehler & Lange v. Hill.

ernor's proclamation of the fact that the people had completed the work of making the constitution by their vote ratifying it. When this life begins, the life of the old constitution ends, and the old government passes away. The officers of the various departments of the government, the people, and the whole world take notice of the existence of the new constitution and the new government, for the simple reason that each is an accomplished fact. The constitution and the government *do* exist, and their existence is made known by manifestation of governmental life. It will not do to say that the constitution and government do not exist because life was given them irregularly. But, if that be true, nevertheless the government is a government *de facto*, based upon a constitution *de facto*, though that constitution was not formed in accord with the law adopted by the people themselves, prescribing the form and proceedings for framing and ratifying a new constitution. No department of the government can inquire into these proceedings in order to overthrow the *de facto* constitution. They cannot withhold obedience to the constitution for the reason that it does not exist *de jure*. Its existence *de facto* gives it all the life and authority it would possess were it a constitution *de jure*. It may be enforced, and obedience thereto exacted, to the same extent as though it existed *de jure*. It can only be overthrown by rebellion, which, if successful, will be termed a revolution. It is as absurd to deny the existence and authority of a *de facto* constitution as to deny the life and natural rights of a bastard on the ground of his illegitimate birth. Each demonstrates its existence by the manifestations of the life and power which it possesses. It will not avail to resist the exercise of governmental power by the state on the ground that its constitution was irregularly adopted. Many of the states of this Union are governed under constitutions adopted in contravention of provisions of prior constitutions, or without authority therefrom.

In view of these doctrines of undoubted soundness, the ex-

ercise of authority by a state cannot be questioned upon the ground that the constitution was irregularly adopted. Nor can proof be demanded to establish the constitution. It is regarded as an accomplished fact, notice of which will be taken by all the departments of the government, and by the people and the world. It manifests its existence by the exercise of governmental authority and power.

V. I have stated that no department of the government can question the constitution after it is fully established by the people, and I have shown that it is so established when the approval of the people by their vote is shown by proclamation of the governor, or in such other manner as is prescribed by the people through their representatives. I have never heard it claimed that either the executive or legislative department of the government could hold for naught the constitution so promulgated, and I have nowhere heard it claimed that the legislature of the state, by statute or any other act, could declare a constitution, promulgated and duly recognized in the manner therein prescribed, and therefore the constitution *de facto*, to be void and of no effect. No case has been brought to my attention where this was attempted. I here refer to the action of the legislature existing under the constitution which is brought in question.

But plaintiffs claim that it is competent for the judicial department of the government to inquire and determine whether the amendment of the constitution was duly ordained. I will hereafter show that no distinction exists between the case where the original constitution is brought in question, and that wherein an amendment is sought to be set aside.

I shall now proceed to inquire into the power of the courts of the state to annul, for irregularity in the proceedings under which it was adopted, the original constitution of the state.

VI. All the judicial power of the state is conferred by the constitution upon the courts. Const., Art. 5, Sec. 1, and Art.

3, Sec. 1. What is meant by the term "judicial power?" Chief Justice MARSHALL, defining the functions of different departments of the government, declares that "the difference between the departments undoubtedly is, that the legislative makes, the executive executes and the judiciary construes the law." *Wayman et al. v. Southard et al.*, 10 Wheat., 1. To complete the distinction, it ought to be added that the judicial department applies the law, to the end that the rights of the citizens may be protected. The judiciary department of the government is charged with the duty and authority of construing and applying the law which is made by the legislative department of the government. See cases cited in Cooley's Constitutional Limitations, 91, 92. It is often said that the judiciary is charged with the duty of determining what the law is. The observation is true in the sense that the courts are to determine the rules prescribed in the written laws—I mean statutes. This is done by the interpretation of the laws under the rules recognized by the courts. It is not true that the judiciary may determine that a statute promulgated by the legislature is not the law, on the ground that it was not enacted by that department of the government. It is often said that courts declare void, annul, and overthrow statutes, on the ground that they are in conflict with the constitution. This is true in the sense that they may refuse to enforce them, but it is not true in the sense that they disregard such statutes on the ground that they were not in fact enacted by the legislature. A few brief thoughts will establish and make plain these propositions:

*First.* As the judiciary cannot make laws (statutes), they cannot unmake them. It cannot be claimed that government has within its organization two departments, one with the power to make laws, the other with the power to destroy them. If this were so, there would be, or could be, a conflict that would speedily overthrow the state. Our government was not established with so little wisdom.

*Second.* But the judiciary may annul, hold as void, that is, refuse to enforce or apply a law. The source and origin of that power is readily discovered by the following considerations:

Two statutes are passed in direct conflict; both cannot be enforced. It is the duty and within the power of the courts, by construction and the application of familiar rules prevailing in such cases, to determine which one of the statutes shall be applied. But the courts do not *unmake* the law which in this instance they refuse to enforce.

The constitution is the paramount law. If a statute is in conflict with it, the courts will determine that fact by construction, and will hold the statute of no effect. The courts in such cases exercise the identical power, and no other, which they apply in the case of conflicting statutes. They compare the laws in question with the constitution, and determine by construction of each whether there is in fact, a conflict; and, if a conflict be thus found, they will not apply the statute, but will maintain and enforce the constitution, because it is the paramount law. *Marbury v. Madison,* 1 Cranch, 137 (177).

Courts will, in certain cases, inquire whether a law was constitutionally enacted, that is, whether the legislature pursued the rules prescribed in the constitution to be followed in the enactment of statutes. But, in the cases now in contemplation, they do nothing more than to compare the statute and constitution, and enforce the paramount law. In the absence of constitutional restrictions, the legislature, by the expression of its will, without regard to the manner in which concurrence in that will was reached, could ordain any law within the sphere of legislative authority. I have thus shown that the judicial department of the government cannot unmake laws.

It cannot be claimed that the courts possess any greater authority over the constitution. They interpret that instru-

ment, and if there should be found conflicting provisions therein, they may, by the rules of construction, determine which provision shall prevail.

I shall now proceed to consider whether the courts may inquire into the proceedings of the people, through their repre.sentatives, to determine whether the constitution was adopted by proceedings in harmony with statutes, or prior constitutional provisions relating to the formation of the instrument. I think they cannot for the following reasons:

1. The exercise of such authority might lead to the overthrow of the constitution by one of the departments of the government. I have shown that such authority in any department of the government cannot exist.

2. Before the courts were created the constitution had an existence. If their separate existence began simultaneously, the constitution surely exists when the judgment of the court is rendered overthrowing it. Such judgment then disregards, sets at naught, and overthrows an existing paramount law, the constitution. This is judicial rebellion.

3. The question of the existence of the government and constitution is not for the determination of the courts; it is not a judicial question. That existence is a fact made known, not by judicial decision, but, as I have before said, by the manifestation of governmental authority. That the constitution does exist is shown by the existence of the government upon which it alone rests. But how shall we discover the contents, the provisions, of the constitution, conceding its existence? At the archives of the state where it is kept, its custodian, who represents the whole people as the keeper of the paramount law which they have ordained, will disclose the instrument. *That is the Constitution.* It was adopted and promulgated by the representatives of the sovereign people. Behind that instrument the courts cannot go.

Suppose a foreigner having no knowledge of our institutions should visit the state. He would discover the government by the manifestation of its authority. He desires to

obtain a knowledge of our laws and institutions, and is informed that they all rest upon a constitution, the supreme law of the land. He desires to become acquainted with this wonderful instrument. A printed copy is shown him and he is informed the original is to be found in the archives of the state. He asks of the learned lawyer, from whom he seeks information. How am I to know this instrument is your constitution? He would be informed that it was promulgated by the representatives of the people, who are sovereign, and is recognized by the people and all the departments of the government, and *that it is, therefore, the Constitution of this State*. Would the learned instructor of the foreigner suggest that the constitution is valid as long as the courts uphold it, and that its existence depends on the decision of the judiciary of the state upon facts relating to proceedings had when it was framed? On the contrary, he would declare that the instrument was, at the beginning, promulgated by the representatives of the people as their constitution, and that it has been recognized by the judicial department of the government, and that its existence as the supreme law cannot be questioned by any authority in the state. This brings me to the thought that questions pertaining to the existence of the constitution must be determined by that authority of the state which is charged with the duty and power of shaping its policy, of protecting its existence, of preserving its safety and peace, of augmenting its strength, and which is charged by the sovereign people with the task of framing a constitution for their approval, and promulgating it when so approved. This authority pertains to, and is exercised by, what is often called the political departments of the government. The courts are clothed with no such authority. They cannot, therefore, determine questions pertaining to the existence and validity of the constitution. Such determination must be alone made by other representatives of the people, who exercise political functions within the political department of the government. *Luther v. Borden*, 7 How., 1; *White v. Hart*,

13 Wal., 646; *Miles v. Bradford*, 22 Md., 170; *Hawkins v. The Governor*, 1 Ark., 570; *Mayor v. Root*, 8 Md., 95; *The U. S. v. Baker*, 5 Blatch., 6; *Foster et al. v. Neilson*, 2 Pet., 253; *Cherokee Nation v. State of Georgia*, 5 Pet., 1; *Garcia v. Lee*, 12 Pet., 511; *Williams v. Suffolk Insurance Co.*, 13 Pet., 415; *Brittle v. The People*, 2 Neb., 214.

This conclusion appears to me to be supported by reason, and is in accord with the principles of our government and sound public policy. The judicial department of the government has nothing to do with shaping the policy or forming the institutions of the state, or with protecting it and augmenting its strength. It cannot, therefore, determine any question striking at the validity and binding force of the constitution, under which all political functions which pertain to these matters must be exercised.

The constitution shapes the form of the government, and prescribes limitations upon legislative authority. Under it the political institutions of the state are established; and its policy is foreshadowed by the constitution. The constitution lays the foundation and erects the frame work of the government, which must be completed and finished by legislation in accord with the measure established and plans contemplated by that instrument. It is the source to which the legislative department of the state must look for instructions, limitations and directions, pertaining to the policy of the state. It follows that the validity or existence of constitutional provisions involve political questions.

VII. I will now proceed to inquire what recognition of the constitution will give it life and constitute it the supreme law of the land. Such recognition must be made by authority emanating from the department of the government charged with such duty. Art. 12, Sec. 13, of the constitution declares that it shall become the constitution of the state after it is adopted by a vote of the people, and the result of the vote is made known by the proclamation of the governor. Here is the determination of the fact that the con-

stitution is the supreme law of the land. It is made under authority of the executive, which is of the political department of the state. For obvious reasons the determination must be final. The constitution becomes supreme and, as I have shown, is not subject to destruction by any authority created by it. When once launched into the life of supremacy, its existence can be terminated by no power save that which created it, the sovereign power of the people. No department of the government can thus question its existence. The legislative, the executive, and the judicial cannot separately or together question its existence or resist its authority. The highest interests of the people demand that their constitution shall be permanent. Under the views I have announced, it is subject to change only by the exercise of the sovereign will of the people. Upon this point I shall have something more to say hereafter. These doctrines, I think, will meet with no denial.

VIII. I shall now proceed to enquire whether different doctrines and rules apply to amendments of the constitution. I am clear that they do not. This proposition, though a vital one upon this branch of my opinion, may be established by a brief discussion.

The same sovereign authority—the people—that made the constitution, made the amendment. Different instrumentalities were used, and therein is the only difference between the one and the other. Jameson's Constitutional Convention, sec. 555.

A convention formed the constitution, provided for its submission to the final approval of the people, and declared what officers should canvass the vote, and that a proclamation should be issued by the governor declaring the fact of its adoption. Constitution, Art. 12, Sec. 13.

The amendment was framed by the General Assembly and submitted to the vote of the people, under the provisions of a statute and in accord with the constitution. It is declared that when the amendment is adopted by the vote of the peo-

ple, it shall become a part of the constitution. The board of state canvassers are authorized to declare the result of the election, and the governor is required *to issue* his proclamation informing the people of the result of such election. See Constitution, Art. 10, Sec. 1; Acts 1876, Chap. 114, sec. 2, (Miller's Code, 1198); Acts 1882, Chap. 172, Sec. 5.

It is not denied that the amendment was adopted, promulgated, and declared to be a part of the constitution, as contemplated by the constitution and the statutes. It then became a part *de facto* of the constitution. In the language of Jameson, "the result of submission (to the people) certified and announced" is "the crowning act by which changes in the fundamental law are consummated." See Jameson's Constitutional Convention, Sec. 523.

Recurring to the doctrine I have heretofore established, it will appear that no department in the state can declare it invalid, for it has become a part of the constitution by the recognition of the political department of the state. It is obvious that all principles I have above announced are applicable to the amendment.

I do not fail to observe that one argument I have used, based upon the fact that the whole of the original constitution was adopted at the same election, after proceedings relating to the whole instrument, is not applicable to the amendment. The argument is that the whole constitution would be equally affected by causes of invalidity. It is true. that there may have been irregularities in the proceedings prior to the vote upon the amendment that did not occur in adopting the original constitution. But this fact, and the inapplicability of the argument based thereon to the questions raised by the amendment, can have no effect to detract from the force of the conclusion I have announced.

It may be urged that, in disregarding the amendment, the courts do not defeat the part of the constitution from which their authority is derived, and that the argument based upon the conclusion that, by overthrowing the constitution, the courts

defeat their authority to adjudicate is, therefore, not applicable. If the courts may defeat this amendment, they may defeat all amendments where the same irregularities exist. They could, therefore, defeat an amendment affecting their own jurisdiction. Such an amendment might create the courts. In that case, if the courts held it invalid, they would overthrow their own power and jurisdiction. This I have shown cannot be done.

There is no limit to the number of amendments which may be proposed and adopted in the manner contemplated by the constitution. By changes of the constitution in that way, the government may be reorganized, the authority of departments changed or taken away. New courts may be created to take the place of old ones, and, indeed, the distribution of powers to the different departments may be wholly reformed. These changes could be as great as would be introduced by a new constitution, and may be introduced by amendments proposed together by the same acts of the legislature, and voted upon at the same election, and promulgated at the same time and in the same manner. If the courts may defeat the amendment in question, it may overthrow the numerous amendments in the case I have supposed. It will not be a reply to this position to claim that courts will stop when they reach amendments affecting their jurisdiction. If that be true, we would have the spectacle of courts existing under amendments, notwithstanding irregularities therein, held sufficient to defeat other amendments. Other absurd results could be pointed out which would follow such a conclusion. I forbear to specifiy them. The position, in my judgment, is without the support of sound reason, and in conflict with legal principles.

IX. I will proceed to point out some certain consequences and probable results following the exercise of jurisdiction by the courts to declare of no effect amendments of the constitution of the state. If such jurisdiction rightfully exists, it may be exercised under the same conditions and in the same

manner in cases involving the validity of the amendment as in other cases. Courts may, nay, often do, refuse to adhere to their own decisions, but overrule them, and recognize principles of law diametrically opposed to the rules of their first decision. Instances of this kind often occur in cases wherein grave constitutional questions are involved. The same judges sometimes change their opinions and overrule their own decisions, but more frequently decisions are overruled by reason of new judges taking the place of those who have retired from the bench. A notable instance of this kind is found in the recent history of this court. In 1869, we held a statute authorizing a township to levy taxes in aid of the construction of railroads unconstitutional and void. *Hanson v. Vernon*, 27 Iowa, 29. In 1870, less than two years after that decision, this court overruled it, and a statute identical in effect and in its general provisions, was held to be constitutional. *Stewart v. Supervisors*, 30 Iowa, 9. After the decision of the case first named, two of the judges concurring therein retired from the bench, and their successors, uniting with the judge who disagreed to the first opinion, constituted a majority which overruled *Hanson v. Vernon*, and established other rules of law, the direct opposite of those approved in that case.

Rules of law established by the decisions of this court, until overruled by this court, or superseded by legislative enactment, have the authority and force of statutes. They settle the rights of persons and property, enter into contracts, in short, they constitute a part of the body of the laws of the state.

Another important doctrine of the law must be here stated, namely, decisions of courts do not make law, but simply declare what the law is. The judicial theory is that the law as declared by the courts existed and was of force before the decision, and is to be applied to all rights existing, and transactions occurring, before the decision was made. Rules are recognized which are introduced to modify the harsh effect of

the doctrine in some cases; but none of them reach so far as to hold that property and rights of the citizen, held and enjoyed under the decision of this court to-day, may not be lost, swept away, by the decision of this court to-morrow. These observations are not made in a spirit of condemnation of the doctrine stated. It doubtless is necessary for the efficient administration of the law, and its application does not always operate with harshness, and is not often the source of injustice. Legislative and judicial wisdom have not, and probably never will, devise rules to supersede it. But it is obvious that the correct administration of the law, and proper exercise of the functions of government, forbid that, under the operation of this rule, the government should be disturbed and the constitution be subject to frequent changes.

It is very plain that, if the courts have jurisdiction to declare what is the constitution and what is not, that an amendment to that instrument was or was not lawfully adopted, and is, therefore, not in force, or is of no effect, the constitution will rest in uncertainty. What will be the constitution—the supreme law—to-day, may not be to-morrow. That the rights and property of the people may be perfectly protected and the government be stable, the constitution must be a certain, permanen tinstrument, unchanged and unchangeable, except by the sovereign authority which ordained it—the people.

Nothing is more conducive to the general prosperity of the state than stability of its constitution and political institutions. Of course, they should accord with the liberty of the people and the natural rights of the citizen. If they do not, the people, the sovereign power in the state, will change them, and there is no other power that can.

Under the doctrine recognized by the majority of this court, the amendment to the constitution in question is void, and, under the decision, the manufacture and sale of wine and beer is lawful, and no liabilities or penalties are, or can be, incurred therefor. Upon the advent of new judges to the

Koehler & Lange v. Hill.

bench, the decision of this court announced to-day may be overruled, and the amendment may be declared valid and a part of the constitution, the supreme law of the state. Such decision would have the effect to declare that the amendment was valid and a part of the constitution from the first; that it was the supreme law of the state during the whole time the decision of this court announced to-day shall stand unreversed. The citizens will then find that they are burdened with liabilities, and probably subject to penalties for acts which they are taught by this decision are lawful. Contracts will be then invalid, which, under this decision, are esteemed of force. Surely, in view of these considerations, the decision of this court, leading to such consequences, is to be deplored, and, to my mind, the argument based upon these consequences, supporting my conclusion that the court has no jurisdiction to set aside the amendment, is irresistible. These consequences can be averted in no other way than by limiting the exercise of judicial authority to judicial questions, and forbidding its exercise in the decision of political questions. I have shown that the questions involving the validity of the amendment are essentially political.

The thoughts I have just expressed fitly introduce for consideration in this connection another powerful argument in support of the conclusion that courts have no jurisdiction to determine political questions, to which class the one now under consideration belongs, involving, as it does, the existence of a part of the constitution of the state.

Political questions are such as involve the authority and acts of the departments of the government charged with the duty and power of shaping the policy of the government, of protecting its existence, of preserving its safety and peace, of augmenting its strength, to which the sovereign people committed the task of forming a constitution for their approval, and promulgating it after they have approved the instrument. I have shown that the courts are not charged with these duties and powers. These political questions al-

ways receive the earnest and watchful attention of the intelligent and free people of our state; and the exercise of political powers is observed by them with jealous attention, for the reason that they pertain to the public policy of the state, to the very existence of the constitution of the state, and other matters exclusively of public interest. Upon these questions the people may be, in fact, usually are, divided in opinion, hence arises what is called *politics* in its partisan sense, and the division of the people into what are called political parties. In matters involved in these questions, the people will have their own way. They will, and always do, settle these questions according to the will of the majority, and no department or power of the state can stand up against that will. If courts and judges oppose it, the constitution affords a ready remedy to the people in its provisions for an elective judiciary. They will elect judges who will decide political questions so that the will of the people as to the policy of the state shall be enforced. Judges cannot escape from the control of the people in this manner, be it right or wrong, if they would. The claim that, as they exercise judicial functions, they ought not to be subject to the will of the sovereign people, will not be heard; and the claim that they ought not to be "dragged into politics" will be answered by the assertion that, by entering the dominion of politics in deciding political questions, they must become subject to political control in the partisan sense of the expression. The subject may be aptly illustrated by reference to our recent political history. During the rebellion, there was a division of opinion as to the constitutional authority of the state to do many acts in aid of the national government in the prosecution of the war. Some thought that the war was prosecuted in violation of the constitution of the United States, and that all acts of the government of Iowa, recognizing the war and giving aid to the national government, were unauthorized. Now, all questions as to the existence of war are political in its governmental sense, and they were at that time, and

still are, political, in the partisan sense. . Suppose the Iowa courts had decided against the authority of the state government to recognize the existence of war and to aid the national government in its prosecution, can it be doubted that the people would have overthrown such decisions by changing the judges, or, if that process would have been too slow, by the reorganizing of the courts; and that, to attain that end, special sessions of the General Assembly would have been called with all possible speed? And who would condemn such action ?

If judges decide political questions they must enter the arena of political strife. Nothing can be plainer. No language can be used too strongly condeming such a thing. Judges ought not to be partisans, and be influenced by partisan control; their duty is to interpret and apply the law, to the end that the liberty and the rights and property of the people may be secured. Their duty and authority extend to no political questions. These are to be determined by the political department of the government. How then shall the courts and judges "keep out of politics?" The ready answer discloses a sure way of escape. Let judges confine themselves to the sphere of their constitutional jurisdiction, and decide only judicial questions. In cases wherein arise questions relating to the policy of the government, let them follow the decisions of the political departments, which have exclusive jurisdiction to determine such questions. They will, by pursuing this course, never become subject to political influences. These considerations pertaining to the efficiency and purity of the judiciary, to my mind, support a controlling argument establishing the position that this court has no jurisdiction to inquire iuto the validity of the amendment—a matter that has been conclusively settled by the political authority of the government

X. Unless the people, in the exercise of their sovereign power, control the courts in a constitutional manner, the judiciary may become the supreme arbiter of all political ques-

tions.   This danger is pointed out by Mr. Justice WOODBURY, in *Luther v. Borden, supra,* in language so strong and direct, that I am restrained by my ideas of courtesy and propriety from repeating it on this occasion, or from presenting the thoughts it conveys.  It is certainly true that the way of safety for our government is that course which will restrict each department of the government to the exercise of authority within its particular sphere.

XI.   I have shown that the people make the constitution. As it is impossible for them to meet in assemblies, as did the democracies of the ancient cities, and there frame and adopt their supreme law, the constitution, it becomes necessary for them to choose representatives, to frame the constitution and submit it for approval by a vote of the people themselves. The constitutional convention, and the General Assembly in proposing amendments, was each constituted by the people their representatives, charged with the duty of framing and submitting for approval, the constitution in one case, and the amendment in the other.   These functions and powers are the same.   Jameson's Constitutional Convention, § 555.   The legislature was required to frame an amendment to the constitution and submit it to the people.   This work was all preparatory to the exercise of the people's sovereign power; that is, the legislature caused to be written out an amendment which if, in the words of the constitution, the people should "approve and ratify," became the constitution.   The act giving life to the instrument was the approval and ratification. Preparatory and preliminary proceedings cannot, after the constitution is ratified and adopted, affect the instrument.   Irregularities on the part of the legislature do not enter into the constitution.   If they did, the people's ratification cures them.   This ratification gives life to this instrument, notwithstanding prior irregularities.

The thought is illustrated by the instance of the irregularities of the act of an agent, a representative of an individual, in preparing and executing a written contract.   If the representa-

tive overstepped the bounds of his authority, or failed to fully discharge it, the ratification and approval of the principal, by adopting the contract, would cure and render of no effect all prior irregularities of the agent. The following authorities support the views I have just expressed. Jameson's Constitutional Convention, § 124; Federalist, No. XL, Ed. 1873, p. 316; *Wells v. Bain*, 75 Pa. St., 39.

In the last case it was held that the court would take cognizance of the action of the constitutional convention upon matters not within its jurisdiction, as the time fixed for the vote thereon, when another time was prescribed by law; but that, touching matters within its jurisdiction, its action was not subject to review in the courts. As the decision of the court bears upon the point now under consideration, as well as upon the question of the court's jurisdiction, I cannot refrain from giving the following language of AGNEW, CH. J., who delivered the opinion of the court: "The convention was clothed with express power to act upon the question of submitting the amendments in whole or in part, having all the neccessary authority to make rules for its own procedure, and to decide upon all questions falling within the scope of its authority. The power over the manner of submitting amendments is expressly conferred in the fifth section. It is true, the law gives to one-third of all the members a right to require a separate submission of any amendment. But while this right is awarded to a majority of the body, it is one upon which the convention itself must act, and it must act according to its own rules of procedure. The question of a separate submission being one committed to the whole body, of which the requiring third is itself a part, it must be presumed that the decision of the body as a whole was rightly made, and, either that the request was not made by a full one-third of all the members, or, if made by one-third, it was not in a regular or orderly way. It would be a violent presumption to suppose that the body would willfully disregard their own oaths, as well as a full and orderly request. And, if they did this wrong,

no appeal is given to the judiciary, and the error can be corrected by the people themselves, by rejecting the work of the convention. If the people, notwithstanding, chose to ratify their work, with them lies the consequence. Mere errors of procedure will then be of no avail. The convention, having in that matter acted within the scope of its undoubted power, we must take its decision as final, and leave correction to the power to which it belongs."

This case does not support the position that courts have jurisdiction to inquire into the validity of constitutions. It holds that a constitution must be submitted at an election conducted in the manner prescribed by law, and that the convention framing it, in the absence of any authority conferred upon it so to do, cannot fix the manner of conducting the election different from the requirements of statutes. It does not hold that, if the constitution had been adopted at such an election, recognized and promulgated by the political department of the state, the courts could inquire into such irregularities. The constitution had not been adopted; no election had been had to vote upon it, when the case was decided, and, of course, no such question could have been raised in it. The case was at *nisi prius*, and was to restrain the commission appointed by the convention from holding an election in the city of Philadelphia, on the 3d Tuesday of December, 1873, to vote upon the adoption of the constitution. The decision was made on the 2d day of December, 1873.

XII. It is not necessary, in order to support the position that the courts have no jurisdiction to inquire into the existence and validity of a constitution, to go to the extent of holding that a constitution, or an amendment thereof, framed and submitted for the approval of the people by a convention or legislature, without any pretense of authority from an existing constitution or government, or in contravention of rules prescribed by such constitution or government, controlling the choice of the members of the convention, or direct-

ing the concurrence of the legislature in the act of framing and submitting the constitution to the vote of the people, and the like, must be accepted by the courts as the constitution of the state. Nor would a constitution be so accepted, where the people failed or refused to approve and ratify it. Whenever the violation of the constitution or law by the convention or legislature is of such character as to defeat their jurisdiction, or when, by reason of non-compliance therewith, these bodies acquire no jurisdiction, their proceedings are void, and the courts of the state may disregard their acts. But mere irregularities, or even violations of law, in matters whereof they have jurisdiction, will form no ground for interference on the part of the courts.

But however irregularly a constitution may be formed and submitted to the people, even though no authority therefor was had under a prior constitution and laws; nay, though it was done in contravention of existing laws, if the constitution or amendment be adopted and ratified by the people, and regarded by the existing political authority of the state, and thus becomes, *de facto*, the supreme law, the courts must accept it as the constitution of the state. Were the rule otherwise, conflicts would arise between the political and judiciary departments of the state. But the constitution contemplates harmony in the several departments of the government, and the courts must, therefore, accept the constitution recognized by the political department of the state. The history of the formation of the constitution of the Union and of the states shows that, in many instances, they were framed and submitted to the people without authority, or in contravention of express constitutional provisions. I have not time to recite instances of this character. The subject is clearly and pointedly discussed in Jameson's Constitutional Convention, a work highly regarded by statesmen and the legal profession. But in no case, I may safely assert, where a constitution, or a constitutional amendment, has been adopted by the people and recognized and promulgated as the constitution by the

political department of the state, have the courts ventured to declare it invalid.

The conclusion I reach upon the question of the jurisdiction of the courts, of course, settles the case. It is proper to say that the question was not brought to our attention upon the first argument, and it did not occur to me upon my investigation of the points upon which the case was submitted. It was not, therefore, noticed in my first opinion.

XIII. Upon an examination of the case, I am satisfied that my conclusion upon the points discussed in my first opinion are sound. Even if I am mistaken on this subject of jurisdiction, I am confident that I am supported in my conclusions by the points I presented in my first opinion. Several authorities have fallen under my observation, and many arguments have occured to my mind, since I prepared that opinion, which support my conclusions therein announced. Some of them I propose to present in connection with answers to the arguments of the majority of the court, as expressed in the opinion of Chief Justice DAY. I pursue this course for the sake of brevity; at the same time, I believe it will enable me more clearly to present the new views and authorities I have at hand.

In support of the sixth point of my former opinion, which maintains that the Nineteenth General Assembly was charged with the duty and authority to determine whether the proceedings were had, which are prescribed by law to be had, preliminary to the action of that body in submitting the amendment to the people, I need, I think, to advance but one additional argument, which is based upon a clearly expressed legislative requirement that at least one preliminary act, giving the Nineteenth General Assembly jurisdiction, should be determined by that body. It is this: Chap. 114, Sec. 1, Acts of 1876 (Miller's Code, p. 1198), provides as follows:

"That whenever any proposition to amend the constitution has passed the General Assembly and been referred to

the next succeeding legislature, as provided in Sec. 1, Art. X, of the constitution, the secretary of state shall cause the same to be published in two newspapers of general circulation in each congressional district in the state, for the time provided in Sec. 1, Art. X, of the constitution; and the fact of such publication having been made shall be verified by the affidavits of the publishers of such newspapers, and such affidavits, together with the certificate of the secretary of state that he had designated the newspapers in which the publication was made, shall be filed, preserved, and recorded in a book kept for that purpose in the office of the secretary of state; and the secretary of state shall report his acts in the premises to the next succeeding General Assembly."

Under this provision the secretary of state is required to designate the newspapers in which the proposition shall be published, and to file and record the proofs of publication, together with his certificate showing the newspaper designated by him. He is required to report his action to the General Assembly last acting upon the proposition. This contemplates that he shall report the record kept by him as required by the statute just quoted. Now, it cannot be doubted that the object of the provision was to inform the General Assembly of what had been done in the way of compliance with the law requiring publication. The law thus provides that all matters pertaining to the publication shall be made known to the General Assembly. Why should it be informed upon these facts? For no other reason than that it is required to determine whether the law regarding publication had been complied with so that it acquired jurisdiction.

Now, surely, if the General Assembly was not clothed with the authority to decide upon this matter, no such requirements would have existed. If the secretary of state was clothed with authority of deciding it, he would have been required to certify his decision, and not the facts. But no such requirement exists. I think it cannot be doubted that this provision contemplates that the General Assembly shall de-

cide upon the question of compliance with the law in regard to publication. Now, it would be strange, indeed, if this question is to be determined by the General Assembly, and all other questions pertaining to their jurisdiction should be left *in nubibus*, without authority anywhere to determine them.

But, under familiar principles of the law, the Nineteenth General Assembly was required to determine the regularity of all prior proceedings. It could lawfully act only in case prior proceedings complied with the law. The proposed amendment was "referred" to it by the Eighteenth General Assembly, Constitution, Art. X, Sec. 1. That reference carried with it all matters connected with the regularity of prior proceedings. A different view would require the legislature to act upon the proposition, even if all proceedings connected with it were utterly illegal. The law in no case countenances such proceedings. Its officers and ministers are the direct representatives of the people, who discharge legislative functions, and are required to act with intelligent deliberation, which will discover their authority and disclose the existence of facts whereon that authority rests.

XIV. In support of the seventh point of my first opinion, which maintains that, as the Nineteenth General Assembly was clothed with authority to determine the regularity of the preliminary proceedings had before they could act, their determination is conclusive, I will add the following thoughts: It is a well settled rule that the decisions of all courts, special tribunals, and officers which have jurisdiction of matters involved in proceedings before them, are held to be conclusive in all collateral proceedings, as long as they stand unreversed by direct review. It is admitted that the law has provided no proceedings to review the action of the General Assembly. The following authorities, in addition to those I have before cited, supports this position. *Town of Coloma v. Eaves*, 92 U. S., 484; *Virginia v. W. Virginia*, 11 Wall., 39; *Gaines v. Thompson*, 7 Wall., 347; *Johnson v.*

*Towsley*, 13 Wall., 72; *Secretary v. McGarrahan*, 9 Wall., 298; *French v. Fyan*, 93 U. S., 169; *Carpenter v. Montgomery*, 7 Blackf., 415.

The rule is applied in cases where the liberty of the citizen is involved. The action and decisions of courts and legislative assemblies committing offenders guilty of contempt, when jurisdiction is possessed of the person and of the offense, will not be reviewed by *habeas corpus*, the decisions being regarded as conclusive. *Anderson v. Dunn*, 6 Wheat., 204; *Ex-parte Kearney*, 7 Wheat., 38; *Brass Crosby's Case*, 3 Wilson, 188; *Howard v. Gossett*, 10 Add. & E. (N. S.), 359; *Burdett v. Abbott*, 14 East, 1; *Sheriff of Middlesex*, 11 Ad. & E., 273.

Of course, if a legislative body or a court has no authority to punish a particular act, as for contempt, and it is not in fact regarded by the law as a contempt, no jurisdiction attaches, *Kilbourn v. Thompson*, 103 U. S., 168. But whenever jurisdiction over the particular act is possessed, the commitment is conclusive and will not be reviewed.

In *Hawkins v. The Governor*, 1 Ark., 576, it was held that the judiciary have no jurisdiction to interfere with other departments of the government in the discharge of political duties. The court says: "All departments of the government unquestionably have the right of judging of the constitution and interpreting it for themselves." If the law provides no direct proceeding to review the action of the political departments in the courts, their action must be conclusive in collateral proceedings. It is admitted that the law provides no way to review the action of the General Assembly in proceedings involving constitutional amendments.

XV. The ninth point of my first opinion maintains that the provision of the constitution, to the effect that a proposed amendment shall be entered upon the journal, does not require it to be copied in full. The purpose of the language of the constitution, in my opinion, is to secure an entry of the yeas and nays, thus showing the votes of members

of the two houses. The language of the provision is that "the proposed amendment shall be entered on the journal with the yeas and nays taken thereon." We are required to interpret the language here used as it is always understood in legislative practice and proceedings. In the absence of aid from this source, the meaning of the provision as to yeas and nays would not be understood. The direction that the yeas and nays shall be entered means, in the parliamentary language, that the name of each member shall be written on the journal, indicating his vote either yea or nay. It does not mean that the number only of the yeas and nays shall appear; it does not mean that the full name of the member shall be written out, for the reason that the language is not so understood when applied to parliamentary proceedings. We surely must interpret the whole provision in the sense of the language when applied to parliamentary proceedings. This conclusion is based upon familiar rules of statutory and constitutional interpretation. Now, if we apply this rule to one part of the provision, to the requirement as to the yeas and nays, we should apply it to the other part, and in that way learn what the word *enter* means, when used in reference to parliamentary proceedings. Under the rule of construction just referred to, we must seek for the meaning of the word as it is used in the constitution and laws of the state, and where used in relation to parliamentary proceedings. I have shown in my first opinion that no instance can be found, where it is used without qualifying words in our statutes, in which it means to copy or write in full.

It is, I think, a uniform practice of legislative assemblies to enter all matters required to appear on their journals by description or titles, unless otherwise specially ordered. So far as I am able to discover, this is the practice prevailing in the General Assembly of this state.

A rule prevailing in Congress (number 131 of the Rules published in 1863), provides that "members having petitions and memorials to present may hand them to the clerk, en-

dorse the same with their names and the reference or dispo-
sition to be made thereof; and such petitions and memorials
shall be *entered on the journal*, subject to the control and
direction of the speaker, etc."

Under this rule, the uniform practice has been for years to
make the entry by stating briefly the relief sought or the ob-
ject prayed for, and the name of the petitioner, if one only
signs the petition, or, if more, the place of residence of the
petitioners, without their names. This statement I have
verified by an examination of the printed journal published
during a period of time when this rule was in force.

The argument based upon the thought that the proposi-
tion should be entered in full upon the journals, in order to
give notice to the people and to the succeeding General As-
sembly of the precise form of the amendment to be voted
upon by the people, fails in support from the facts. It is to
be presumed that the framers of the constitution were fa-
miliar with parliamentary proceedings and the language of
legislative bodies, and well knew the habits of our people.
They knew that, in a parliamentary sense, as well as in the
statutory sense, the word *enter* does not mean to copy in
full, that it means a note or memorandum describing by its
title, or otherwise, the paper to be entered, and that no one
in the state ever consulted the journals for the purpose of
gaining information relating to the acts of the respective
houses of the General Assembly, further than as to the votes
of the members. The journals are of limited circulation, and
are not sought after by officers of the state or the people.
They are not usually read by any citizen for any purpose.
It surely could not have been in contemplation of the framers
of the constitution that the people would gain information
of the proposed amendment from the journals. On the other
hand, the statutes of the state are the source of information
to which all the people resort for knowledge touching the
legislation of the state. These statutes are extensively cir-
culated, and present the laws in a form that is readily acces-

sible to all. The joint resolutions of the General Assembly are published with the statutes. This has always been the practice in Iowa, beginning with the first territorial legislature. Indeed, it appears unreasonable to suppose that the framers of the constitution intended the proposition to amend the constitution to be copied into the journals of the General Assembly for the information of the people. But inasmuch as the journals are the proper record of the votes of the members of the General Assembly, whose constituents have a right to know, and an interest in knowing, how they voted, the constitutional provisions requiring the proposition to amend the constitution to be "entered upon the journals with the yeas and nays taken thereon," was intended to provide for a record of the votes of the General Assembly. The entry of the proposition by its title, with the yeas and nays, in the manner recognized and practiced by legislative assemblies, is what the constitution requires. It has been complied with in the case of the amendment under consideration.

XVI. An ancient yet familiar maxim of the law is expressed in this language: "All acts are presumed to have been rightly and regularly done." The maxim applies to acts of all officers of every department of the government, and, indeed, to the acts of private persons. It is unnecessary to cite cases to show that proceedings of the legislature are within its scope. The presumption always prevails that men will act honestly, and duly discharge all duty, whether imposed by law or morals. The law regards every citizen as honest, and every officer of the state as patriotic and faithful in the discharge of public duties. Hence, the acts of all men are presumed, in the language of the maxim, "to have been rightly and regularly done." Surely, it will not be expected of me to cite cases to support the authority of this ancient maxim. Under it, if an official act is done in the exercise of lawful authority, all preliminary and preceding acts are presumed to have been regular, until irregularity is proved. Under this presumption, all uncertainty as

to the regularity of the acts in question will be solved in their favor. Thus, if the record of official proceedings shows that an act was done, or an order made, which would arrest all future proceedings until its effect should be removed by another act or order, and the officer proceeds as though it were done, yet the record fails to show it, the law will presume the existence of regularity, and that the effect of the act or order was removed by proper proceedings. Thus, if a court should order a continuance of a case and afterwards, at the same time, it appears that the parties went to trial, it would be presumed that the order for the continuance was set aside. So, if a default should be entered, and the record shows that subsequently the defendant pleaded, and a trial was had, and a verdict rendered against the plaintiff, it would be presumed that the default was set aside. But it is useless to illustrate the maxim under consideration. It may be stated in general terms that, when an officer is charged with the duty of performing certain preliminary acts before an ultimate act is done, the law will presume that the preliminary acts were done; and if, according to the course of business of an officer, or according to the rules of practice of a court, such preliminary acts may be done, and are not shown by the record, the law will presume they were done according to the course of business or rules.

I will now proceed to show that under these rules the fatal words "or to be used," which, in the view of the majority of this court, are so potent as to overthrow a part of the constitution adopted by the people, and recognized and promulgated by the political authority of the state, will be held by the law to have been stricken out of the substitute of Senator Heminway, before it was finally adopted by the senate.

Under the plain language and unquestioned spirit of the maxim cited above, these mischievous words must be presumed to have been stricken out, for the very plain reason that the passage of the resolution in the form of its enrollment, the ultimate act, could not have been regularly done

if the words remained. . Hence, as in the case of the order of continuance, or the default above supposed, the law will presume in favor of the regularity of the proceedings, that the words were, in some manner in accord with rules of legislative proceedings, eliminated from the substitute, the adoption of which, without the words, was the ultimate act shown by the enrollment in the archives of the state; and the presumption is entirely in accord with the rules of parliamentary proceedings, and does not necessarily contradict the journal entry. At any time while the substitute of Senator Heminway was under the control of the senate, the words, "or to be used," could have been stricken out by general consent, without the formality of a vote in any form. See Cushing's Manual, sections 21, 164, 316. Of course, in cases where acts of a parliamentary body are done by general consent, there is no motion and no vote; hence neither motion nor vote upon striking out the words, could have been entered in the journal, for there was nothing of the kind, and an order for striking out the words would not appear upon the journal. Cushing's Law and Practice of Legislative Assemblies, section 1793. It follows, therefore, that the words, "or to be used," could have been struck out without that act appearing, in any form, upon the journal. After general consent was had, in pursuance thereof the words would have been stricken out of the Heminway amendment. This required no entry to be made by the clerk keeping the journal. Under the maxim and doctrine above stated the law will presume that the words were stricken out. It must be remembered that the journal does not show that the words were not stricken out, it is, therefore, not contradicted by this legal presumption. Cushing's Manual, cited above, by statute governs the proceedings of the General Assembly. Code, § 27.

XVII. I will now present additional considerations which support the position advanced in the tenth point of my first opinion, to the effect that the enrolled joint resolution is the authoritative and conclusive expression of the legislative will,

behind which courts cannot go. This position is resisted in both the first and supplemental opinion of the majority, on the ground that there is no requirement, either in the constitution or statutes of the state, to the effect that joint resolutions shall be signed by the presiding officers of the respective houses of the General Assembly and be enrolled.

As is stated in the first majority opinion, "no provis ion is made in the constitution or statutes for the enrollment of a bill, act, or joint resolution which has passed the General Assembly." It is, in another connection in the same opinion, incorrectly stated that "there is no provision of the constitution, nor is there a statute, which, by implication, requires that a joint resolution proposing to amend the constitution shall be signed by the presiding officers of the two bodies." Upon this position as to the provisions of the law, the majority conclude that the enrollment of a joint resolution has not the force and effect of an enrolled bill. It is conceded by the majority that the enrollment of each is required by the law, on the ground that it was the practice at the time of the adoption of this constitution, that is, it is a provision of the parliamentary law which is not repealed, but rather recognized by the constitution. But, because there is no requirement that the joint resolution shall be signed by the presiding officers of the two houses and approved by the governor, the enrollment does not impart to it the authenticity and force as evidence of the legislative will, that is imparted by the enrollment of a bill.

In the first place parliamentary law regards bills and joint resolutions in the same light. Cushing, in his work on the Law and Practice of Legislative Assemblies, section 2403, uses this language: "A form of legislation which is in frequent use in this country, chiefly for administration purposes of local or temporary character, sometimes for private purposes only, is variously known in our legislative assembly as a joint resolution, a resolution, or a resolve. This form of legislation is recognized in most of our constitutions, in

which, and in the rules and orders of our legislative bodies, it is put upon the same footing and made subject to the same regulations with bills properly so called. In congress, a joint resolution, which is the name given in that body to this kind of legislation, is then known as a bill."

Unwritten laws, by which expression I mean laws not in the form of statutes, are established by custom and the course of practice of the people or the government acting under and in recognition of such laws. Parliamentary law is mainly established in that way, as there are few statutes pertaining to the practice of parlianentary bodies. When a practice has continued for a long time, and has never been questioned or varied from, it is regarded as authorized by law; indeed, the custom under which the practice is had has the force of law. Since the beginning of the territorial existence of Iowa, it has been the custom of all legislatures, territorial and state, to regard joint resolutions as bills. Under this custom, which, as I have shown, is in accord with parliamentary law, joint resolutions have been signed by the presiding officers of the two houses, approved by the governor, and enrolled. In this respect there has been no variation of the practice.

At the first session of the territorial legislature, commencing in 1838, twelve joint resolutions were passed, the first on the 27th day of November. All were signed by the presiding officers of the houses and approved by the governor. In subsequent General Assemblies, both before and since the admission of the state into the Union, joint resolutions have been frequently passed. Their number reaches nearly five hundred, yet in every instance have they been signed by the presiding officers of the houses and approved by the governor, except in one or two instances, when executive approval was withheld, as in the case of a bill, and also enrolled. I conclude that, under the well established rule of parliamentary law, joint resolutions are included within the term "bills."

Now, parliamentary law was in existence when the constitution was adopted, and the words bills, when used in it, must be understood in the sense it bears when used in that law from which it was borrowed. When we find the word bills in the constitution, we turn to the foregoing authoritative statement and practice to ascertain what the term includes. We are there told that it includes "bills properly so called," and joint resolutions. The principles upon which these positions are based are admitted in that part of the majority opinion just referred to. I am sure it will not now be denied.

Article 3, sections 15–16 of the constitution provides that "bills" shall be signed by the president and speaker of the respective houses, and approved by the governor. As we have seen, the word *bills* includes joint resolutions. So joint resolutions, under the requirement of the constitution, must be signed by the presiding officers of the two houses and approved by the governor.

Does the law require that a joint resolution shall be enrolled? The majority admit that it does, as I have above shown, on the ground that such is the requirement of parliamentary law. But in the case of a joint resolution containing a proposition to amend the constitution, there is a statute contemplating such enrollment. Code, section 61, provides that the secretary of state "shall have charge of and keep all the acts and resolutions of the territorial legislature and General Assembly of the state, the enrolled constitutions of the state," etc. The statute contemplates that the constitution is enrolled. Of course the whole constitution is enrolled. An amendment becomes a part of the constitution. It must be enrolled; otherwise the whole instrument would not be enrolled.

I conclude, therefore, that the constitution, in explicit language, requires the joint resolution proposing the amendment to the constitution to be signed by the presiding officers of the two houses and approved by the governor; and that

not only is the enrollment required under the practice prescribed by parliamentary law, but is contemplated by the statute.

We have the joint resolution signed by the presiding officers of the two houses, and approved by the governor, and enrolled under constitutional and legislative requirement. Here is the enrolled bill, the ultimate expression of the legislative will, in the form, and authenticated in the manner, prescribed by the constitution and statute, and yet the majority of the court think it evidence inferior to the journals of the houses, for the only reason that the constitution requires the amendment shall be "entered" upon the journals which, in their opinion, can only be done by copying it in full.

If it were conceded that the constitution, by the use of the word "enter," required the amendment to be copied in full upon the journal, in view of the foregoing conclusions that the signing of the joint resolution by the presiding officers, its approval by the governor, and its enrollment, are required by the constitution, the enrolled resolution must be regarded as the ultimate expression of the legislative will. The *entry* in the journal is but preliminary to the ultimate acts, the signing, approval and enrollment, which the constitution and law prescribe as the final expression of the legislative will. This, under the plainest principles, cannot be defeated by an omission to do the preliminary act. In this view the requirement to enter was not jurisdictional. It was in the nature of a requirement pertaining to proceedings to be had prior to the ultimate and final act of the General Assembly. The enrollment, after the authentication by the presiding officers of both houses and approval by the governor, all being required by the constitution and the law, cannot be questioned or impeached, for it is the ultimate expression of legislature will, behind which no court can go.

XVIII. The first position taken in the majority opinion is, that *Luther v. Borden*, 7 How., 1, and other cases which

I have cited, are not applicable in principle to the case now before us. A lengthy statement of the history of the Dorr rebellion is made in the opinion. Whether it be fully accurate, I will not inquire. Surely, my brothers will not claim that, because the Dorr rebellion was not founded upon just cause, and the Dorr constitution was not lawfully adopted, and the government established thereby, in the language of the majority, "had but a short and ignoble existence," these facts, stated by the Chief Justice with so much emphasis, have anything to do with the questions of law decided by the courts.

It is true, and the facts are shown by the statements of the case found in the majority opinion, that one of the parties to the action, the defendant, contended that the *charter* was the paramount law of Rhode Island, and the government established thereunder was *the* government of the state, while the plaintiff maintained that the Dorr constitution was the authoritative constitution of the state, and the government established by it was the rightful government. The question upon which the case turned involved the validity of the Dorr constitution. If it was valid, the charter had no authoritative existence. But it was held that this was a political question which the court had no jurisdiction to decide. The merits of the case were not considered; it was disposed of upon the question of jurisdiction, and no other. The case involved the validity of the whole of the Dorr constitution. Can it be supposed that, if the validity of but a part was in question, the case would have been differently decided? And if that part had been an amendment, would not the result have been the same? Or, suppose we consider the case as involving the validity of the charter, which is the fact, the case is the same. And if a part of the charter, being an amendment thereto, had been involved, no different result could have followed. The court decided that it had not jurisdiction to determine a question involving the organic law of the state. It is plain that the jurisdiction would not attach if the case involved

only an amendment to that law, and this is the only distinction between that case and the one before us.

The majority opinion states a distinction in this language: " In that case (*Luther v. Borden*) the authority of the court was invoked for the admission of oral evidence to overthrow the existing government and establish a new one in its place; in this case same authority is invoked, simply to preserve the existing constitution intact." For the present, admitting the language quoted to be correct, it expresses, as plainly as words can, that the dispute in Rhode Island involved the question, which was the constitution of the state, the charter or Dorr's constitution. And the controversy in this state relates to the validity of the constitution in a certain form.

It is clearly shown by the language quoted that both cases involve the question of the existence of a constitution—the whole constitution in one case, and a part of the constitution in the other.

The language I have quoted has not the merit of the highest ingenuousness. It aims to gather strength for the views of the majority in the merit of sustaining old constitutions in Rhode Island and Iowa, when, in fact, the merits of the old and new constitutions, in neither state, has anything to do with the case. It is surely an incorrect statement, from the standpoint of the majority, to assert that the question before us is whether our constitution shall be maintained *intact;* that is, kept from injury, left complete; thus claiming that our constitution is injured, rendered incomplete by the amendment. Speaking from my standpoint, there might be an apology for the language, as the following considerations will make plain: The amendment has been adopted by the people in the form prescribed by law, and has been recognized and promulgated by the political department of the government, as required by the constitution and the statute. It has, therefore, become a part of the constitution. The conclusions of the majority overthrow a part of the constitution; my conclusions preserve the whole "intact." If there is anything to

be gained from the position of the majority, as announced in the language just quoted, to the effect that there is great merit in preserving the constitution "intact," it comes to my support, and not to theirs.

Suppose the government of Rhode Island had recognized the Dorr constitution, can it be doubted that, under the doctrines of *Luther v. Borden*, the courts would have held it to be the valid constitution of the state, and would not have gone behind that recognition to inquire into the regularity of its adoption?

The doctrine of *Luther v. Borden* is applicable in principle, whatever court, whether state or federal, is called upon to decide upon the validity of a constitution. The quotation found in the opinion of the majority from that decision, to the effect that the United States courts will follow the decisions of the state courts, in cases involving state law and state constitutions, is advanced as another ground upon which the decision is sustained. It does not in any way affect the other point decided, namely, that the question of the validity of a state constitution is political in its character and nature, and will not be decided by the courts, either state or federal.

Upon the question of the applicability of *Luther v. Borden*, and other cases announcing the same doctrines, to the case before us, the only real question of dispute is this: Do the doctrines apply to the case of the amendment of the constitution? I have pointed out in so many forms of argument that the question of the existence and validity of a part of the constitution is a political question, in no respect differing from the question of the existence and validity of the whole constitution, that nothing more need be said in this connection upon the subject. It would not be profitable to quote from the cases I have cited, to show that they hold that the courts have no jurisdiction in political cases, and that the question of the validity of a constitution is to be settled by the political department of the government.

Reference is made in the majority opinion to the presiden

tial electoral commission of 1876. It was a special tribunal, organized by the political department of the government, to decide a political question. It surely ought not to be urged, as is done in the majority opinion, that this was a judicial decision which establishes the authority of the courts to decide political questions, or that it illustrates the great public good which may result from the courts assuming jurisdiction of such questions. It was, in fact, a political tribunal; that is, a tribunal organized to decide a great political question. While it cannot be doubted that patriotic motives prompted Congress to create the tribunal, and the country, through that instrumentality, probably escaped a serious partisan conflict, which I cannot believe would have resulted in civil war, the policy of including judges in the commission is subject to great doubt. It is certainly true that many intelligent citizens are of the opinion that their connection with the commission tended to impair the confidence to which they are entitled from all the people.

XIX. Much is said with great force and earnestness, in the last opinion of the majority, about the evils which would result from changing the constitution in a manner not authorized by that instrument. This is denomniated revolution, which would be consummated by force of arms. In the course of my opinion I have advocated no position which sustains the thought that the constitution can be lawfully changed under its provisions except upon a substantial compliance therewith. But the question whether there has been such compliance, is for the political department of the government to decide, and not for the judicial. I have said, if the change is recognized by the political department of the government, however it was effected, the courts must follow that recognition, and cannot defeat the constitution as existing and recognized by the government. It is true that if, without authority from the prior constitution, a change is made by the ratification of the people, which is concurred in by the political department of the government and by the

people, this may be called a peaceable revolution. But I cannot see that any odium ought to be thrown upon the principle I state, by the use of the word revolution to designate the change in this way. If there is resistance to such change, the question would be settled by an appeal to arms, and those citizens who would oppose the existing government and constitution recognized by that government, would be the rebels. Happily, under the wise provisions of the constitution of the United States (article IV, section 4), the national government would interfere and protect the state from internal strife. This would be done upon the application of the existing government, and the federal authorities would recognize it, under the decision of *Luther v. Borden*, which is in accord with the fixed policy of the United States government.

We have discovered that there may occur two classes of revolutions, one accomplished peaceably, the other by arms. There may occur a revolution under other circumstances, which requires a place in a third class, under another designation. This would happen when a constitution is changed or altered in pursuance of a prior constitutional provision, and with the intention on the part of the people and the government to comply therewith, and the change and alteration is recognized and promulgated by the political department of the government, holding that the constitution and laws have been complied with in making the change. Thereupon, the courts, disregarding the action of the political department of the government in making and recognizing the change in the constitution, set aside the constitution adopted by the people and recognized by the political department of the government. This would be a judicial revolution. A revolution of that character is accomplished by the decision of the majority of the court in this case. Peaceful it will be, for the law-abiding, intelligent and patriotic people of Iowa never resist the law or decisions of the courts. They know well that they have a remedy, peaceful and efficient, through

which they can establish a constitution in accord with their will.

XX. The dangers of internal strife, and its effects if inaugurated, are forcibly, and with more eloquence than calmness, depicted in the last opinion of the majority. It is claimed that, if the judiciary do not exercise jurisdiction, there may be a conflict of arms between contending factions, and that to avoid this result the courts must be clothed with the authority to decide political questions pertaining to the existence of the government. We are to infer from that opinion that the majority of the court believe that the decisions of courts possess some magic power which will soothe and subdue the passions of the people when aroused upon political questions. We are to infer that the majority think the excited people will obey decisions of courts upon political questions, and will utterly disregard the decisions of the legislative and executive—the political departments of the government. The history of the past shows that good citizens will obey all departments of the government, and that those who may resist the law and rebel against the government have no more respect for the judiciary than for the other departments of the government.

My brothers seem to think that, if there were such a state of affairs in Iowa that the amendment to the constitution would be resisted, after being recognized by the political department of the government, the rebellious spirit and purpose would be subdued by a decision of the courts. I have never observed an instance in history where the spirit of rebellion was subdued by judicial decisions. But the majority of the court, by their decision, make resistance to the amendment impossible, by doing what they seem to fear might be done by rebellion. They overthrow the amendment by their own decision.

XXI. The majority opinion contains much and cites much from the authorities, to the effect that a constitutional amendment must be made in accord with constitutional and

statutory provisions. Now, upon this proposition, there has been no dispute in this case. It is not denied. But the questions upon which there is a difference are these: What acts constitute a compliance with the constitution and laws, and what authority of the state, the political or judicial, is clothed with the jurisdiction to decide these questions? I surely do not claim, and have not heard it claimed in the case, that, in the amendment of the constitution, the laws, both constitutional and statutory relating to that subject, must not be followed. But the political department of the state is alone clothed with the authority to determine whether they have been pursued.

Surely, the statement that, if the people adopted a constitution without authority of a prior existing constitution which is recognized by the political department of the government, the courts cannot set it aside, is not a warrant for the assumption that, by making such a statement, the claim is set up that the prior constitution may be disregarded by the convention or General Assembly which undertakes to submit to the people a proposition to amend the instrument under its provisions. The statement is intended to illustrate the exclusive jurisdiction of the political department of the state in recognizing and promulgating a new constitution, or an amendment thereto.

XXII. A brief examination of the authorities cited by the majority in support of the position that the courts have jurisdiction to declare void an amendment of the constitution recognized by the political department of the government, will clearly show that they have not that effect. The citations from Cooley's Constitutional Limitations are to the effect that changes in the constitution must be made according to provisions of existing laws, constitutional or statutory. But it is nowhere in these extracts intimated, that the political departments of the government are not clothed with exclusive jurisdiction to determine whether these laws are complied

with.   The closing sentence, from page 598, seems to indicate a contrary view.

It cannot be inferred from the *Opinions of the Judges*, 6 Cush., 573, that it is therein held that the courts have jurisdiction over the political questions connected with the change of the constitution.   The contrary is to be inferred.   Under the statutes of Massachusetts, the legislature called upon the judges for an opinion touching the duty of that body which contemplated the discharges of political power in changing the constitution.   Under the statute the judges were empowered to answer the questions asked them.   Now the judges advised the political body as to its political duties, but it is nowhere suggested in the answers that the courts have jurisdiction to decide these questions in any case brought therein. The answers cited in the majority opinion are not authority to establish the doctrine advocated.   Besides this, the opinion has not the weight of authority of an adjudicated case.   Judge COOLEY says that such expression of the opinion of the judges "can seldom be satisfactory when made, as they commonly will be, under such calls, without the benefit of argument at the bar, and of that light upon points involved, which might be afforded by counsel learned in the law, and interested in giving them thorough examination."   Const. Limitations, pages 40–41.   *Collier v. Frierson*, 24 Ala., 100, cited by the majority, fails to support the doctrine in regard to the court's jurisdiction upon which the conclusion of the majority is based.   The constitution of Alabama contained a provision in the following language: "Mode of amending and revising the constitution:—

"The General Assembly, whenever two-thirds of the houses shall deem it necessary, may propose amendments to this constitution; which proposed amendment shall be duly published in print, at least three months before the next general election of representatives, for the consideration of the people; and it shall be the duty of the several returning officers, at

the next election which shall be held for representatives, to open a poll for, and make a return to the secretary of state, for the time being, of the names of all those voting for representatives who have voted upon such proposed amendments; and if, thereupon, it shall appear that a majority of all the citizens of this state voting for representatives have voted in favor of such amendments, and two-thirds of each house of the next General Assembly, after such an election and before another, ratify the same amendments by yeas and nays, they shall be valid to all intents and purposes as parts of the constitution; provided that the said prosposed amendments shall, at each of the said sessions, have been read three times, on three several days in each house."

Eight separate amendments were proposed, and all of them adopted by the people, but the last General Assembly required to act upon the propositions failed to ratify one of them. The court rightly held that it did not become a part of the constitution. Attention to the constitutional provision above quoted will disclose the fact, that the ratification of the last General Assembly required to act upon the proposition was intended as a recognition and promulgation of the amendments, just as the announcement of the vote of the people and proclamation is the recognition of the amendment under our constitution. The act of the General Assembly wanting in the Alabama case was essential to the recognition and promulgation by the political department of the government, without which it did not become a part of the constitution. Of this fact the court would take judicial notice, and treat the proposed amendment as no part of the constitution.

In the *State v. McBride*, 4 Mo., 303, two questions were raised by counsel: *First*—that the courts had no jurisdiction of the case. *Second*—that the enrollment was a verity. The court did not discuss or pass upon the first question, simply holding that it would, in the language of the discussion, "look into the matter" and determine whether the action of the General Assembly was had upon a vote of a constitutional

majority. A careful reading will show that the question of jurisdiction cut no figure in the decision. The case was not well considered; there is no discussion of principles or citation of authorities in the opinion.

*The State v. Swift,* 69 Ind., 505; *Westinghausen v. The People,* 44 Mich., 265; the *Prohibitory Amendment Cases,* 24 Kansas, 700; *The Trustees, etc., v. McIver,* 72 N. C., 76; and *State ex rel. v. Timme,* 54 Wis., 318, are cited by the majority with the admission that the question of jurisdiction was not made in the cases. I will surely not be expected to cite the books to support the position that cases are not authority upon points not passed upon in them. There is scarcely a case argued before us in which the authority of some precedent is not questioned, upon the ground that the point it is cited to sustain is not made or decided in it. And in our opinions it is often stated that cases cited to support a disputed question of law do not decide such questions, and are, therefore, not precedents in point. It is never said that, because a question of jurisdiction could have been raised in a case but was not, therefore, the court must have passed upon it. Cases, to be precedents upon questions of law, must not only show that such questions were decided, but that they received proper judicial consideration. As the question of jurisdiction was not raised, discussed, or decided in any of the cases, they are not authority upon the point in support of which they are cited. The majority say: "But the court could not have entered upon an examination of the cases without first determining in favor of their jurisdiction. If they entertained doubts respecting their jurisdiction, it was the duty of the courts to raise the question themselves." How these observations could have been ventured, in view of the fact, well known to every member of this court, that this case was decided by the first majority opinion, without the question of jurisdiction being so much as thought of by one of the judges, I am unable to surmise. Surely my brothers exercise presumption the most liberal, and contrary to prob-

abilities and facts within their own observation, in order to give these cases the force of precedent upon a point that was not made, argued, or decided therein.

In addition to this, the *State v. Swift*, 69 Ind., 505, was decided by a bare majority, there being five judges, two of whom dissented. And the decision holds that the court will take judicial notice of the number of votes at the election, a doctrine that is strange and new. It is known, too, from the current political history of the county, that the character of the decision is questioned on the ground that it was rendered for partisan purposes.

XXIII. The argument of the majority found in their last opinion, upon the question of the conclusiveness of the action of the Nineteenth General Assembly touching the proceedings of the Eighteenth General Assembly, demands brief attention. In the first place, it is justly subject to the criticism that in it is found frequent statements to the effect that the argument in support of my position admits false recitals, etc., etc. The language is used for no other purpose than to convey the impression that there were in fact errors and false recitals, and they are admitted. I must enter an earnest and respectful protest against this manner of argument in a judicial decision. Counsel who in the argument of a demurrer would urge the implied admission of the facts pleaded, to the end that the question of law could be raised, as a ground for overruling the demurrer, would receive reproof from the court. The language to which I am now objecting is justly subject to the same objection. There has been no admission made by any one connected with this case that there is anything false or irregular connected with the proceedings. This and other parts of the majority opinion demand that the truthfulness of all the legislative recitals be vindicated. I point out in my first opinion that the Nineteenth General Assembly had authority to determine the irregularity of the action of the Eighteenth General Assembly, and that abundant evidence was within reach of the members of

that body which support their determination that all proceedings were regular. It is well also to notice that the majority use the words "estop" and "estoppel" in connection with the conclusiveness of decisions of the courts. The words are not properly so used, and convey the idea of no legal principle supporting the opinion of the majority. We never hear the expression used in the law that courts are estopped in the exercise of judicial functions. Parties are estopped to plead or set up matter in an action, on the ground of some prior act or thing which the law calls an estoppel. A judgment of a court may operate as an estoppel against parties. But courts are never estopped in the judicial sense of the word.

XXIV. The last opinion of the majority clearly misapprehends the legal principles upon which my position is based, to the effect that the decision of the Nineteenth General Assembly, as shown by the joint resolution adopted by it, is conclusive. The doctrine relied upon is this: The decisions of all courts, special tribunals and officers, upon facts whereon their jurisdiction is based, is conclusive in all collateral proceedings, while such decisions remain unreversed. It is admitted by the majority that the decision of the Nineteenth General Assembly is within this rule. But it is urged that the courts of the state, as they have unlimited jurisdiction, may inquire into the correctness of the decision of the Nineteenth General Assembly in this case, which is not claimed to be a direct attack, but must be admitted to be collateral. It is said that, because the courts have jurisdiction to determine whether the amendment was constitutionally adopted, they could not exercise that jurisdiction, if they are precluded from inquiring into the facts decided by the Nineteenth General Assembly; therefore, it is argued, the courts have authority to disregard the decision of the Nineteenth General Assembly, and decide upon the facts adjudicated upon by that body. This is the position fairly stated. Now I presume we are not to have special legal rules for this case,

and, if the position of the majority is correct in this case, it will apply in all collateral cases wherein arises the question of the effect of a court's decision upon facts whereon its jurisdiction is based.    I will apply this position of the majority to other cases.    An action is brought to recover land, the title of which is based upon a judgment.    The record of the court wherein this judgment was recovered shows that the court rendering it decided upon the facts whereon its jurisdiction rested; as, that notice was duly served, and the like. Thereupon the defendant proposes to show that the very matters found by the court rendering the judgment are false— that notice was not served, thus claiming a retrial of the very issues settled by the judgment. · Now the question of the conclusiveness of the judgment comes before this court, on a ruling made upon the question of the correctness of admitting evidence as to the facts whereon the court's jurisdiction is based.    Would this court hold that, as the court wherein the action to recover the land is brought is a court of general jurisdiction—that its jurisdiction extends to everything—that it has jurisdiction to try the title to the land and to inquire into the validity of the judgment whereon the title is based, therefore it cannot be "estopped" to form an issue involving the facts pertaining to the jurisdiction of the court rendering the judgment?    And would this court support this decision by presumptions that the court rendering the judgment decided the facts falsely, and would it use language, inferentially at least, charging that the facts were different from those found by the court rendering the judgment.    Yet the only difference between the supposed case and the one at bar is, that involves the validity of title to land, this the validity of an amendment to the constitution of the state.    The argument of the majority of the court now under consideration is based upon the single assumption that the jurisdiction of courts extend to all matters, and they cannot exercise their jurisdiction if they are "cut short" by the decision of a tribunal upon questions of fact whereon

jurisdiction of the tribunal rests. The argument does not even reach the merit of reasoning in a circle. It asserts the authority of the court to disregard the conclusive adjudication because it has authority to decide the case. The doctrine as to the conclusiveness of decisions of courts and other tribunals is simple and well understood. They are verities, and cannot be disputed in collateral proceedings. The rule extends to the decision of facts whereon jurisdiction is based. The majority of the court disregards it in this case, on the avowed ground that it stands in the way of courts in deciding upon the validity of the amendment, or, more properly speaking, it stands in the way of determining that the amendment is invalid. The majority incorrectly state that nothing will be presumed to be beyond the jurisdiction of the court. Courts of general jurisdiction may determine all questions within the sphere of judicial cognizance. They cannot go outside of the circle circumscribing the subjects of judicial authority. The majority incorrectly state that the argument maintaining the conclusiveness of the decision of the Nineteenth General Assembly is based upon the position that the jurisdiction of the court does not extend to cases involving the validity of the constitutional amendment. The true position is that, if the courts have such jurisdiction, and, in its exercise in this case, it is discovered that the Nineteenth General Assembly decided that all proceedings were regular, that decision being conclusive, the court must hold the amendment valid.

*The People v. Cassels*, 5 Hill., 168, cited in the last majority opinion, has not the remotest bearing upon the question before us. The case was a review by *certiorari* of a *habeas corpus* proceeding to enlarge one committed for contempt. It was held that the recital in the commitment, showing that a contempt had been committed, would not conclusively give the committing magistrate jurisdiction, and that the petitioner could show the recitals false. To give a court or magistrate jurisdiction to punish for contempt, the

party charged therewith must be guilty of an act held by the law to be contempt. The jurisdiction depends on the act itself. If the act is contemptuous, all proceedings are conclusive; if not contemptuous there is no jurisdiction. See *Kilborn v. Thompson, supra.*

The jurisdiction to punish in contempt cases depends upon the very subject of adjudication—the existence of the contempt. Hence, a recital of guilt in a commitment would not be conclusive. It will readily be discovered by a little thought that contempt cases differ from all others in regard to jurisdiction of the committing court or magistrate.

There is another argument which the majority opinion declares is convincing upon this point. It is based upon the well understood legal principle that, when the record of a judgment shows that the court had no jurisdiction, the judgment is void. Thus, if the judgment, or the record of the court wherein it was rendered, affirmatively shows that no notice or process was served, the judgment is void. The majority bring this case within this rule in this way. The journal of the Eighteenth General Assembly shows a failure to comply with the law; the joint resolution of the Nineteenth General Assembly shows that body adjudged the law had been complied with, by the Eighteenth General Assembly. Now the majority say that here the record shows the law was not complied with, and contradicts the adjudication of the Nineteenth General Assembly. What record shows this? The record of the Eighteenth General Assembly, not the record of the Nineteenth. The trouble with my brothers is, they go to the wrong record. They regard the journal of the Eighteenth General Assembly as the journal of the Nineteenth. It may be true that, if the journal of the Nineteenth General Assembly contradicts the adjudication of that body, we would hold that its adjudication is void. But we cannot question this adjudication under the recitals of the record of the Eighteenth General Assembly, which were the very subjects of adjudication of the Nineteenth General Assembly.

My brothers go to the record of the wrong General Assembly to find contradictions of the recitals of the Nineteenth General Assembly. The effect of the argument is to deprive the Nineteenth General Assembly of all power to decide upon the acts of the Eighteenth General Assembly, a power which, in very cautious language, is admitted in the majority opinion. The point may be illustrated in the following manner: A judgment is rendered against A, the return of service and other records show the notice was served on B, the plaintiff, in the judgment, alleging that the return is a mistake and that notice was served on A, instituted proper proceedings to validate the judgment, wherein it is afterward declared and adjudged that service was made on A, and the judgment is valid and binding. Afterwards, in a collateral proceeding to recover land sold upon the judgment as validated, it is claimed that the court entering the judgment of validation had no jurisdiction, because the record of the original case shows no service. This is the precise case before us. The Nineteenth General Assembly declared that the law was complied with; the majority would contradict their ajudication by going back of the record of the Nineteenth General Assembly and bringing before us the very record of the Eighteenth General Assembly, in the proceedings declared correct by the action of the Nineteenth General Assembly. The point demands no further attention.

XXV. It is said that under the rules of the General Assembly there is no authority for enrolling the joint resolution. I may here call attention to the fact that, in parliamentary language which is introduced into the constitution, and, of course, used in the rules of the General Assembly, a joint resolution is a *bill;* that it is so regarded by parliamentary law; that from the beginning of our existence as a territory to the present day all joint resolutions have been approved by the governor, after having been signed by the presiding officers of the General Assembly, and enrolled. And it may be further added, that all amendments of the constitu-

tion, proposed or adopted, have been in the same manner authenticated, approved and enrolled. I wonder to hear this court say, that there is no law requiring joint resolutions to be signed by the presiding officers of the two houses, approved by the governor and enrolled.

XXVI. I am surprised to read in the majority opinion the assertion that "it is impossible to determine from the house journal that the senate substitute ever passed the house. It seems fairly inferable from the house journal, pages 502–3, that the house re-adopted the original Harvey resolution, denominating it the senate amendment." All the foundation there is for this remark is the fact that, upon the return to the house of the substitute for the Harvey resolution, that resolution is set out by way of designating it in showing that a substitute to it had been returned from the senate, and it is expressly shown that the senate substitute did pass.

XXVII. Much is said in the majority opinion about matters not in the record. To one of them I will briefly allude. The original resolution is now in the office of the secretary of state, and has been deposited there, where it should have been from the first, in the manner stated in the majority opinion. I have examined that document, and there can be no doubt on the part of any unprejudiced mind that it is the identical resolution that passed the senate, and was sent back to the house and was passed by that body. It has the indorsement and signature of the secretary of the senate and clerk of the house and enrolling clerk—all genuine, which show that it passed, and is the identical resolution that was finally enrolled and now remains in the archives of the state. It corresponds precisely with the enrolled resolution, and shows that the words "or to be used" were stricken out. In addition to this, the secretary of state declares that he had, at one time, in his possession the substitute in Senator Hemenway's hand writing, which also shows that the words "or to be used" were stricken out. A copy of this paper

appears to have been pasted to the original resolution as a "rider."

If the position of the majority of the court be correct, that there is no law requiring the enrollment of the joint resolution, then this paper is the original, and is the proper resolution for the secretary to keep, as he is required by Code, section 61. It does not affect the character of the instrument, however the record may be regarded by the secretary. The law, and not that officer, must determine its character and custody. As to its absence, and the method of its delivery to the custody of the secretary, this may be said: If it is a record to be kept by that officer, its effect is not impaired by its being irregularly taken, and delivered in a manner described in the majority opinion. If a citizen find in improper hands papers belonging to the custody and records of any officer, he should restore them, and the fact that they have been irregularly taken and retained does not affect their validity, if they bear no evidence of having been tampered with and altered. A case fell under my observation where public papers had been kept from their proper custodian for fifteen years. After their restoration to the proper officer, no question was or could have been raised as to their legal effect. They identified themselves, as the original joint resolution does, and were entitled to full credit, just as though they had been all the time in the proper custody.

But, in my view, the original joint resolution referred to need not be consideration in the determination of this case. The enrollment is to be regarded as the original and ultimate expression of the legislative will, behind which no court can go. The original referred to is unimportant, and its consideration is not necessary to influence my decision. But, in another view, it is a document of vast importance. While it has nothing to do with making judicial decisions, it makes history. Upon it and other evidence which will go into history, as the many copies made on the very day and hour of the passage of the resolution, and the statements of the sec-

retary of state and others, history will record, and the whole world will believe, that the words "or to be used" were not in the resolution but were stricken out before its passage. The decision in this case is that, under rules recognized by this court, which make a legislative journal the conclusive evidence, the will of the people may be defeated by over-throwing truth. A decision having such result, it cannot be denied, is a great strain upon the confidence due the courts.

XXVIII. In both opinions of the majority, arguments are based upon the presumption that the legislative departments of the government will violate the law, and that, therefore, the exercise of authority by the judiciary is necessary to restrain this department within the bounds of its authority. When any department or officer of the government violates the law, the judiciary ought to administer all remedies within its authority. But decisions of courts cannot be based upon presumptions of the disregard of law by any of the departments of the state, or any officer. Judges should presume in favor of the patriotism, intelligence, and honesty of legislators and other representatives of the people. It would be just as reasonable for the legislative department of the government to restrict the exercise of judicial authority, on the ground that judges might disobey the law and fail or refuse to enforce it. I am sure I do not want for respect toward the judiciary of the state. I know that, during our whole history, the courts have inteligently and faithfully administered the law. But I have equal respect for, and confidence in, other departments of the government, and am sure that they have been conducted with equal patriotism and fidelity. The prosperity of the state testifies to the uniform wisdom and fidelity to public interests of the legislative and executive departments of the state government.

The argument based upon distrust of future legislatures ought not to emanate from this court. I have never before seen anything of the kind referred to in decisions of other courts, except to be condemned as improper and unwarranted.

I regret, too, the statements found in the majority opinion, stronger than inferences, that the resolution of the Nineteenth General Assembly is untrue. Courts, in my opinion, ought not thus refer to the action of another department of the government. It should be protected from charges of this character by the presumption of regularity required by the maxim I have stated and commented upon. But this presumption the majority exercise in favor of no official act involved in this case, save that of the journal clerk who failed to strike from the journal the fatal words "or to be used," which the facts and legal presumptions clearly establish, to my mind, ought to have been stricken out.

The majority opinion expresses correct and patriotic sentiments of loyalty and obedience to the constitution, which I fully approve, in eloquent language, which I greatly admire. Regarding, as I do, the amendment as a part of the constitution, these sentiments, in my opinion, condemn the decision of the court, which disregards and overthrows that supreme law, instead of rendering to it support and obedience. While inculcating obedience and respect for the constitution, this court destroys a part of it.

It is painful for me to dissent from the opinion of my brothers, whose learning and ability I so highly esteem. But my convictions, which admit of no doubt, compel me to stand by the constitution as it was ratified and approved by the people, and promulgated by the proper legal authority, thus becoming the supreme law of the state.